IN THE SUPREME COURT OF NORTH CAROLINA

 2022-NCSC-17

 No. 413PA21

 Filed 14 February 2022

REBECCA HARPER; AMY CLARE OSEROFF; DONALD RUMPH; JOHN
ANTHONY BALLA; RICHARD R. CREWS; LILY NICOLE QUICK; GETTYS
COHEN, JR.; SHAWN RUSH; JACKSON THOMAS DUNN, JR.; MARK S.
PETERS; KATHLEEN BARNES; VIRGINIA WALTERS BRIEN; and DAVID
DWIGHT BROWN

 v.
REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House
Standing Committee on Redistricting; SENATOR WARREN DANIEL, in his
official capacity as Co-Chair of the Senate Standing Committee on Redistricting
and Elections; SENATOR RALPH HISE, in his official capacity as Co-Chair of the
Senate Standing Committee on Redistricting and Elections; SENATOR PAUL
NEWTON, in his official capacity as Co-Chair of the Senate Standing Committee
on Redistricting and Elections; SPEAKER OF THE NORTH CAROLINA HOUSE
OF REPRESENTATIVES, TIMOTHY K. MOORE; PRESIDENT PRO TEMPORE
OF THE NORTH CAROLINA SENATE, PHILIP E. BERGER; THE NORTH
CAROLINA STATE BOARD OF ELECTIONS; and DAMON CIRCOSTA, in his
official capacity

NORTH CAROLINA LEAGUE OF CONSERVATION VOTERS, INC.; HENRY M.
MICHAUX, JR.; DANDRIELLE LEWIS; TIMOTHY CHARTIER; TALIA FERNÓS;
KATHERINE NEWHALL; R. JASON PARSLEY; EDNA SCOTT; ROBERTA
SCOTT; YVETTE ROBERTS; JEREANN KING JOHNSON; REVEREND
REGINALD WELLS; YARBROUGH WILLIAMS, JR.; REVEREND DELORIS L.
JERMAN; VIOLA RYALS FIGUEROA; and COSMOS GEORGE

 v.

REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House
Standing Committee on Redistricting; SENATOR WARREN DANIEL, in his
official capacity as Co-Chair of the Senate Standing Committee on Redistricting
and Elections; SENATOR RALPH E. HISE, JR., in his official capacity as Co-Chair
of the Senate Standing Committee on Redistricting and Elections; SENATOR
PAUL NEWTON, in his official capacity as Co-Chair of the Senate Standing
Committee on Redistricting and Elections; REPRESENTATIVE TIMOTHY K.
MOORE, in his official capacity as Speaker of the North Carolina House of
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

Representatives; SENATOR PHILIP E. BERGER, in his official capacity as
President Pro Tempore of the North Carolina Senate; THE STATE OF NORTH
CAROLINA; THE NORTH CAROLINA STATE BOARD OF ELECTIONS;
DAMON CIRCOSTA, in his official capacity as Chairman of the North Carolina
State Board of Elections; STELLA ANDERSON, in her official capacity as
Secretary of the North Carolina State Board of Elections; JEFF CARMON III, in
his official capacity as Member of the North Carolina State Board of Elections;
STACY EGGERS IV, in his official capacity as Member of the North Carolina State
Board of Elections; TOMMY TUCKER, in his official capacity as Member of the
North Carolina State Board of Elections; and KAREN BRINSON BELL, in her
official capacity as Executive Director of the North Carolina State Board of
Elections

 Appeal pursuant to N.C.G.S. § 7A-27(b)(1) from the unanimous decision of a

three-judge panel of the Superior Court in Wake County, denying plaintiffs’ claims

and requests for Declaratory Judgment and Permanent Injunctive Relief. On 8

December 2021, pursuant to N.C.G.S. § 7A-31 and Rule 15(e) of the North Carolina

Rules of Appellate Procedure, the Supreme Court allowed plaintiffs’ petitions for

discretionary review prior to determination by the Court of Appeals. Heard in the

Supreme Court on 2 February 2022.

 Patterson Harkavy LLP, by Narendra K. Ghosh, Burton Craige, and Paul E.
 Smith; Elias Law Group LLP, by Abha Khanna, Lalitha D. Madduri, Jacob D.
 Shelly, and Graham W. White; and Arnold and Porter Kaye Scholer LLP, by
 Elisabeth S. Theodore, R. Stanton Jones, and Samuel F. Callahan, for Harper
 plaintiff-appellants.

 Robinson, Bradshaw & Hinson, P.A., by Stephen D. Feldman, John R. Wester,
 Adam K. Doerr, and Erik R. Zimmerman; and Jenner & Block LLP, by Sam
 Hirsch, Jessica Ring Amunson, Zachary C. Schauf, Karthik P. Reddy, and Urja
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

Mittal, for North Carolina League of Conservation Voters, Inc. plaintiff-
appellants.

Southern Coalition for Social Justice, by Hilary H. Klein, Allison J. Riggs,
Mitchell Brown, Katelin Kaiser, Jeffrey Loperfido, and Noor Taj; and Hogan
Lovells US LLP, by J. Tom Boer and Olivia T. Molodanof, for Common Cause
plaintiff-appellant.

North Carolina Department of Justice, by Amar Majmundar, Senior Deputy
Attorney General, and Terence Steed, Mary Carla Babb, and Stephanie A.
Brennan, Special Deputy Attorneys General, for State defendant-appellees.

Nelson Mullins Riley & Scarborough, LLP, by Phillip J. Strach, Alyssa M.
Riggins, John Branch, and Thomas A. Farr; and Baker & Hostetler LLP, by
Katherine L. McKnight and E. Mark Braden, for Legislative Defendants
defendant-appellees.

Abraham Rubert-Schewel, Chris Lamar, and Orion de Nevers, for Campaign
Legal Center, amicus curiae.

Haynsworth Sinkler Boyd, P.A., by William C. McKinney, Jonathan D. Klett
and Sara A. Sykes; and States United Democracy Center, by Christine P. Sun
and Ranjana Natarajan, for former governors, amici curiae.

Poyner Spruill LLP, by Edwin M. Speas Jr. and Caroline P. Mackie, for
Buncombe County Board of Commissioners, amicus curiae.

Joshua H. Stein, Attorney General, by Ryan Y. Park, Solicitor General, James
W. Doggett, Deputy Solicitor General, and Zachary W. Ezor, Solicitor General
Fellow, for Governor Roy A. Cooper II and Attorney General Joshua H. Stein,
amici curiae.

Phelps Dunbar LLP, by Nathan A. Huff and Jared M. Burtner, for National
Republican Congressional Committee, amicus curiae.

Forward Justice, by Kathleen E. Roblez, Caitlin A. Swain, Daryl V. Atkinson,
Ashley M. Mitchell, and Aviance Brown; and Irving Joyner for NC NAACP,
amicus curiae.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 Poyner Spruill LLP, by Caroline P. Mackie, for Professor Charles Fried, amicus
 curiae.

 HUDSON, Justice.

¶1 Today, we answer this question: does our state constitution recognize that the

 people of this state have the power to choose those who govern us, by giving each of

 us an equally powerful voice through our vote? Or does our constitution give to

 members of the General Assembly, as they argue here, unlimited power to draw

 electoral maps that keep themselves and our members of Congress in office as long

 as they want, regardless of the will of the people, by making some votes more powerful

 than others? We hold that our constitution’s Declaration of Rights guarantees the

 equal power of each person’s voice in our government through voting in elections that

 matter.

¶2 In North Carolina, we have long understood that our constitution’s promise

 that “[a]ll elections shall be free” means that every vote must count equally. N.C.

 Const. art. I, § 10. As early as 1875, this Court declared it “too plain for argument”

 that the General Assembly’s malapportionment of election districts “is a plain

 violation of fundamental principles.”1 People ex rel. Van Bokkelen, v. Canaday, 73

 N.C. 198, 225 (1875). Likewise, this Court has previously held that judicial review

 1 Even earlier, in 1787, this Court held that the courts must interpret the constitution

 and invalidate laws that violate it. Bayard v. Singleton, 1 N.C. (Mart.) 5, 7 (1787).
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 was appropriate in legislative redistricting cases to enforce the requirements of the

 state constitution, even when doing so means interpreting state constitutional

 provisions more expansively than their federal counterparts. See Stephenson v.

 Bartlett, 355 N.C. 354, 379–82 (2002).

¶3 “A system of fair elections is foundational to self-government.” Comm. to Elect

 Dan Forest v. Emps. Pol. Action Comm., 376 N.C. 558, 2021-NCSC-6, ¶ 86 (Newby,

 C.J., concurring in the result). While partisan gerrymandering is not a new tool,

 modern technologies enable mapmakers to achieve extremes of imbalance that, “with

 almost surgical precision,”2 undermine our constitutional system of government.3

 Indeed, the programs and algorithms now available for drawing electoral districts

 have become so sophisticated that it is possible to implement extreme and durable

 partisan gerrymanders that can enable one party to effectively guarantee itself a

 supermajority for an entire decade, even as electoral conditions change and voter

 2 We note this expression was coined to describe the precision with which the North

 Carolina General Assembly targeted African American voters through the identification and
 exclusion of various forms of voter photo identification. N.C. State Conf. of NAACP v.
 McCrory, 831 F.3d 204, 214 (4th Cir. 2016). We believe it is equally apt as a description of
 the technical proficiency with which legislators across the country dilute the power of votes
 through the drawing of district lines.
 3 In fact, the term “gerrymander” was coined in 1812 after the redrawing of

 Massachusetts Senate election districts to ensure the advantage of the Democratic-
 Republican Party under then-Governor Elbridge Gerry, in reference to a district drawn in a
 manner so contrived that it was said to resemble a salamander. The gerrymander was
 successful, as although the Federalist Party ousted Governor Gerry and flipped the
 Massachusetts House in the 1812 election, the Democratic-Republicans retained control of
 the state senate under this map. See Elmer C. Griffith, The Rise and Development of the
 Gerrymander 73–77 (1907).
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 preferences shift. Fortunately, the technology that makes such extreme

 gerrymanders possible likewise makes it possible to reliably evaluate the partisan

 asymmetry of such plans and review the extent to which they depart from and

 subordinate traditional neutral redistricting principles.

¶4 Partisan gerrymandering creates the same harm as malapportionment, which

 has previously been held to violate the state constitution: some peoples’ votes have

 more power than others. But a legislative body can only reflect the will of the people

 if it is elected from districts that provide one person’s vote with substantially the

 same power as every other person’s vote. In North Carolina, a state without a citizen

 referendum process and where only a supermajority of the legislature can propose

 constitutional amendments, it is no answer to say that responsibility for addressing

 partisan gerrymandering is in the hands of the people, when they are represented by

 legislators who are able to entrench themselves by manipulating the very democratic

 process from which they derive their constitutional authority. Accordingly, the only

 way that partisan gerrymandering can be addressed is through the courts, the branch

 which has been tasked with authoritatively interpreting and enforcing the North

 Carolina Constitution.

¶5 Here, the General Assembly enacted districting maps for the United State

 Congress, the North Carolina House of Representatives, and the North Carolina

 Senate that subordinated traditional neutral redistricting criteria in favor of extreme
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 partisan advantage by diluting the power of certain people’s votes.4 Despite finding

 that these maps were “extreme partisan outliers[,]” “highly non-responsive” to the

 will of the people, and “incompatible with democratic principles[,]” the three-judge

 panel below allowed the maps to stand because it concluded that judicial action

 “would be usurping the political power and prerogatives” of the General Assembly.

¶6 We emphatically disagree. Although the task of redistricting is primarily

 delegated to the legislature, it must be performed “in conformity with the State

 Constitution.” Stephenson, 355 N.C. at 371. It is thus the solemn duty of this Court

 to review the legislature’s work to ensure such conformity using the available

 judicially manageable standards. We will not abdicate this duty by “condemn[ing]

 complaints about districting to echo into a void.” Rucho v. Common Cause, 139 S. Ct.

 2484, 2507 (2019). Today, we hold that the enacted maps violate several rights

 guaranteed to the people by our state constitution. Accordingly, we reverse the

 judgment of the trial court below and remand this case back to that court to oversee

 the redrawing of the maps by the General Assembly or, if necessary, by the court.

¶7 Our dissenting colleagues have overlooked the fundamental reality of this case.

 Rather than stepping outside of our role as judicial officers and into the policymaking

 realm, here we are carrying out the most fundamental of our sacred duties: protecting

 4 The 2021 enacted plans for Congress, the North Carolina House of Representatives,

 and the North Carolina Senate have been attached in an appendix for ease of reference.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 the constitutional rights of the people of North Carolina from overreach by the

 General Assembly. Rather than passively deferring to the legislature, our

 responsibility is to determine whether challenged legislative acts, although presumed

 constitutional, encumber the constitutional rights of the people of our state. Here, our

 responsibility is to determine whether challenged apportionment maps encumber the

 constitutional rights of the people to vote on equal terms and to substantially equal

 voting power. This role of the courts is not counter to precedent but was one of the

 earliest recognized. In 1787, in Bayard v. Singleton, 1 N.C. (Mart.) 5 (1787), in a

 passage quoted by the dissenters, the Court held that it must step in to keep the

 General Assembly from taking away the state constitutional rights of the people, and

 “if the members of the General Assembly could do this, they might with equal

 authority . . . render themselves the Legislators of the State for life, without any

 further election of the people[,]” id. at 7. This we cannot countenance.

¶8 The dissenters here do not challenge in any way, as Legislative Defendants

 presented no evidence at trial to disprove, the extensive findings of fact of the trial

 court, to the effect that the enacted plans are egregious and intentional partisan

 gerrymanders, designed to enhance Republican performance, and thereby give a

 greater voice to those voters than to any others. Instead, they attempt at some length

 to justify our taking no action to correct the constitutional violations or to ignore them

 altogether. For example, while acknowledging that the “right to vote on equal terms
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 is a fundamental right,” citing Northampton Cnty. Drainage Dist. No. One v. Bailey,

 326 N.C. 742, 747 (1990) (emphasis by the dissent), the dissent asserts, contrary to

 the findings and the extensive evidence at the trial and with no citation to the record

 or other authority, that “partisan gerrymandering has no significant impact upon the

 right to vote on equal terms.”

¶9 Our contrary view is the beating heart of this case. Accordingly, we must act

 as a Court to make sure that the rights of the people are treated with proper respect.

 In so doing, we are protecting the individual rights of voters to cast votes that matter

 equally, as guaranteed by our constitution in article I, sections 10, 12, 14, and 19:

 Sec. 10. Free elections.
 All elections shall be free.

 Sec. 12. Right of assembly and petition.
 The people have a right to assemble together to
 consult for their common good, to instruct their
 representatives, and to apply to the General Assembly for
 redress of grievances; . . . .

 Sec. 14. Freedom of speech and press.
 Freedom of speech and of the press are two of the
 great bulwarks of liberty and therefore shall never be
 restrained, but every person shall be held responsible for
 their abuse.

 Sec. 19. Law of the land; equal protection of the laws.
 . . . No person shall be denied the equal protection of
 the laws; . . . .

 N.C. Const. art. I, §§ 10, 12, 14, 19. We ground our decision in the text, structure,

 history, and intent of these provisions from the Declaration of Rights.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

¶ 10 Despite the dissenters’ repeated assertions, we seek neither proportional

 representation for members of any political party, nor to guarantee representation to

 any particular group. We are only upholding the rights of individual voters as

 guaranteed by our state constitution. As the dissenters have noted, in Deminski and

 Corum, this Court has recently recognized and even expanded the role of the Court

 to interpret and protect individual rights enumerated in the state constitution.

¶ 11 In this opinion, we give as much direction as appropriate to the General

 Assembly while fully respecting their authority to proceed first in the effort to draw

 maps that meet constitutional standards. Should they be unable to do so or if they

 produce maps that fail to protect the constitutional rights of the people, the trial court

 may select maps by the process it deems best, subject to our review, in accordance

 with the timeline already set out in our order of 4 February 2022.

 I. Factual and Procedural Background

 A. Redistricting Process

¶ 12 Article II, sections 3 and 5 of the North Carolina Constitution require that

 “[t]he General Assembly, at the first regular session convening after the return of

 every decennial census of population taken by order of Congress, shall revise the

 [legislative] districts and the apportionment of Senators [and Representatives]

 among those districts, subject to [certain] requirements[.]” N.C. Const. art. II § 3, 5.

 This redistricting authority is subject to limitations contained in the North Carolina
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 Constitution, including both in the provisions allocating the initial redistricting

 responsibility to the General Assembly and in other provisions which have been

 interpreted by this Court to be applicable to the redistricting process. See, e.g.,

 Stephenson, 355 N.C. 354; Blankenship v. Bartlett, 363 N.C. 518 (2009). Additionally,

 the General Assembly must comply with all applicable provisions of federal law,

 including federal one-person-one-vote requirements and the Voting Rights Act, under

 Article I, sections 3 and 5 of the North Carolina Constitution. See id.

¶ 13 On 12 February 2021, the United States Census Bureau announced that its

 release of the 2020 census data would be delayed by the COVID-19 pandemic and

 would not be released until the fall of 2021. On 24 February 2021, North Carolina

 State Board of Elections Executive Director Karen Brinson Bell recommended to the

 House Elections Law and Campaign Finance Reform Committee that the 2022

 primary elections be delayed to a 3 May primary, 12 July second primary, and 8

 November general election. The Committee, however, “did not follow the Board’s

 recommendations to delay the primaries and provide more time for the redistricting

 cycle.” The full census data was ultimately released to the states on 12 August 2021.

¶ 14 On 5 August 2021, the General Assembly’s Senate Committee on Redistricting

 and Elections and House Redistricting Committee convened a Joint Meeting to begin

 the discussion on the redistricting process. On 9 August 2021, the chairs of the Joint

 Redistricting Committee released its “2021 Joint Redistricting Committee Proposed
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

Criteria.” During the subsequent public comment period and committee debate,

several citizens (including counsel for plaintiff Common Cause) and legislators

(including Senate Minority Leader Dan Blue Jr.) urged the committee to change the

criteria, which mandated a “race-blind” approach, to allow for the consideration of

racial data in order to ensure compliance with the Voting Rights Act (VRA). The Joint

Committee rejected these proposals. On 12 August 2021, the Joint Committee

adopted the final redistricting criteria (Adopted Criteria), which were as follows:

 Equal Population. The Committees will use the 2020
 federal decennial census data as the sole basis of
 population for the establishment of districts in the 2021
 Congressional, House, and Senate plans. The number of
 persons in each legislative district shall be within plus or
 minus 5% of the ideal district population, as determined
 under the most recent federal decennial census. The
 number of persons in each congressional district shall be as
 nearly as equal as practicable, as determined under the
 most recent federal decennial census.

 Contiguity. No point contiguity shall be permitted in any
 2021 Congressional, House, and Senate plan.
 Congressional, House, and Senate districts shall be
 compromised of contiguous territory. Contiguity by water
 is sufficient.

 Counties, Groupings, and Traversals. The Committees
 shall draw legislative districts within county groupings as
 required by Stephenson v. Bartlett, 355 N.C. 354, 562
 S.E.2d 377 (2002) (Stephenson I), Stephenson v. Bartlett,
 357 N.C. 301, 582 S.E.2d 247 (2003) (Stephenson II),
 Dickson v. Rucho, 367 N.C. 542, 766 S.E.2d 238 (2014)
 (Dickson I) and Dickson v. Rucho, 368 N.C. 481, 781 S.E.2d
 460 (2015) (Dickson II). Within county groupings, county
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

lines shall not be traversed except as authorized by
Stephenson I, Stephenson II, Dickson I, and Dickson II.

Division of counties in the 2021 Congressional plan shall
only be made for reasons of equalizing population and
consideration of double bunking. If a county is of sufficient
population size to contain an entire congressional district
within the county’s boundaries, the Committees shall
construct a district entirely within that county.

Racial Data. Data identifying the race of individuals or
voters shall not be used in the construction or consideration
of districts in the 2021 Congressional, House, and Senate
plans. The Committees will draw districts that comply with
the Voting Rights Act.

VTDs. Voting districts (“VTDs”) should be split only when
necessary.

Compactness. The Committees shall make reasonable
efforts to draw legislative districts in the 2021
Congressional, House and Senate plans that are compact.
In doing so, the Committee may use as a guide the
minimum Reock (“dispersion”) and Polsby-Popper
(“permitter”) scores identified by Richard H. Pildes and
Richard G. Neimi in Expressive Harms, “Bizarre Districts,”
and Voting Rights: Evaluating Election-District
Appearances After Shaw v. Reno, 92 Mich. L. Rev. 483
(1993).

Municipal Boundaries. The Committees may consider
municipal boundaries when drawing districts in the 2021
Congressional, House, and Senate plans.

Election Data. Partisan considerations and election
results data shall not be used in the drawing of districts in
the 2021 Congressional, House, and Senate plans.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 Member Residence. Member residence may be
 considered in the formation of legislative and congressional
 districts.

 Community Consideration. So long as a plan complies
 with the foregoing criteria, local knowledge of the character
 of communities and connections between communities may
 be considered in the formation of legislative and
 congressional districts.

¶ 15 On 5 October 2021, after thirteen public hearings across the state during the

 month of September, the House and Senate redistricting committees convened

 separately to begin the redistricting process. The committee chairs announced that

 beginning on 6 October 2021, computer stations would be available in two rooms for

 legislators to draw potential maps. These stations would be open during business

 hours, and both the rooms and the screens of the station computers would be live-

 streamed and available for public viewing while the stations were open. In an

 apparent effort to show transparency and instill public confidence in the redistricting

 process, Legislative Defendants “requir[ed] legislators to draw and submit maps

 using software on computer terminals in the redistricting committee hearing rooms.

 That software did not include political data, and the House and Senate Committees

 would only consider maps drawn and submitted on the software.” “According to

 Representative [Destin] Hall, [Chair of the House Standing Committee on

 Redistricting,] the Committee and ‘the House as a whole’ would ‘only consider maps

 that are drawn in this committee room, on one of the four stations.’ ”
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

¶ 16 However, “[w]hile the four computer terminals in the committee hearing room

 did not themselves have election data loaded onto them, the House and Senate

 Committees did not actively prevent legislators and their staff from relying on pre-

 drawn maps created using political data, or even direct consultation of political data.”

 For instance, between sessions at the public computer terminals, Representative

 Hall, who “personally drew nearly all of the House map [later] enacted[,] . . . met with

 his then-General Counsel . . . and others about the map-drawing in a private room

 adjacent to the public map-drawing room.” During these meetings, and sometimes

 while sitting at the public terminals, Representative Hall viewed “concept maps”

 created on an unknown computer and using unknown software and data.5 Further,

 “Representative Hall and Senator Ralph E. Hise, Jr., one of the Chairs of the Senate

 Redistricting Committee, confirmed that no restrictions on the use of outside maps

 were ever implemented or enforced.”

¶ 17 Proposed versions of the congressional and House maps were filed on 28 and

 29 October 2021 and then passed several readings in each chamber without

 alteration. A proposed version of the Senate map was filed on 29 October 2021. On 1

 November 2021 the Senate Redistricting Committee adopted a substitute map. On 2

 5 On 21 December 2021, during trial, the court ordered Legislative Defendants to

 produce these “concept maps” and related materials. Legislative Defendants never did so.
 Instead, Legislative Defendants asserted in verified interrogatory responses that “the
 concept maps that were created were not saved, are currently lost[,] and no longer exist.”
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 November 2021, the Committee adopted two amendments offered by Senator

 Natasha Marcus and Senator Ben Clark, respectively. On 3 and 4 November 2021,

 the final versions of each map passed several readings in each chamber without

 further alteration.

¶ 18 On 4 November 2021, the congressional, House, and Senate reapportionment

 maps were ratified into law as S.L. 2021-174, S.L. 2021-175, and S.L. 2021-173,

 respectively. Each map passed along strict party-line votes in each chamber.

 B. Litigation

¶ 19 On 16 November 2021, plaintiffs North Carolina League of Conservation

 Voters, Inc., Henry M. Michaux Jr., Dandrielle Lewis, Timothy Chartier, Talia

 Fernos, Katherine Newhall, R. Jason Parsley, Edna Scott, Roberta Scott, Yvette

 Roberts, Jereann King Johnson, Reverend Reginald Wells, Yarbrough Williams Jr.,

 Reverend Deloris L. Jerman, Viola Ryals Figueroa, and Cosmos George (NCLCV

 Plaintiffs) filed a complaint against Legislative Defendants (Civil Action No. 21 CVS

 015426) contemporaneously with a Motion for Preliminary Injunction pursuant to

 Rules 7(b) and 65 of the North Carolina Rules of Civil Procedure. NCLCV Plaintiffs’

 complaint alleged

 that the 2021 districting plans for Congress, the North
 Carolina Senate, and the North Carolina House of
 Representatives violate the North Carolina Constitution
 by establishing severe partisan gerrymanders in violation
 of the Free Elections Clause, Art. I, § 10, the Equal
 Protection Clause, Art. I, § 19, and the Freedom of Speech
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 and Assembly Clauses, Art. I, §§ 12, 14; by engaging in
 racial vote dilution in violation of the Free Elections
 Clause, Art. I, § 10, and the Equal Protection Clause, Art.
 I, § 19; and by violating the Whole County Provisions, Art.
 II, §§ 3(3), 5(3).

¶ 20 On 18 November 2021, plaintiffs Rebecca Harper, Amy Clare Oseroff, Donald

 Rumph, John Anthony Balla, Richard R. Crews, Lily Nicole Quick, Gettys Cohen Jr.,

 Shawn Rush, Mark S. Peters, Kathleen Barnes, Virginia Walters Brien, Eileen

 Stephens, Barbara Proffitt, Mary Elizabeth Voss, Chenita Barber Johnson, Sarah

 Taber, Joshua Perry Brown, Laureen Floor, Donald M. MacKinnon, Ron Osborne,

 Ann Butzner, Sondra Stein, Bobby Jones, Kristiann Herring, and David Dwight

 Brown (Harper Plaintiffs) filed a complaint against Legislative Defendants (Civil

 Action No. 21 CVS 500085) and a Motion for Preliminary Injunction pursuant to Rule

 65 and N.C.G.S. § 1-485. On 13 December 2021, Harper Plaintiffs amended their

 complaint. Harper Plaintiffs’ complaint “allege[d] that the 2021 districting plans for

 Congress, the North Carolina Senate, and the North Carolina House of

 Representatives violate the North Carolina Constitution―namely its Free Elections

 Clause, Art. I, § 10; its Equal Protection Clause, Art. I, § 19; and its Freedom of

 Speech and Freedom of Assembly Clauses, Art. I, §§ 12, 14.”

¶ 21 On 19 and 22 November 2021, “the NCLCV and Harper actions, respectively,

 were assigned to [a] three-judge panel of Superior Court, Wake County, pursuant to

 N.C.G.S. § 1-267.1.” On 3 December 2021, the panel consolidated the two cases
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 pursuant to Rule 42 of the North Carolina Rules of Civil Procedure and heard NCLCV

 Plaintiffs’ and Harper Plaintiffs’ motions for preliminary injunction. On 3 December

 2021, “after considering the extensive briefing and oral arguments on the motions,

 the [panel] denied [the parties’] Motion for Preliminary Injunction.”

¶ 22 NCLCV Plaintiffs and Harper Plaintiffs subsequently filed a notice of appeal

 with the North Carolina Court of Appeals. On 6 December 2021, “[a]fter initially

 partially granting a temporary stay of the candidate filing period for the 2022

 elections, the North Carolina Court of Appeals denied the requested temporary stay.”

 NCLCV Plaintiffs and Harper Plaintiffs subsequently filed several items with this

 Court: two petitions for discretionary review prior to determination by the Court of

 Appeals; a motion to suspend appellate rules to expedite a decision; and a motion to

 suspend appellate rules and expedite schedule. On 8 December 2021, this Court

 granted a preliminary injunction and temporarily stayed the candidate filing period

 “until such time as a final judgment on the merits of plaintiffs’ claims, including any

 appeals, is entered and remedy, if any is required, has been ordered.” “The Order

 further directed [the panel] to hold proceedings on the merits of NCLCV Plaintiffs’

 and Harper Plaintiffs’ claims and provide a written ruling on or before [11 January

 2022].”

¶ 23 On 13 December 2021, the panel “entered a scheduling order . . . expediting

 discovery and scheduling [a] trial to commence on [3 January 2022].” That same day,
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 “Common Cause moved to intervene in the[ ] consolidated cases as a plaintiff,

 challenging the process undertaken by the General Assembly to create and enact the

 state legislative and congressional districts as a product of intentional racial

 discrimination undertaken for the purpose of racial vote dilution and to further the

 legislature’s partisan gerrymandering goals.” On 15 December 2021, the panel

 granted plaintiff Common Cause’s motion. On 16 December 2021, plaintiff Common

 Cause filed its complaint, alleging

 that the 2021 districting plans for Congress, the North
 Carolina Senate, and the North Carolina House of
 Representatives violate the North Carolina Constitution—
 namely its Equal Protection Clause, Art. I, § 19; its Free
 Elections Clause, Art. I, § 10; and its Freedom of Speech
 and Freedom of Assembly Clauses, Art. I, §§ 12, 14—and
 seeks, among other relief, a declaratory ruling under the
 Declaratory Judgment Act.

¶ 24 On 17 December 2021 “Defendants Representative Destin Hall, in his official

 capacity as Chairman of the House Standing Committee on Redistricting; Senators

 Ralph E. Hise, Jr., Warren Daniel, Paul Newton, in their official capacities as Co-

 Chairmen of the Senate Committee on Redistricting and Elections; Philip E. Berger,

 in his official capacity as President Pro Tempore of the North Carolina Senate;

 Timothy K. Moore, in his official capacity as Speaker of the North Carolina House of

 Representatives (hereinafter “Legislative Defendants”) filed their Answer to NCLCV

 Plaintiffs’ Complaint.” Legislative Defendants asserted numerous affirmative

 defenses, including, inter alia, that: (1) granting the requested relief will violate the
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 VRA and the Constitution of the United States; (2) granting the requested relief will

 violate the rights of Legislative Defendants, Republican voters, and Republican

 candidates under the United States and North Carolina Constitutions; (3) the court

 cannot lawfully prevent the General Assembly from considering partisan advantage

 and incumbency protection; (4) plaintiffs seek to require districts where Democratic

 candidates are elected where such candidates are not currently elected; (5) plaintiffs’

 claims are barred by the doctrine of laches; (6) plaintiffs have failed to state claims

 upon which relief can be granted; (7) plaintiffs seek a theory of liability that will act

 to impose a judicial amendment to the North Carolina Constitution; (8) the only

 limitations on redistricting legislation are found in article II, sections 2, 3, 4, and 5 of

 the North Carolina Constitution; (9) plaintiffs’ request for a court-designed

 redistricting plan violates the separation of powers doctrine; (10) plaintiffs’ claims

 are nonjusticiable and fail to provide judicially manageable standards; (11) plaintiffs

 lack standing; and (12) plaintiffs have unclean hands and therefore are not entitled

 to equitable relief.

¶ 25 On 17 December 2021, defendants North Carolina State Board of Elections and

 its members Damon Circosta, in his official capacity as Chairman of the Board of

 Elections; Stella Anderson, in her official capacity as Secretary of the Board of

 Elections; and Jeff Carmon III, Stacy Eggers IV, and Tommy Tucker, in their official

 capacities as Members of the Board of Elections filed their answer to Harper
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 Plaintiffs’ amended complaint. That same day, these same defendants along with

 defendant State of North Carolina and defendant Karen Brinson Bell, in her official

 capacity as Executive Director of the North Carolina State Board of Elections filed

 their answer to NCLCV Plaintiffs’ complaint.

¶ 26 “Throughout the intervening and expedited two-and-a-half-week period

 reserved for discovery, the parties filed and the [c]ourt expeditiously ruled upon over

 ten discovery-related motions . . . .” “Plaintiffs collectively designated eight

 individuals as expert witnesses and submitted accompanying reports[, and]

 Legislative Defendants designated two individuals as expert witnesses and

 submitted accompanying reports.” The parties’ discovery period closed on 31

 December 2021, and a three-and-one-half day trial commenced on 3 January 2022.

 C. Trial Court’s Judgment

 1. Findings of Fact

¶ 27 First, the trial court made extensive factual findings based on the evidence

 presented at trial. In short, these factual findings confirmed plaintiffs’ assertions that

 each of the three enacted maps were “extreme partisan outliers” and the product of

 “intentional, pro-Republican partisan redistricting.”

 a. Plaintiffs’ Extreme Partisan Gerrymandering Claims

¶ 28 After reviewing the factual and procedural history summarized above, the trial

 court made factual findings regarding plaintiffs’ constitutional claims of extreme
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 partisan gerrymandering. First, the court considered whether the evidence presented

 showed partisan intent and effects. Addressing direct evidence, the court found that

 “[t]here is no express language showing partisan intent within the text of the session

 laws establishing the Enacted Plans” and noted that “[t]he Adopted Criteria

 expressly forbade partisan considerations and election results data from being used

 in drawing districts in the Enacted Plans.” Further, the court noted that “[n]o

 elections have been conducted under the Enacted Plans to provide direct evidence of

 partisan effects that could be attributed as a result of the Enacted Plans.” However,

 the lack of direct evidence of intent did not stop the trial court from determining that

 the enacted plans were intentionally constructed to yield a consistent partisan

 advantage for Republicans in a range of electoral environments.

¶ 29 Instead, the trial court turned to circumstantial evidence of partisan intent

 and effects. After surveying the recent history of partisan redistricting litigation and

 legislation and the neutral districting criteria Legislative Defendants claimed they

 had adhered to, the court reviewed plaintiffs’ and Legislative Defendants’ expert

 analyses of the enacted plans. The court’s extensive factual findings regarding each

 expert’s analysis are summarized below.

¶ 30 Harper Plaintiffs’ Expert Dr. Jowei Chen. “Dr. Chen was qualified and

 accepted as an expert at trial in the fields of redistricting, political geography,

 simulation analyses, and geographic information systems.” “Dr. Chen analyzed the
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 partisan bias of the enacted congressional plan on a statewide and district-by-district

 basis.” Specifically, Dr. Chen analyzed the congressional plans using

 various computer simulation programming techniques
 that allow him to produce a large number of nonpartisan
 districting plans that adhere to traditional districting
 criteria using U.S. Census geographies as building blocks.
 Dr. Chen’s simulation process ignores all partisan and
 racial considerations when drawing districts, and the
 computer simulations are instead programmed to draw
 districting plans following various traditional districting
 goals, such as equalizing population, avoiding county and
 Voting Tabulation District (VTD) splits, and pursuing
 geographic compactness. By randomly generating a large
 number of districting plans that closely adhere to these
 traditional districting criteria, Dr. Chen assesses an
 enacted plan drawn by a state legislature and determines
 whether partisan goals motivated the legislature to deviate
 from these traditional districting criteria. Specifically, by
 holding constant the application of nonpartisan,
 traditional districting criteria through the simulations, he
 is able to determine whether the enacted plan could have
 been the product of something other than partisan
 considerations.

¶ 31 “Based on his analysis, Dr. Chen concluded that partisan intent predominated

 over the 2021 Adopted Criteria in drawing the adopted congressional plan, and that

 the Republican advantage in the enacted plan cannot be explained by North

 Carolina’s political geography or adherence to the Adopted Criteria.”

¶ 32 Harper Plaintiffs’ Expert Dr. Christopher Cooper. “Dr. Cooper was

 qualified and accepted as an expert at trial in the field of political science with a

 specialty in the political geography and political history of North Carolina.” Using
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 statewide voting data from the 2020 election, “Dr. Cooper analyzed the 2021

 Congressional Plan [and] the partisan effects of each district’s boundaries.” Based on

 Dr. Cooper’s analysis, the court observed that “[a]lthough North Carolina gained an

 additional congressional seat as a result of population growth that came largely from

 the Democratic-leaning Triangle (Raleigh-Durham-Chapel Hill) and the Charlotte

 metropolitan areas, the number of anticipated Democratic seats under the enacted

 map actually decreases, with only three anticipated Democratic seats, compared with

 the five seats that Democrats won in the 2020 election.” This decrease, the court

 observed, is enacted “by splitting the Democratic-leaning counties of Guilford,

 Mecklenburg, and Wake among three congressional districts each.” The court further

 noted that “[t]here was no population-based reason” for these splits.

¶ 33 After reviewing Dr. Cooper’s maps showing these redistricted congressional

 lines as compared to county boundaries and VTD boundaries, the court noted that

 “[t]he congressional district map is best understood as a single organism given that

 the boundaries drawn for a particular congressional district in one part of the state

 will necessarily affect the boundaries drawn for the districts elsewhere in the state.”

 Accordingly, the court found “that the ‘cracking and packing’ of Democratic voters in

 Guilford, Mecklenburg, and Wake counties has ‘ripple effects throughout the map.’ ”

¶ 34 Reviewing Dr. Cooper’s analysis of a few specific congressional districts within

 the new map as exemplars, the court noted that “[t]he 2021 Congressional Plan places
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 the residences of an incumbent Republican representative and an incumbent

 Democratic representative within a new, overwhelmingly Republican district, NC-11,

 ‘virtually guaranteeing’ that the Democratic incumbent will lose her seat.” Similarly,

 the court observed that “[t]he 2021 Congressional Plan includes one district where no

 incumbent congressional representative resides . . . [which] ‘overwhelmingly favors’

 the Republican candidate based on the district’s partisan lean.”

¶ 35 The court then found that the 2021 North Carolina House and Senate Plans

 “similarly benefit the Republican party.” The court noted that “Legislative

 Defendants’ exercise of . . . discretion in the Senate and House 2021 Plans resulted

 in Senate and House district boundaries that enhanced the Republican candidates’

 partisan advantage, and this finding is consistent with a finding of partisan intent.”

 Finally, the court noted Dr. Cooper’s finding that the “partisan redistricting carried

 out across the State has led to a substantial disconnect between the ideology and

 policy preferences of North Carolina’s citizenry and their representatives in the

 General Assembly.”

¶ 36 Harper Plaintiffs and Plaintiff Common Cause’s Expert Dr. Jonathan
 Mattingly.

 Dr. Mattingly was qualified and accepted as an expert at
 trial in the fields of applied math, statistical science, and
 probability.

 . . . Dr. Mattingly used the Metropolis-Hasting
 Markov Chain Monte Carlo (“MCMC”) Algorithm to create
 a representative set, or “ensemble,” of 100,000 maps for the
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 state legislative districts and 80,000 maps for
 congressional districts as benchmarks against which he
 could compare the enacted maps. The algorithm produced
 maps that accorded with traditional districting criteria. Dr.
 Mattingly tuned his algorithm to ensure that the
 nonpartisan qualities of the simulated maps were similar
 to the nonpartisan qualities of the enacted map with
 respect to compactness and, for his primary ensembles,
 municipality splits.

 “After generating the sample of maps, Dr. Mattingly used votes from multiple prior

 North Carolina statewide elections reflecting a range of electoral outcomes to

 compare the partisan performance and characteristics of the 2021 Congressional Plan

 to the simulated plans.”

¶ 37 The trial court found, “based upon Dr. Mattingly’s analysis, that the

 Congressional map is the product of intentional, pro-Republican partisan

 redistricting.” The court further determined that “[t]he Congressional map is ‘an

 extreme outlier’ that is ‘highly non-responsive to the changing opinion of the

 electorate.’ ”

¶ 38 Regarding the North Carolina legislative districts, the court likewise found,

 “based upon Dr. Mattingly’s analysis, that the State House and Senate plans are

 extreme outliers that ‘systematically favor the Republican Party to an extent which

 is rarely, if ever, seen in the non-partisan collection of maps.’ ” The court found that

 “[t]he intentional partisan redistricting in both chambers is especially effective in
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 preserving Republican supermajorities in instances in which the majority or the vast

 majority of plans in Dr. Mattingly’s ensemble would have broken it.”

¶ 39 Regarding the North Carolina House map, the court further found that “the

 enacted plan shows a systematic bias toward the Republican party, favoring

 Republicans in every single one of the 16 elections [Dr. Mattingly] considered.” The

 court determined that the North Carolina House “map is also especially anomalous

 under elections where a non-partisan map would almost always give Democrats the

 majority in the House because the enacted map denied Democrats that majority. The

 probability that this partisan bias arose by chance, without an intentional effort by

 the General Assembly, is ‘astronomically small.’ ” The court determined that

 [t]he North Carolina House maps show that they are the
 product of an intentional, pro-Republican partisan
 redistricting over a wide range of potential election
 scenarios. Elections that under typical maps would
 produce a Democratic majority in the North Carolina
 House give Republicans a majority under the enacted
 maps. Likewise, maps that would normally produce a
 Republican majority under nonpartisan maps produce a
 Republican supermajority under the enacted maps. Among
 every possible election that Dr. Mattingly analyzed, the
 partisan results were more extreme than what would be
 seen from nonpartisan maps. In every election scenario,
 Republicans won more individual seats tha[n] they
 statistically should under nonpartisan maps.
 . . . The 2021 House Plan’s partisan bias creates
 firewalls protecting the Republican supermajority and
 majority in the House, and this effect is particularly robust
 when the Republicans are likely to lose the supermajority:
 the enacted plan sticks at 48 democratic seats or fewer,
 even in situations where virtually all of the plans in the
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 nonpartisan ensemble would elect 49 Democratic seats or
 more.

¶ 40 Regarding the North Carolina Senate, the court found that

 the results are the same: the enacted plan is an outlier or
 extreme outlier in elections where Democrats win a vote
 share between 47.5% and 50.5%. This range is significant
 because many North Carolina elections have this vote
 fraction, and this is the range where the non-partisan
 ensemble shows that Republicans lose the super-majority.
 But the enacted map in multiple elections used in Dr.
 Mattingly’s analysis sticks at less than 21 Democratic
 seats, preserving a [Republican] supermajority. Notably,
 the enacted map never favors the Democratic party in
 comparison to the non-partisan ensemble in a single one of
 the 16 elections that Dr. Mattingly considered.

¶ 41 The court then considered Dr. Mattingly’s “cracking and packing” analysis of

 the congressional, House, and Senate maps. Here, the court found

 that cracking Democrats from the more competitive
 districts and packing them into the most heavily
 Republican and heavily Democratic districts is the key
 signature of intentional partisan redistricting and it is
 responsible for the enacted congressional plan’s non-
 responsiveness when more voters favor Democratic
 candidates, as shown in [Dr. Mattingly’s] charts. Across his
 80,000 simulated nonpartisan plans, not a single one had
 the same or more Democratic voters packed into the three
 most Democratic districts—i.e., the districts Democrats
 would win no matter what—in comparison to the enacted
 plan. And not a single one had the same or more
 Republican voters in the next seven districts—i.e., the
 competitive districts—in comparison to the enacted plan.

¶ 42 The trial court found similar “cracking and packing” in the House maps, noting

 that “the enacted maps, as compared to the sample maps, there is an
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 overconcentration of Democratic voters in the least Democratic districts and in the

 most Democratic districts.” The court found that “the districts with the highest

 concentration of Democrats have far more Democratic voters than expected in

 nonpartisan maps, and threshold districts have far fewer Democratic voters than

 expected in nonpartisan maps.” In contrast, the court found that

 [i]n the middle districts—between the 60th most
 Democratic seat and the 80th most democratic seat—the
 Democratic vote fraction in the enacted plan is far below
 the . . . nonpartisan plans. These are the seats that
 determine the supermajority line and the majority line (if
 Republicans win the 61st seat, they win the majority, and
 if they win the 72nd most Democratic seat, they win the
 supermajority). The [c]ourt [found] that the systematic
 depletion of Democratic votes in those districts signals
 packing, does not exist in the non-partisan ensemble, and
 is responsible for the map’s partisan outlier behavior.
 Those Democrat[ic] votes are instead placed in the 90th to
 105th most Democratic district[s], where they are wasted
 because those seats are already comfortably Democratic.

¶ 43 Regarding cracking and packing in the Senate maps, the court found that “the

 same structure appears where virtually all of the seats in the middle range that

 determines majority and supermajority control have abnormally few Democrats.”

¶ 44 Next, the court determined that “a desire to prevent the pairing of incumbents

 cannot explain the extreme outlier behavior of the enacted plan.”

¶ 45 The court also observed that the General Assembly selectively prioritized

 preserving municipalities within the maps, choosing to do so “only when doing so

 advantaged Republicans.” “Put differently, prioritizing municipality preservation in
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 the Senate plans appears to enable more maps that favor Republicans. By contrast,

 for the House plan, where the enacted map does not prioritize preserving

 municipalities, . . . prioritizing municipalities would not have favored the Republican

 party in comparison.”

¶ 46 Finally, the court found that “[t]he partisan bias that Dr. Mattingly identified

 by comparing the enacted plans to his nonpartisan ensemble could not be explained

 by political geography or natural packing.”

¶ 47 Harper Plaintiffs’ Expert Dr. Wesley Pegden. “Dr. Pegden was qualified

 and accepted as an expert at trial in probability.”

 In this case, Dr. Pegden used . . . outlier analysis to
 evaluate whether and to what extent the 2021 Plans were
 drawn with the intentional and extreme use of partisan
 considerations. To do so, using a computer program, Dr.
 Pegden began with the enacted plans, made a sequence of
 small random changes to the maps while respecting certain
 nonpartisan constraints, and then evaluated the partisan
 characteristics of the resulting comparison maps.

 The trial court noted that “Dr. Pegden applied these constraints in a ‘conservative’

 way, to ‘avoid second-guessing the mapmakers’ choices in how they implemented the

 districting criteria.” The court observed that Dr. Pegden’s algorithm repeated this

 process “billions or trillions of times”: “begin[ning] with the enacted map, mak[ing] a

 small random change complying with certain constraints, and us[ing] historical

 voting data to evaluate the partisan characteristics of the resulting map.”
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

¶ 48 Based on Dr. Pegden’s analysis, the court found “that the enacted

 congressional plan is more favorable to Republicans than 99.9999% of the comparison

 maps his algorithm generated.” Accordingly, the court determined that “the enacted

 congressional map is more carefully crafted to favor Republicans than at least

 99.9999% of all possible maps of North Carolina satisfying the nonpartisan

 constraints imposed in [Dr. Pegden’s] algorithm.” In every “run” of the analysis, the

 court found, “the enacted congressional plan was in the most partisan 0.000031% of

 the approximately one trillion maps generated by making tiny random changes to the

 district’s boundaries.” “[I]f the districting had not been drawn to carefully optimize

 its partisan bias,” the court stated, “we would expect naturally that making small

 random changes to the districting would not have such a dramatic and consistent

 partisan effect.”

¶ 49 The court found similar extremes regarding North Carolina’s legislative

 districts. Regarding the North Carolina House, the court determined based on Dr.

 Pegden’s analysis that “the enacted House map was more favorable to Republicans

 than 99.99999% of the comparison maps generated by his algorithm making small

 random changes to the district boundaries.” Accordingly, the court found “that the

 enacted map is more carefully crafted for Republican partisan advantage than at

 least 99.9999% of all possible maps of North Carolina satisfying [the nonpartisan]

 constraints.” Regarding the North Carolina Senate, the court determined “that the
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 enacted Senate map was more favorable to Republicans than 99.9% of comparison

 maps.” Accordingly, the court found “that the enacted Senate map is more carefully

 crafted for Republican partisan advantage than at least 99.9% of all possible maps of

 North Carolina satisfying [the nonpartisan] constraints.” “These results,” the court

 determined, “cannot be explained by North Carolina’s political geography.”

¶ 50 NCLCV Plaintiffs’ Expert Dr. Moon Duchin. “Dr. Duchin was qualified and

 accepted as an expert at trial in the field of redistricting.” The trial court noted that

 Dr. Duchin’s analysis “uses a Close-Votes-Close-Seats principle, [in which] ‘an

 electoral climate with a roughly 50-50 split in partisan preference should produce a

 roughly 50-50 representational split.’ ” The trial court observed that “Close-Votes-

 Close-Seats is not tantamount to a requirement for proportionality. Rather, it is

 closely related to the principle of Majority Rule, which is where ‘a party or group with

 more than half of the votes should be able to secure more than half of the seats.’ ”

¶ 51 Based on Dr. Duchin’s analysis, the trial court found “that the political

 geography of North Carolina today does not lead only to a district map with partisan

 advantage given to one political party.” Rather, the court determined, “[t]he Enacted

 Plans behave as though they are built to resiliently safeguard electoral advantage for

 Republican candidates.” The results of Dr. Duchin’s analysis, the court found, “reveal

 a partisan skew in close elections.” For instance, the court determined that in a recent
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 statewide election in which the Republican candidate won by less than 500 total

 votes,

 [t]he Enacted Plans would have converted that near tie at
 the ballot box into a resounding Republican victory in seat
 share across the board: Republicans would have won 10
 (71%) of North Carolina’s congressional districts, 28 (56%)
 of North Carolina’s Senate districts, and 68 (57%) of North
 Carolina’s House districts. Nor is that election unusual.

 In fact, the court found “that in every single one of the 52 elections decided within a

 6-point margin, the Enacted Plans give Republicans an outright majority in the

 state’s congressional delegation, the State House, and the State Senate.” “This is

 true[,]” the court noted, “even when Democrats win statewide by clear margins.” Or,

 more plainly, “more Democratic votes usually do not mean more [D]emocratic seats.”

 Accordingly, the trial court determined that “[t]he Enacted Plans resiliently

 safeguard electoral advantage for Republican candidates. This skewed result is not

 an inevitable feature of North Carolina’s political geography.” Rather, the court

 found, “[t]he plan is designed in a way that safeguards Republican majorities in any

 plausible election outcome, including those where Democrats win more votes by clear

 margins.”

¶ 52 Next, the court specified that these findings were consistent across all three of

 the enacted maps. First, regarding the enacted congressional plan, the court found

 that “a clear majority of Democratic votes does not translate into a majority of seats.”
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 The court determined “that the Enacted Congressional Plan achieves these results

 by the familiar means of ‘packing’ and ‘cracking’ Democratic voters across the state.”

¶ 53 Second, the court found that

 [t]he Enacted Senate Plan effectuates the same sort of
 partisan advantage as the Enacted Congressional Plan.
 The Enacted Senate Plan consistently creates Republican
 majorities and precludes Democrats from winning a
 majority in the Senate even when Democrats win more
 votes. Even in an essentially tied election or a close
 Democratic victory, the Enacted Senate Plan gives
 Republicans a Senate majority, and sometimes even a veto-
 proof 30-seat majority. And that result holds even when
 Democrats win by larger margins.

 “As with the Enacted Congressional Plan, the [c]ourt [found] that the Enacted Senate

 Plan achieves its partisan goals by packing Democratic voters into a small number of

 Senate districts and then cracking the remaining Democratic voters by splitting them

 across other districts . . . .”

¶ 54 Third, the court likewise determined that

 the Enacted House Plan is also designed to systematically
 prevent Democrats from gaining a tie or a majority in the
 House. In close elections, the Enacted House Plan always
 gives Republicans a substantial House majority. That
 Republican majority is resilient and persists even when
 voters clearly express a preference for Democratic
 candidates.

 “As with the Enacted Congressional Plan and the Enacted Senate Plan, the [c]ourt

 [found] that the Enacted House Plan achieves this resilient pro-Republican bias by

 the familiar mechanisms of packing and cracking Democratic voters . . . .”
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

¶ 55 Plaintiff Common Cause’s Expert Dr. Daniel Magleby. “Dr. Magleby was

 qualified and accepted as an expert at trial in the fields of political geography and

 legislative and congressional elections, mathematical modeling and political

 phenomena and measurements of gerrymandering.” Like plaintiffs’ previous experts,

 Dr. Magleby “used a peer-reviewed algorithm . . . to generate a set of unbiased maps

 against which he compared the enacted House, Senate, and congressional maps.” “Dr.

 Magleby . . . used this algorithm to develop a set of between 20,000 and 100,000 maps,

 from which he took a random sample of 1,000 maps that roughly met the North

 Carolina Legislature’s 2021 criteria for drawing districts.” Using voting data from

 statewide races between 2016 and 2020, Dr. Magleby compared expected performance

 under the enacted maps with performance in the neutral sample maps. More

 specifically, Dr. Magleby’s analysis utilized “median-mean” calculations. Median-

 mean calculations compare “the average Democratic vote share” in districts statewide

 with “the median Democratic vote share” in those districts “by lining up the enacted

 . . . districts from least Democratic to most Democratic and identifying the districts

 that fell in the middle. In a nonpartisan map, a low median-mean difference is

 expected.”

¶ 56 Based on Dr. Magleby’s analysis, the trial court found “that the level of

 partisan bias in seats in the House maps went far beyond expected based on the

 neutral political geography of North Carolina.” Specifically, the court determined
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 “that the median-mean bias in the enacted maps was far more extreme than expected

 in nonpartisan maps.” In fact, the court found, “[n]o randomly generated map had

 such an extreme median-mean share—meaning that . . . no simulated map . . . was

 as extreme and durable in terms of partisan advantage.”

¶ 57 Legislative Defendants’ Expert Dr. Michael Barber.

 Dr. Barber was qualified and accepted as an expert at trial
 in the areas of political geography, partisanship statistical
 analysis, and redistricting.
 . . . Dr. Barber analyzed the Enacted Plans, as well
 as NCLCV Plaintiffs’ Optimized Maps, in the context of the
 partisan gerrymandering claims brought by Plaintiffs
 challenging the North Carolina Senate and North Carolina
 House of Representatives Districts.
 . . . Dr. Barber utilized a publicly-available and peer-
 reviewed redistricting simulation algorithm to generate
 50,000 simulated district maps in each county grouping in
 which there are multiple districts in both the North
 Carolina House of Representatives and the North Carolina
 Senate. In Dr. Barber’s simulations, the model generates
 plans that adhere to the restrictions included in the North
 Carolina Constitution as well as the Stephenson criteria of
 roughly equal population, adherence to county cluster
 boundaries, minimization of county traversals within
 clusters, and geographic compactness. Only after the
 simulated district plans are complete is the partisan lean
 of each district in each plan computed . . . .

¶ 58 Although Dr. Barber was qualified as an expert, the trial court found that “Dr.

 Barber’s method is not without limitations.” “Because it is impossible for a

 redistricting algorithm to account for all non-partisan redistricting goals[,]” the court

 noted, “differences between the range of his simulated plans and the 2021 Plans may
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 be the result of non-partisan goals the algorithm failed to account for, rather than of

 partisan goals.” The court observed that “under Dr. Barber’s analysis, it is plausible

 that the 2021 Plans were prepared without partisan data or considerations.” The

 court noted Dr. Barber’s subsequent conclusion that “the advantage between the

 expected Republican seat share in the state legislature compared to the statewide

 Republican vote share in the recent past is more due to geography than partisan

 activity by Republican map drawers.” Notably, the court did not adopt Dr. Barber’s

 findings as its own as it did for plaintiffs’ experts and later explicitly rejected his

 conclusions regarding the impact of political geography on the enacted maps.

¶ 59 Legislative Defendants’ Expert Dr. Andrew Taylor. “Dr. Taylor was

 qualified and accepted as an expert at trial in the areas of political science, political

 history of North Carolina[ ] and its constitutional provisions, and the comparative

 laws and Constitutions in other states and jurisdictions.” The trial court reviewed Dr.

 Taylor’s analysis of the enacted maps under political science principles, including

 noting that “in political science, an election is generally regarded as ‘equal’ so long as

 ‘[e]ach person has one vote to elect one legislator who has one vote in the legislature,’

 and departures even from that ideal are tolerated.” Likewise, the court noted Dr.

 Taylor’s opinion that “[i]n political science, equal outcomes are not generally accepted

 as a necessary facet of equal elections, administering such a rule would seem to be

 unworkable, and voting is not a feature of party participation but of individual
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 participation as a citizen.” The court further noted Dr. Taylor’s opinion that

 “purportedly ‘fair’ redistricting plans are not understood in the political-science field

 as germane to free speech, [because free speech] can occur regardless of the shapes

 and sizes of districts.” “For many of these reasons,” the court noted, “measuring

 gerrymanders can be elusive, problematic, and beyond the consensus of political

 scientists.”

¶ 60 The trial court also noted Dr. Taylor’s opinion that the “significant change in

 North Carolina’s political geography over the past thirty years . . . ‘is not the result

 of redistricting[,]’ ” but is instead “a function of slow social and economic forces,

 changes in the state’s citizenry, and party ideology.” As with Dr. Barber’s similar

 conclusion noted above, the trial court again later explicitly rejected Dr. Taylor’s

 conclusions regarding the impact of political geography on the enacted maps.

¶ 61 Legislative Defendants’ Rebuttal Expert Sean Trende. “Mr. Trende was

 qualified and accepted as an expert at trial in the areas of political science,

 redistricting, drawing redistricting maps[,] and analyzing redistricting maps.” The

 trial court noted that Mr. Trende used color-coded maps of North Carolina counties

 “noting the number of counties in which a majority of voters voted for the Republican

 presidential candidate in the past decade (between 70 and 76 counties) and whether

 the Republican candidate performed better in a county than nationally.” It is unclear
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 how, if at all, the trial court considered Mr. Trende’s testimony. This concluded the

 trial court’s review of the expert testimony.

¶ 62 After considering the analysis of each expert, the trial court engaged in a

 district-by-district analysis of each of the three enacted maps: those for the North

 Carolina Senate, North Carolina House, and Congress, respectively.

¶ 63 North Carolina Senate Districts. The trial court found that the following

 North Carolina Senate district groupings minimized Democratic districts and

 maximized safe Republican districts through the “packing” and “cracking” of

 Democratic voters as the “result of intentional, pro-Republican partisan

 redistricting”: the Granville-Wake Senate County Grouping; the Cumberland-Moore

 Senate County Grouping; the Guilford-Rockingham Senate County Grouping; the

 Forsyth-Stokes Senate County Grouping; the Iredell-Mecklenburg Senate County

 Grouping; the Northeastern Senate County Grouping (Bertie County, Camden

 County, Currituck County, Dare County, Gates County, Hertford County,

 Northampton County, Pasquotank County, Perquimans County, Tyrrell County,

 Carteret County, Chowan County, Halifax County, Hyde County, Martin County,

 Pamlico County, Warren County, and Washington County); and the Buncombe-

 Burke-McDowell Senate County Grouping. The trial court did not find any of the

 Senate district groupings to not be the result of intentional, pro-Republican

 redistricting through packing and cracking.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

¶ 64 North Carolina House of Representatives District. The trial court found

 that the following North Carolina House district groupings minimized Democratic

 districts and maximized safe Republican districts through the “packing” and

 “cracking” of Democratic voters as the “result of intentional, pro-Republican partisan

 redistricting”: the Guilford House County Grouping; the Buncombe House County

 Grouping; the Mecklenburg House County Grouping; the Pitt House County

 Grouping; the Durham-Person House County Grouping; the Forsyth-Stokes House

 County Grouping; the Wake House County Grouping; the Cumberland House County

 Grouping; and the Brunswick-New Hanover House County Grouping. Notably,

 however, the trial court found the Duplin-Wayne House County Grouping and the

 Onslow-Pender House County Grouping “to not be the result of intentional, pro-

 Republican partisan redistricting.”

¶ 65 North Carolina Congressional Districts. Next, the trial court found “that

 the 2021 Congressional plan is a partisan outlier intentionally and carefully designed

 to maximize Republican advantage in North Carolina’s Congressional delegation.”

 The court found that the enacted congressional map “fails to follow and subordinates

 the Adopted Criteria’s requirement[s]” regarding splitting counties and VTDs.

 Further, the court found

 that the enacted congressional plan fails to follow, and
 subordinates, the Adopted Criteria’s requirement to draw
 compact districts. The [c]ourt [found] that the enacted
 congressional districts are less compact than they would be
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 under a map-drawing process that adhered to the Adopted
 Criteria and prioritized the traditional districting criteria
 of compactness.

 Further, “when compared to the 1,000 computer-simulated plans[,]” the court found

 that “the enacted congressional plan is a statistical outlier” in regard to the total

 number of Republican-favoring districts it creates.

¶ 66 Next, the court noted four types of analyses in particular that confirm the

 “extreme partisan outcome” of the congressional map that “cannot be explained by

 North Carolina’s political geography or by adherence to Adopted Criteria”: (1) “mean-

 median difference” analysis ; (2) “efficiency gap” analysis (“measur[ing] . . . the degree

 to which more Democratic or Republican votes are wasted across an entire districting

 plan”); (3) “the lopsided margins test”; and (4) “partisan symmetry” analysis. Based

 on these methods, the trial court found “that the enacted congressional plan

 subordinates the Adopted Criteria and traditional redistricting criteria for partisan

 advantage.”

¶ 67 Next, the trial court considered “whether the congressional plan is a statistical

 partisan outlier at the regional level.” Here, the court found “that the enacted

 congressional plan’s districts in each region examined exhibit[ed] political bias when

 compared to the computer-simulated districts in the same regions.” These included

 the Piedmont Triad area, the Research Triangle area, and the Mecklenburg County

 area. “The [c]ourt [found] that the packing and cracking of Democrats in [these
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 regions] could not have resulted naturally from the region’s political geography or the

 districting principles required by the Adopted Criteria.” “The enacted congressional

 map[,]” the court determined, “was therefore designed in order to accomplish the

 legislature’s predominant partisan goals.” Later, the court again confirmed “that the

 enacted congressional plan’s partisan bias goes beyond any ‘natural’ level of electoral

 bias caused by North Carolina’s political geography or the political composition of the

 state’s voters, and this additional level of partisan bias . . . can be directly attributed

 to the map-drawer’s intentional efforts to favor the Republican Party.”

¶ 68 Next, as it did for the North Carolina House and Senate districts, the trial

 court engaged in a district-by-district analysis of all fourteen enacted congressional

 districts. After individual analysis, the court found all fourteen districts “to be the

 result of intentional, pro-Republican partisan redistricting.”

¶ 69 Finally, the trial court noted that “elections are decided by any number of

 factors.” Statistical analyses, the court observed, “treat the candidates as inanimate

 objects” and “assume that voters will vote along party lines.” In essence, the court

 doubted that a computer analysis could ever “take the human element out of the

 human.” “Notwithstanding these doubts,” though, the court “conclude[d] based upon

 a careful review of all of the evidence that the Enacted Maps are a result of

 intentional, pro-Republican partisan redistricting.” This concluded the court’s factual

 findings regarding plaintiffs’ partisan gerrymandering claims.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 b. Plaintiffs’ Intentional Racial Discrimination and Racial Vote Dilution
 Claims

¶ 70 Second, the trial court considered plaintiffs’ intentional racial discrimination

 and racial vote dilution claims. Beginning with intentional racial discrimination, the

 court found that “[t]here is no express language showing discriminatory intent within

 the text of the session laws establishing the Enacted Plans.” Next, the court noted

 plaintiffs’ circumstantial evidence of racial discrimination, including testimony from

 plaintiff Common Cause’s expert James Leloudis II, regarding the historical

 connection between North Carolina’s past racial gerrymandering practices and the

 current plans.

¶ 71 The trial court then considered plaintiffs’ racial vote dilution claims. After

 reviewing the evidence presented by plaintiffs’ and Legislative Defendants’ experts

 on this matter, the court found that “[r]ace was not the predominant, overriding factor

 in drawing the districts in the Enacted Plans.” The court found that “[t]he General

 Assembly did not subordinate traditional race-neutral districting principles,

 including compactness, contiguity, and respect for political subdivisions to racial

 considerations.” Accordingly, the court found that a district-by-district analysis of

 racial vote dilution, as it had previously performed for the extreme partisan

 gerrymandering claim, was not necessary. This concluded the trial court’s findings

 regarding plaintiffs’ intentional racial discrimination and racial vote dilution claims.

 c. Plaintiffs’ Whole County Provision Claims
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

¶ 72 Finally, the court made findings regarding plaintiffs’ whole county provision

 claim. Here, the court noted that under the enacted plans, 35 senate districts and 107

 North Carolina House districts split counties. The court observed that the Senate

 districts divided 15 total counties, while the House districts divided 37 total counties.

 The court noted that in instances where “multiple county groupings were possible

 under the Supreme Court’s interpretation of the Whole County Provision[,] . . .

 groupings were chosen from the range of legally possible groupings.” “Within each

 remaining county grouping containing a district challenged under the Whole County

 Provision,” the court found, “the district line’s traversal of a county line occurs

 because of the need to comply with the equal-population rule required by law and

 memorialized in the Adopted Criteria.”

 2. Trial Court’s Conclusions of Law

¶ 73 After making these extensive findings of fact, the trial court concluded as a

 matter of law that claims of extreme partisan gerrymandering present purely

 political questions that are nonjusticiable under the North Carolina Constitution.

 Accordingly, the court concluded that the enacted maps are not unconstitutional as a

 result of partisan gerrymandering.

 a. Standing

¶ 74 First, the court addressed plaintiffs’ standing to bring their various claims.

 Because “[i]ndividual private citizens and voters of a county have standing to sue to
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 seek redress from an alleged violation of N.C. Const. art II, §§ 3 and 5[,]” the court

 held, “the Individual NCLCV Plaintiffs challenging a district based upon the Whole

 County Provision have standing.” However, based on its legal conclusion that

 “Plaintiffs have not stated any cognizable claim for partisan gerrymandering under

 the various provisions of the North Carolina Constitution[,]” the court concluded that

 all plaintiffs lack standing for these claims.

¶ 75 Finally, the court addressed NCLCV Plaintiffs’ and Common Cause Plaintiffs’

 standing to bring claims of intentional racial discrimination and racial vote dilution

 under the North Carolina Constitution. Because the court found “there to be no

 factual basis underlying these asserted claims,” it concluded that “there is a lack of

 the requisite ‘direct injury’—i.e., the deprivation of a constitutionally guaranteed

 personal right. Accordingly, [the court concluded that] these Plaintiffs do not have

 standing for these claims.” Similarly, the court concluded that “Plaintiff Common

 Cause lacks standing for its claim requesting a declaratory judgment . . . directing

 the legislative process to be undertaken in redistricting.”

 b. Partisan Gerrymandering Claims

¶ 76 Next, the court addressed plaintiffs’ partisan gerrymandering claims under

 various provisions of the North Carolina Constitution. Here, the court determined

 that plaintiffs’ claims amounted to political questions that are nonjusticiable under

 the North Carolina Constitution. Specifically, after surveying the history of the
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 constitutional provisions under which plaintiffs brought their claims, the court

 concluded that “redistricting is an inherently political process” that “is left to the

 General Assembly.”

¶ 77 The court then addressed each of plaintiffs’ constitutional claims. First, the

 court held that the enacted maps do not violate the free elections clause, which

 mandates that “[a]ll elections shall be free.” N.C. Const. art. I, § 10. The court noted

 that “[w]hile the Free Elections Clause has been part of our constitutional

 jurisprudence since the 1776 Constitution, there are very few reported decisions that

 construe the clause.” Based on a survey of the clause’s history, the court “conclude[d]

 that the Free Elections Clause does not operate as a restraint on the General

 Assembly’s ability to redistrict for partisan advantage.”

¶ 78 Second, the trial court addressed plaintiffs’ claims under the free speech clause

 and the equal protection clause. After reviewing the historical background of the

 addition of these clauses to the constitution in 1971, the court concluded that “the

 incorporation of the Free Speech Clause and the Equal Protection Clause to the North

 Carolina Constitution of 1971 was not intended to bring about a fundamental change

 to the power of the General Assembly.” Accordingly, the court refused to “assume that

 . . . the Equal Protection Clause and Free Speech Clause impose new restrictions on

 the political process of redistricting.”
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

¶ 79 From this historical foundation, the court concluded that “the Enacted Maps

 do not violate the Equal Protection Clause.” The court concluded that although “[i]t

 is true that there is a fundamental right to vote[,] . . . [r]edistricting and the political

 considerations that are part of that process do not impinge on the right to vote.

 Nothing about redistricting affects a person’s right to cast a vote.” Accordingly, and

 because political affiliation is not a suspect class, the court concluded that “[a]ny

 impingement is limited and distant and as such is subject to rational basis review.”

 The court then concluded “that the plans are amply supported by a rational basis and

 thus do not violate the Equal Protection Clause.”

¶ 80 Third, the court likewise concluded that “the Enacted Plans do not violate the

 Free Speech Clause.” Specifically, the court concluded that “plaintiffs are free to

 engage in speech no matter what the effect the Enacted Plans have on their district.”

¶ 81 Fourth, the trial court concluded that “the Enacted Plans do not violate the

 Right of Assembly Clause.” Specifically, the court noted that “Plaintiffs remain free

 to engage in their associational rights and rights to petition no matter what effect the

 Enacted Plans have on their district.”

¶ 82 In total, the trial court concluded that “[t]he objective constitutional

 constraints that the people of North Carolina have imposed on legislative

 redistricting are found in Article II, Sections 3 and 5 of the 1971 Constitution and not

 in the Free Elections, Equal Protection, Freedom of Speech[,] or Freedom of Assembly
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 Clauses found in Article I of the 1971 Constitution.” “Therefore, the [c]ourt

 conclude[d] that our Constitution does not address limitations on considering

 partisan advantage in the application of its discretionary redistricting decisions and

 Plaintiffs’ claims on the basis of ‘extreme partisan advantage’ fail.”

 c. Justiciability

¶ 83 Next, the court again addressed justiciability. First, the court considered

 whether the North Carolina Constitution delegates the responsibility and oversight

 of redistricting exclusively to the General Assembly. Citing article II, sections 3, 5,

 and 20, the court concluded that “[t]he constitutional provisions relevant to the issue

 before [it] establish that redistricting is in the exclusive province of the legislature.”

¶ 84 Second, the court considered “whether satisfactory and manageable criteria or

 standards exist for judicial determination of the issue.” Here, relying on its analysis

 of the Supreme Court of the United States in Rucho, 139 S. Ct. at 2506–07, regarding

 the justiciability of partisan gerrymandering claims in federal courts, the trial court

 “determine[d] that satisfactory and manageable criteria or standards do not exist for

 judicial determination of the issue and thus the partisan gerrymandering claims

 present a political issue beyond our reach.”

¶ 85 In reaching this conclusion, the court noted that it

 agree[s] with the United States Supreme Court that
 excessive partisanship in districting leads to results that
 are incompatible with democratic principles. Rucho, 139 S.
 Ct[.] at 2504. Furthermore, it has the potential to violate
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 “the core principle of republican government . . . that the
 voters should choose their representatives, not the other
 way around.” Ariz. State Legislature v. Ariz. Indep.
 Redistricting Comm’n, 567 U.S. 787, 824 . . . (2015). Also,
 it can represent “an abuse of power that, at its core, evinces
 a fundamental distrust of voters, serving the self-interest
 of the political parties at the expense of the public good.”
 LULAC v. Perry, 548 U.S. 399, 456 . . . (2006) (Stevens, J.[,]
 concurring in part and dissenting in part) (quotation and
 citation omitted)).

 The Court then added that it “neither condones the enacted maps nor their

 anticipated potential results” and that it has a “disdain for having to deal with issues

 that potentially lead to results incompatible with democratic principles and subject

 our State to ridicule.” Nevertheless, the court concluded that because redistricting “is

 one of the purest political questions which the legislature alone is allowed to

 answer[,]” judicial action “in the manner requested . . . would be usurping the political

 power and prerogatives of an equal branch of government.” Accordingly, the trial

 court concluded that plaintiffs’ partisan gerrymandering claims are nonjusticiable.

 d. Intentional Racial Discrimination and Racial Vote Dilution

¶ 86 Next, the trial court addressed plaintiffs’ claims of intentional racial

 discrimination and racial vote dilution. The court “conclude[d] that based upon the

 record before [it], Plaintiffs have failed to prove the merit of their claim.”

¶ 87 Here, the court noted that “[t]he North Carolina Constitution’s guarantees of

 ‘substantially equal voting power’ and ‘substantially equal legislative representation’

 are violated when a redistricting plan deprives minority voters of ‘a fair number of
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 districts in which their votes can be effective,’ measured based on ‘the minority’s

 rough proportion of the relevant population[,]’ ” quoting Bartlett v. Strickland, 556

 U.S. 1, 28–29 (2009) (Souter, J., dissenting). The court then stated that “[a]n act of

 the General Assembly can violate North Carolina’s Equal Protection Clause if

 discriminatory purpose was ‘a motivating factor.’ ” “And whether discriminatory

 purpose was a motivating factor[,]” the court observed, “can be ‘inferred from the

 totality of the relevant facts, including the fact, if it is true, that the law bears more

 heavily on one race than another.’ ” “To determine whether this is true,” the court

 stated, “the court may weigh the law’s historical background, the sequence of events

 leading up to the law, departures from normal procedure, legislative history, and the

 law’s disproportionate impact.”

¶ 88 Based upon these standards, the court then concluded that “NCLCV Plaintiffs

 and Plaintiff Common Cause have failed to satisfy their burden of establishing that

 race was the predominant motive behind the way in which the Enacted Plans were

 drawn.” The court first reached this conclusion based on plaintiffs’ “fail[ure] to show

 a predominant racial motive through direct [or circumstantial] evidence.” Second, the

 court concluded, “Plaintiffs have failed to establish that the General Assembly failed

 to adhere to traditional districting principles on account of racial considerations.”

 Third, the court concluded that “Plaintiffs have failed to make the requisite

 evidentiary showing that the General Assembly sought to dilute the voting strength
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 of Blacks based upon their race, or that Blacks have less of an opportunity to vote for

 or nominate members of the electorate less than those of another racial group.”

 Although the court agreed with plaintiffs’ showing “that a substantial number of

 Black voters are affiliated with the Democratic Party[,]” it nevertheless concluded

 that plaintiffs had not shown

 how the General Assembly targeted this group on the basis
 of race instead of partisanship. Black voters who also
 happen to be Democrats have therefore been grouped into
 the partisan intent of the General Assembly. There is
 nothing in the evidentiary record before th[e] [c]ourt
 showing that race and partisanship were coincident goals
 predominating over all other factors in redistricting.

 Accordingly, the court rejected plaintiffs’ claims of intentional racial discrimination

 within the enacted plans.

¶ 89 Second, the court addressed plaintiffs’ claims of racial vote dilution in violation

 of the free elections clause. Having previously concluded that the free elections clause

 should be narrowly interpreted to not apply in the redistricting context, the court

 concluded that “NCLCV Plaintiffs’ claim that the Enacted Plans unnecessarily dilute

 the voting power of citizens on account of race in violation of the Free Elections Clause

 of Art. I, § 10 is without an evidentiary or legal basis.” Accordingly, the court rejected

 this claim.

 e. Whole-County Provision Claims
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

¶ 90 Next, the trial court addressed plaintiffs’ claims under the whole county

 provision of article II, sections 3 and 5 of the North Carolina Constitution. Although

 the boundaries of certain legislative districts under the enacted plans indeed crossed

 county lines, the court “conclude[d] that the counties grouped and then divided in the

 formation of the specific districts at issue for this claim were the minimum necessary,

 and contained the minimum number of traversals and maintained sufficient

 compactness, to comply with the one-person-one-vote standard in such a way that it

 met the equalization of population requirements set forth in Stephenson v. Bartlett,

 355 N.C. 354, 383[–]84 . . . (2002).” Accordingly, the court “conclude[d] that the

 manner by which the counties at issue for this specific claim were traversed was not

 unlawful because it was predominantly for traditional and permissible redistricting

 principles, including for partisan advantage, which are allowed to be taken into

 account in redistricting.”

 f. Declaratory Judgment Claim

¶ 91 Finally, the trial court addressed plaintiff Common Cause’s declaratory

 judgment claim regarding the redistricting process laid out in Stephenson and

 Dickson v. Rucho, 368 N.C. 481 (2015). On this issue, the court stated that “[t]he

 requirement in Stephenson that districts required by the VRA be drawn first was put

 in place to alleviate the conflict and tension between the WPC and VRA.” But, the

 court noted, “[t]here is nothing in Stephenson that requires any particular analysis
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 prior to making a decision as to whether VRA districts are necessary.” Accordingly,

 the court concluded that “[t]he fact is, whether correct or not, the Legislative

 Defendants made a decision that no VRA Districts are required.” The court then

 stated that, in this situation, “[w]hat Plaintiff Common Cause asks of this [c]ourt is

 to impose a judicially-mandated preclearance requirement . . . [that] does not exist in

 Stephenson.” Therefore, the court concluded as a matter of law “that Plaintiff

 Common Cause is not entitled to a Declaratory Judgment or Injunctive Relief.”

 3. Trial Court’s Decree

¶ 92 Following these extensive factual findings and conclusions of law, the trial

 court issued its ultimate decree. Specifically, the trial court ordered that (1) plaintiffs’

 requests for declaratory judgment are denied; (2) plaintiffs’ requests for permanent

 injunctive relief are denied; (3) the court’s judgment fully and finally resolves all

 claims of plaintiffs, judgment is entered in favor of Legislative Defendants, and

 plaintiffs’ claims are dismissed with prejudice; and (4) the candidate filing period for

 the 2022 primary and municipal elections is set to resume at 8:00 a.m. on Thursday,

 24 February 2022, and shall continue through and end at 12:00 noon on Friday, 4

 March 2022.

 D. Present Appeal

¶ 93 Pursuant to this Court’s 8 December 2021 order certifying the case for

 discretionary review prior to determination by the Court of Appeals, all plaintiffs filed
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 notices of appeal to this Court from the trial court’s final judgment on 11 and 12

 January 2022. The parties’ briefs and arguments before this Court largely echoed the

 arguments made before the trial court. Namely, plaintiffs asserted that the enacted

 plans constitute extreme partisan gerrymandering in violation of the free elections

 clause, equal protection clause, free speech clause, and freedom of assembly clause of

 the North Carolina Constitution and that these state constitutional claims were

 justiciable in state court. Legislative Defendants argued that plaintiffs’ claims

 presented nonjusticiable political questions and therefore did not violate any of the

 asserted state constitutional provisions. The Court also accepted amicus briefs from

 several interested parties. Due to the time-sensitive nature of this case, oral

 arguments were calendared and heard in a special session on 2 February 2022.

 II. Legal Analysis

¶ 94 Now, this Court must determine whether plaintiffs’ claims are justiciable

 under the North Carolina Constitution and, if so, whether Legislative Defendants’

 enacted plans for congressional and state legislative districts violate the free elections

 clause, equal protection clause, free speech clause, and freedom of assembly clause of

 our constitution. After careful consideration, we conclude that partisan

 gerrymandering claims are justiciable under the North Carolina Constitution and

 that Legislative Defendants’ enacted plans violate each of these provisions of the

 North Carolina Constitution beyond a reasonable doubt.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 A. Standing

¶ 95 As a threshold issue, we must determine whether plaintiffs have standing to

 bring their claims. As noted above, the trial court ruled that individual NCLCV

 Plaintiffs had standing to challenge the enacted plans under the whole county

 provision but that plaintiffs lacked standing to bring their partisan gerrymandering

 claims because they had “not stated any cognizable claim for partisan

 gerrymandering under the various provisions of the North Carolina Constitution.”

 The court further determined that NCLCV Plaintiffs and plaintiff Common Cause

 likewise lacked standing to bring their intentional racial discrimination and racial

 vote dilution claims under the North Carolina Constitution. Specifically, the court

 ruled that “[b]ecause . . . there [is] no factual basis underlying these asserted claims,

 there is a lack of the requisite ‘direct injury’—i.e., the deprivation of a constitutionally

 guaranteed personal right.”

¶ 96 We cannot agree. As this Court held in Committee to Elect Dan Forest v.

 Employees Political Action Committee, “the federal injury-in-fact requirement has no

 place in the text or history of our Constitution.” 376 N.C. 558, 2021-NCSC-6, ¶ 73.

 Rather, in the case of direct constitutional challenges to statutes or other acts of

 government, we require only the requisite “concrete adverseness which sharpens the

 presentation of issues upon which the court so largely depends for illumination of

 difficult constitutional questions.” Id. ¶ 64 (quoting Stanley v. Dep’t of Cons. and Dev.,
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

284 N.C. 15, 28 (1973)). Accordingly, as a “prudential principle of judicial self-

restraint” and not as a limitation on the judicial power, we have required that a

person challenging government action be directly injured or adversely affected by it.

Id. ¶ 63. This prudential requirement that the person challenging a statute be

directly injured or adversely affected thereby is purely to ensure that the putative

injury belongs to them and not another, and hence that they “can be trusted to battle

the issue.” Id. ¶ 64 (citing Stanley, 284 N.C. at 28). Accordingly, “[t]he ‘direct injury’

required in this context could be, but is not necessarily limited to, ‘deprivation of a

constitutionally guaranteed right or an invasion of his property rights,’ ” id. ¶ 62

(emphasis added), and “[w]hen a person alleges the infringement of a legal

right . . . arising under . . . the North Carolina Constitution, . . . the legal injury itself

gives rise to standing,” id. ¶ 82 (emphasis added). This direct injury requirement does

not require a showing that a party will in fact prevail under the constitutional theory

they advance. Rather, alleging the violation of a legal right which belongs to them,

even if widely shared with others and even if they are not entitled to relief under their

theory of the legal right, is sufficient to show the requisite “concrete adverseness” in

our courts which we, for purely pragmatic reasons, require in the resolution of

constitutional questions. To hold otherwise would resuscitate an injury-in-fact

requirement as a barrier to remedy by the courts in another form.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

¶ 97 The trial court contravened the concrete adverseness rationale for the direct

 injury requirement by concluding that plaintiffs lacked standing because their

 partisan gerrymandering claims, which they contended violated their constitutional

 rights under the free elections clause, equal protection clause, free speech clause, and

 freedom of assembly clause, were not “cognizable.”6 The allegation of violations of

 these constitutional rights was sufficient to generate an actual controversy and hence

 concrete adverseness, whether or not their theory of the violation ultimately

 prevailed in the courts. For example, in Baker v. Carr, from which this Court in part

 derived its concrete adverseness rationale, see Comm. to Elect Dan Forest, ¶ 64, the

 Supreme Court of the United States announced for the first time that claims of vote

 dilution were cognizable and justiciable under the Equal Protection Clause. See

 generally Baker v. Carr, 369 U.S. 186 (1962); see also Comm. to Elect Dan Forest, ¶

 46 (“[T]he only injury asserted [in Baker] is the impairment of a constitutional right

 broadly shared and divorced from any ‘factual’ harm experienced by the plaintiffs”).

 The constitutional right to equal protection of the laws existed although the Baker

 Court had not yet extended it to the precise theory the plaintiffs advanced. Similarly,

 here, the plaintiffs all had standing to challenge the maps based on their allegation

 of violations of their constitutional rights under the free elections clause, equal

 6 The trial court also conflated the existence of a “cognizable” claim under the state

 constitution with one that is justiciable. A claim may violate the constitution yet not be
 justiciable because it is a political question.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 protection clause, free speech clause, and freedom of assembly clause of our

 Declaration of Rights, which are injuries to legal rights that they directly suffered,

 irrespective of whether courts previously or the court below determined their

 particular theory under those rights ultimately entitled them to prevail.

¶ 98 Finally, the court also determined that “the organizational Plaintiffs each seek

 to vindicate rights enjoyed by the organization under the North Carolina

 Constitution” and that “organizational Plaintiffs each have members who would

 otherwise have standing to sue in their own right, the interests each seeks to protect

 are germane to the organization’s purpose, and neither the claim asserted nor the

 relief requested requires the participation of individual members in the lawsuit.” We

 agree.

¶ 99 Taken together, the trial court’s findings are sufficient to establish that each

 individual and organizational plaintiff here meets the standing requirements under

 the North Carolina Constitution as summarized above. Accordingly, the trial court

 erred in ruling to the contrary.

 B. The Political Question Doctrine

¶ 100 We next address Legislative Defendants’ contention that plaintiffs’ claims

 present only nonjusticiable political questions. Whether partisan gerrymandering

 claims present a nonjusticiable “purely political question” under North Carolina law

 is a question of first impression. We have held that certain claims raising “purely
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 political question[s]” are “nonjusticiable under separation of powers principles.” Hoke

 Cnty. Bd. of Educ. v. State, 358 N.C. 605, 618 (2004). Purely political questions are

 those questions which have been wholly committed to the “sole discretion” of a

 coordinate branch of government, and those questions which can be resolved only by

 making “policy choices and value determinations.” Bacon v. Lee, 353 N.C. 696, 717

 (2001) (quoting Japan Whaling Ass’n v. Am. Cetacean Soc’y, 478 U.S. 221, 230 (1986)).

 Purely political questions are not susceptible to judicial resolution. When presented

 with a purely political question, the judiciary is neither constitutionally empowered

 nor institutionally competent to furnish an answer. See Hoke Cnty. Bd. of Educ., 358

 N.C. at 638–39 (declining to reach the merits after concluding that “the proper age at

 which children should be permitted to attend public school is a nonjusticiable political

 question reserved for the General Assembly”).

¶ 101 The trial court and Legislative Defendants rely in part on Rucho and other

 federal cases. These cases may be instructive, but they are certainly not controlling.

 We have previously held that “[w]hile federal standing doctrine can be instructive as

 to general principles . . . and for comparative analysis, the nuts and bolts of North

 Carolina standing doctrine are not coincident with federal standing doctrine.”

 Goldston v. State, 361 N.C. 26, 35 (2006). This principle extends to all justiciability

 doctrines. “Federal justiciability doctrines—standing, ripeness, mootness, and the

 prohibition against advisory opinions—are not explicit within the constitutional text,
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

but are the fruit of judicial interpretation of Article III’s extension of the ‘judicial

Power’ to certain ‘Cases’ or ‘Controversies.’ ” Comm. to Elect Dan Forest, 376 N.C.

558, 2021-NCSC-6, ¶ 35. Originally, federal courts showed great reluctance to involve

themselves in policing redistricting practices at all. The result was both the grossly

unequal apportionment of representation of legislative and congressional seats and

the drawing of district lines in pursuit of partisan advantage.7 The judicial

repudiation of any role in redistricting was summarized in Colegrove v. Green, where

the Supreme Court declared a challenge to the drawing of congressional districting

lines in Illinois nonjusticiable under the Fourteenth Amendment. 328 U.S. 549, 556

(1946). Writing for the Court, Justice Frankfurter reasoned that “effective working of

our Government revealed this issue to be of a peculiarly political nature and therefore

not [fit] for judicial determination.” Id. at 552. “Authority for dealing with such

problems resides elsewhere.” Id. at 554. The Court concluded, revealing the

prudential basis of its reasoning, that “[c]ourts ought not to enter this political

 7 Before the “reapportionment revolution” of Baker v. Carr and its progeny in the

1960s, “states had much more leeway over when, and even if, to redraw district boundaries.
One result was that in many states, district lines remained frozen for decades—often leading
to gross inequalities in district populations and substantial partisan biases.” Erik J.
Engstrom, Partisan Gerrymandering and the Construction of American Democracy 13 (2013).
“Connecticut, for instance, kept the exact same congressional district lines for 70 years (1842–
1912).” Id. at 8. Other state legislatures redrew maps whenever they wanted. “In every year
from 1862 to 1896, with one exception, at least one state redrew its congressional district
boundaries. Ohio, for example, redrew its congressional district boundaries six times between
1878 and 1890.” Id. Moreover, “parties were willing to push partisan advantage to the edge.
To do so, partisan mapmakers carved states into districts with narrow, yet winnable,
margins.” Id.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 thicket.” Id. at 556 (emphasis added).

¶ 102 In the landmark decision of Baker v. Carr, the Supreme Court reversed course

 and held in a case involving claims that malapportionment violates the Equal

 Protection Clause of the Fourteenth Amendment that such claims are justiciable

 since they do not present political questions. 369 U.S. 186, 209 (1962). The Baker

 Court began its justiciability analysis by noting that “the mere fact that the suit seeks

 protection of a political right does not mean it presents a political question. Such an

 objection is little more than a play upon words.” Id. (cleaned up). After reviewing

 cases to discern the threads that, in various formulations, comprise a nonjusticiable

 political question, the Court identified what has become the standard definition of

 the political question doctrine under federal law:

 Prominent on the surface of any case held to involve a
 political question is found a textually demonstrable
 constitutional commitment of the issue to a coordinate
 political department; or a lack of judicially discoverable
 and manageable standards for resolving it; or the
 impossibility of deciding without an initial policy
 determination of a kind clearly for nonjudicial discretion;
 or the impossibility of a court’s undertaking independent
 resolution without expressing lack of the respect due
 coordinate branches of government; or an unusual need for
 unquestioning adherence to a political decision already
 made; or the potentiality of embarrassment from
 multifarious pronouncements by various departments on
 one question.

 Id. at 217. The Court in Baker held that the plaintiffs’ claim under the Equal

 Protection Clause, unlike prior claims under the Guaranty Clause, was justiciable
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 because it presented, inter alia, “no question decided, or to be decided, by a political

 branch of government coequal with th[e] Court” and no “policy determinations for

 which judicially manageable standards are lacking,” as “[j]udicial standards under

 the Equal Protection Clause are well developed and familiar,” which are “that a

 discrimination reflects no policy, but simply arbitrary and capricious action.” Id. at

 226. Accordingly, over a dissent written by Justice Frankfurter and joined by Justice

 Harlan, the Court entered the political thicket. The Court did not in that decision

 announce a remedy for the violation of the Equal Protection Clause but in later cases

 held that the principle of “one person, one vote” required as close to mathematical

 equality as practicable in the drawing of congressional districts and “substantial

 equality” in the drawing of legislative districts. Cf. Wesberry v. Sanders, 376 U.S. 1,

 7–8 (1964) (holding that “as nearly as is practicable one man’s vote in a congressional

 election is to be worth as much as another’s”); Reynolds v. Sims, 377 U.S. 533, 579

 (1964) (“So long as the divergences from a strict population standard are based on

 legitimate considerations incident to the effectuation of a rational state policy, some

 deviations from the equal-population principle are constitutionally permissible with

 respect to the apportionment of seats in either or both of the two houses of a bicameral

 state legislature.”).

¶ 103 Although federal courts concluded that malapportionment claims were

 justiciable, the Supreme Court of the United States did not expressly hold that a
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

partisan gerrymandering claim was justiciable until Davis v. Bandemer, where it

held that a partisan gerrymandering claim existed under the Fourteenth Amendment

that did not present a nonjusticiable political question.8 478 U.S. 109, 124 (1986)

(plurality opinion), abrogated by Rucho, 139 S. Ct. 2484. The plurality opinion in

Bandemer identified the claim as being “that each political group in a State should

have the same chance to elect representatives of its choice as any other political

group,” and although the claim was distinct from that in Reynolds involving districts

of unequal size, “[n]evertheless, the issue is one of representation, and we decline to

hold that such claims are never justiciable.” Id. The plurality adopted as a test that

“unconstitutional discrimination occurs only when the electoral system is arranged

in a manner that will consistently degrade a voter’s or a group of voters’ influence on

the political process as a whole.” Id. at 132. Justice O’Connor concurred in the

judgment, arguing in part that the Court’s decision would result in a requirement for

“roughly proportional representation.”9 Id. at 147 (O’Connor, J., concurring in the

judgment).

 8 As noted in the plurality opinion in Bandemer, the Supreme Court did address a

partisan gerrymandering claim in Gaffney v. Cummings, by holding that a districting plan
which incorporated a “political fairness principle” across the plan did not violate the Equal
Protection Clause; however, no concern about justiciability was raised in Gaffney. 412 U.S.
735, 751–52 (1973).
 9 The plurality responded that their decision did not reflect “a preference for

proportionality per se but a preference for a level of parity between votes and representation
sufficient to ensure that significant minority voices are heard and that majorities are not
consigned to minority status.” Davis v. Bandemer, 478 U.S. 109, 125 n.9 (1986).
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

¶ 104 Eighteen years later the Supreme Court overruled Bandemer in Vieth v.

 Jubelirer, 541 U.S. 267 (2004), a challenge to Pennsylvania’s 2001 congressional

 redistricting plan on the grounds that it was a political gerrymander. Justice Scalia

 wrote the plurality opinion, in which three other justices joined, and would have also

 held partisan gerrymandering claims to be nonjusticiable political questions because

 they lack a “judicially discernable and manageable standard[,]” id. at 306—“judicially

 discernible in the sense of being relevant to some constitutional violation[,]” id. at

 288. Justice Kennedy concurred in the judgment but refused to hold partisan

 gerrymandering nonjusticiable because “in another case a standard might emerge.”

 Id. at 312 (Kennedy, J., concurring in the judgment).

¶ 105 In Rucho, completing its retreat from Bandemer, the Supreme Court of the

 United States abandoned the field in policing partisan gerrymandering claims. The

 Supreme Court held that claims alleging that North Carolina’s and Maryland’s

 congressional districts were unconstitutionally gerrymandered for partisan gain were

 nonjusticiable in federal court. Rucho, 139 S. Ct. at 2493–2508. It reached this

 conclusion because it could find “no legal standards discernible in the [United States]

 Constitution for” resolving partisan gerrymandering claims, “let alone limited and

 precise standards that are clear, manageable, and politically neutral.” Id. at 2500.

¶ 106 Three concerns appear to have motivated the Court in Rucho. The first premise

 which concerned the Court in Rucho was the absence of a “judicially discernable”
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 standard, that is, one that is “relevant to some constitutional violation.” Vieth, 541

 U.S. at 288; see Rucho, 139 S. Ct. at 2507 (“ ‘[J]udicial action must be governed by

 standard, by rule,’ and must be ‘principled, rational, and based upon reasoned

 distinctions’ founded in the [United States] Constitution or laws.” (first alteration in

 original) (quoting Vieth, 541 U.S. at 278)). In essence, the Supreme Court concluded

 that no provision of the United States Constitution supplied a cognizable legal basis

 for challenging the practice of partisan gerrymandering. See, e.g., Rucho, 139 S. Ct.

 at 2501 (“[T]he one-person, one-vote . . . requirement does not extend to political

 parties.”); id. at 2502 (“[O]ur racial gerrymandering cases [do not] provide an

 appropriate standard for assessing partisan gerrymandering.”); id. at 2504 (“[T]here

 are no restrictions on speech, association, or any other First Amendment activities in

 the districting plans at issue.”); id. at 2506 (“The North Carolina District Court

 further concluded that the 2016 Plan violated the Elections Clause and Article I, § 2.

 We are unconvinced by that novel approach.”).

¶ 107 The second premise underpinning Rucho’s political-question holding was the

 absence of a standard that the Court deemed to be “clear, manageable[,] and

 politically neutral.” Id. at 2500. This rationale was particularly pressing because,

 “while it is illegal for a jurisdiction to depart from the one-person, one-vote rule, or to

 engage in racial discrimination in districting, ‘a jurisdiction may engage in

 constitutional political gerrymandering’ ” under federal law. Id. at 2497 (quoting
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 Hunt v. Cromartie, 526 U.S. 541, 551 (1999)). According to the Court, “the question

 is one of degree,” and “it is vital in such circumstances that the Court act only in

 accord with especially clear standards.” Id. at 2498. However, the Court held the

 plaintiffs had not supplied standards to answer the question, “At what point does

 permissible partisanship become unconstitutional?” Id. at 2501. Moreover, the tests

 adopted by the lower courts were unsatisfactory because they failed to articulate such

 a standard that was sufficiently “clear” and “manageable.” Id. at 2503–05. Finally,

 the dissent’s proposed test, using “a State’s own districting criteria as a neutral

 baseline” was unmanageable because “it does not make sense to use criteria that will

 vary from State to State and year to year.” Id. at 2505.

¶ 108 A third consideration animating the Court’s decision was a prudential

 evaluation of the role of federal courts in the constitutional system. Rucho, 139 S. Ct.

 at 2494 (framing the question presented as “whether there is an ‘appropriate role for

 the Federal Judiciary’ in remedying the problem of partisan gerrymandering”

 (emphasis added) (quoting Gill v. Whitford, 138 S. Ct. 1916, 1926 (2018))); id. at 2507

 (“Consideration of the impact of today’s ruling on democratic principles cannot ignore

 the effect of the unelected and politically unaccountable branch of the Federal

 Government assuming such an extraordinary and unprecedented role.”); id.

 (advocating action through states, including by state supreme courts on state law

 grounds); id. at 2508 (suggesting Congress could act); id. at 2499 (“But federal courts
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 are not equipped to apportion political power as a matter of fairness, nor is there any

 basis for concluding that they were authorized to do so.”).

¶ 109 In summary, federal courts initially forswore virtually any role in the “political

 thicket” of apportionment. See Colegrove, 328 U.S. at 556. However, in Baker and its

 progeny, the Supreme Court of the United States entered that thicket at least to the

 extent of policing malapportionment. See Baker, 369 U.S. 186. The Court’s reasons

 for entering the thicket are relevant today: the Supreme Court recognized that absent

 its intervention to enforce constitutional rights, our system of self-governance would

 be representative and responsive to the people’s will in name only. The Court entered

 the political thicket for a time as well to review partisan gerrymandering claims in

 Bandemer, but ultimately rejected that decision in Vieth, and in Rucho, the Court

 removed such claims from the purview of federal courts altogether. The premises that

 animated the Court in Rucho are substantially the same as those that kept it from

 policing malapportionment claims in the first place: the perception that there is no

 “discernable” right to such claims cognizable in the federal Constitution, a prudential

 evaluation that courts are ill-equipped to hear such claims, and a belief that courts

 should not involve themselves in “political” matters.

¶ 110 However, simply because the Supreme Court has concluded partisan

 gerrymandering claims are nonjusticiable in federal courts, it does not follow that

 they are nonjusticiable in North Carolina courts, as Chief Justice Roberts himself
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 noted in Rucho. Rucho, 139 S. Ct. at 2507 (“Provisions in state statutes and state

 constitutions can provide standards and guidance for state courts to apply.”). First,

 our state constitution “is more detailed and specific than the federal Constitution in

 the protection of the rights of its citizens.” Corum v. Univ. of N.C. Through Bd. of

 Governors, 330 N.C. 761, 783 (1992). Second, state law provides more specific neutral

 criteria against which to evaluate alleged partisan gerrymanders, and those criteria

 would not require our court system to consider fifty separate sets of criteria, as would

 federal court involvement. Finally, Rucho was substantially concerned with the role

 of federal courts in policing partisan gerrymandering, while recognizing the

 independent capacity of state courts to review such claims under state constitutions

 as a justification for judicial abnegation at the federal level. The role of state courts

 in our constitutional system differs in important respects from the role of federal

 courts.

¶ 111 Having canvassed relevant federal decisions, we now consider whether as a

 matter of state law plaintiffs’ partisan gerrymandering claims are justiciable under

 the North Carolina Constitution. We conclude that they are.

 C. The Question Presented Is Not Committed to the “Sole Discretion” of
 the General Assembly

¶ 112 Under North Carolina law, courts will not hear “purely political questions.”

 This Court has recognized two criteria of political questions: (1) where there is “a

 textually demonstrable constitutional commitment of the issue” to the “sole
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 discretion” of a “coordinate political department[,]” Bacon v. Lee, 353 N.C. 696, 717

 (2001) (quoting Baker v. Carr, 369 U.S. 186, 217 (1962)); and (2) those questions that

 can be resolved only by making “policy choices and value determinations[,]” id.

 (quoting Japan Whaling Ass’n v. American Cetacean Soc’y, 478 U.S. 221, 230 (1986)).

¶ 113 We first consider the issue of whether there is a textually demonstrable

 commitment of the issue to the “sole discretion” of a coordinate branch of government.

 The constitution vests the responsibility for apportionment of legislative districts in

 the General Assembly under article II of our state constitution. Article II provides:

 “The General Assembly . . . shall revise the senate districts and the apportionment of

 Senators among those districts.” N.C. Const. art. II, § 3; see N.C. Const. art. II, § 5

 (stating the same requirement for the North Carolina House). Legislative Defendants

 contend that “a delegation of a political task to a single political branch of government

 impliedly forecloses the other branches of government from undertaking that task”

 and that these provisions evidence such a textual commitment. They argue that this

 Court “has repeatedly acknowledged that this constitutional text is a grant of

 unreviewable political discretion to the legislative branch.” This argument—that

 gerrymandering claims are categorically nonjusticiable because reapportionment is

 committed to the sole discretion of the General Assembly—is flatly inconsistent with

 our precedent interpreting and applying constitutional limitations on the General

 Assembly’s redistricting authority. We have interpreted and applied both the
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 expressly enumerated limitations contained in article II, sections 3 and 5, and the

 limitations contained in other constitutional provisions such as the equal protection

 clause. Stephenson v. Bartlett, 355 N.C. 354, 370–71, 378–81 (2002) (determining

 whether the General Assembly’s use of its article II power to apportion legislative

 districts complied with federal law in accordance with article I, sections 3 and 5 of

 our constitution, and our state’s equal protection clause in article I, section 19);

 Blankenship v. Bartlett, 363 N.C. 518, 525–26 (2009) (holding that General

 Assembly’s exercise of its power under article IV, section 9 to establish the election of

 superior court judges in judicial districts must comport with our state’s equal

 protection clause in article I, section 19). Legislative defendants’ argument is,

 essentially, an effort to turn back the clock to the time before courts entered the

 political thicket to review districting claims in Baker v. Carr. Yet, as the facts of this

 case demonstrate, the need for this Court to continue to enforce North Carolinians’

 constitutional rights has certainly not diminished in the intervening years.

¶ 114 Relatedly, but more specifically, Legislative Defendants argue that even if

 certain gerrymandering claims may be justiciable, claims alleging partisan

 gerrymandering in violation of state constitutional provisions are nonjusticiable

 because this Court has endorsed the consideration of partisan advantage in the

 redistricting process. In support of this proposition, Legislative Defendants cite to our

 decision in Stephenson, where we stated the following in full:
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 The General Assembly may consider partisan advantage
 and incumbency protection in the application of its
 discretionary redistricting decisions, see Gaffney v.
 Cummings, 412 U.S. 735, 93 S. Ct. 2321, 37 L. Ed. 2d 298
 (1973), but it must do so in conformity with the State
 Constitution. To hold otherwise would abrogate the
 constitutional limitations or “objective constraints” that
 the people of North Carolina imposed on legislative
 redistricting and reapportionment in the State
 Constitution.

355 N.C. at 371. Legislative Defendants misread this statement. We did not conclude

that the text of our state constitution permits the General Assembly to “consider

partisan advantage and incumbency protection”; we concluded that federal law

permitted that consideration by citing to the decision of Gaffney v. Cummings, 412

U.S. 735 (1973). See Stephenson, 355 N.C. at 371. Moreover, Gaffney in no way

supports Legislative Defendants’ argument that we have endorsed their interest in

securing partisan advantage to any extent and which results in systematically

disfavoring voters of one political party. In Gaffney, the Supreme Court of the United

States rejected a partisan gerrymandering claim to an apportionment plan that

pursued a principle of “political fairness” in order to “allocate political power to the

parties in accordance with their voting strength.” Gaffney, 412 U.S. at 754 (emphasis

added). We expressly reserved the question of whether the General Assembly could

consider such criteria “in conformity with the State Constitution,” while also

affirming the applicability of “constitutional limitations” that the people imposed on

the legislative redistricting process in other provisions of the North Carolina
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 Constitution, such as the equal protection clause. Stephenson, 355 N.C. at 371.

 Simply put, resolving Stephenson did not require us to decide the legality of partisan

 gerrymandering under the North Carolina Constitution.

¶ 115 The commitment of responsibility for apportionment to the General Assembly

 in article II provides no support for the Legislative Defendants’ argument. First, the

 list of criteria the General Assembly is required to consider by that section does not

 include “partisan advantage.” See N.C. Const. art. II, § 3. Furthermore, we cannot

 infer the non-justiciability of partisan gerrymandering purely from the structural fact

 that the decennial apportionment of legislative districts is committed to a “political”

 branch. The General Assembly has the legislative power of apportionment under

 article II, but exercise of that power is subject to other “constitutional limitations.”

 Stephenson, 355 N.C. at 371. Put another way, the mere fact that responsibility for

 reapportionment is committed to the General Assembly does not mean that the

 General Assembly’s decisions in carrying out its responsibility are fully immunized

 from any judicial review. That startling proposition is, again, entirely inconsistent

 with our modern redistricting precedents and, on a more fundamental level,

 inconsistent with this Court’s obligation to enforce the provisions of the North

 Carolina Constitution dating to 1787.

¶ 116 Stephenson itself is incompatible with Legislative Defendants’ argument.

 Stephenson was a vote-dilution challenge under the equal protection clause of our
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 state constitution. If Stephenson concluded that redistricting decisions were

 exclusively constitutionally committed to the General Assembly because of article II,

 then no other constitutional limitations would be applicable. Plainly they are. See id.

 at 379.

¶ 117 This case does not ask us to remove all discretion from the redistricting

 process. The General Assembly will still be required to make choices regarding how

 to reapportion state legislative and congressional districts in accordance with

 traditional neutral districting criteria that will require legislators to exercise their

 judgment. Rather, this case asks how constitutional limitations in our Declaration of

 Rights limit the General Assembly’s power to apportion districts under article II. It

 is thus analogous to Cooper v. Berger, 370 N.C. 392 (2018), in that it “involves a

 conflict between two competing constitutional provisions,” and it “involves an issue

 of constitutional interpretation, which this Court has a duty to decide.” Id. at 412.

¶ 118 More fundamentally, Legislative Defendants’ argument that the textual grant

 of a power to a “political” branch is sufficient to render exercise of that power

 unreviewable strikes at the foundation stone of our state’s constitutional caselaw—

 Bayard v. Singleton, 1 N.C. (Mart.) 5 (1787). In Bayard, the courts of North Carolina

 first asserted the power and duty of judicial review of legislative enactments for

 compliance with the North Carolina Constitution, and to strike down laws in conflict

 therewith. Id. at 7. In holding that we had the power of judicial review we specifically
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 reasoned that if “members of the General Assembly” could violate some constitutional

 rights, “they might with equal authority, not only render themselves the Legislators

 of the State for life, without any further election of the people, [but] from thence

 transmit the dignity and authority of legislation down to their heirs male forever.”

 Id. It was out of concern for the very possibility that the legislature might intercede

 in the elections for their own office, which our constitution delegates the legislature

 power over, in contravention of the constitutional rights of the people to elect their

 own representatives that led this Court to assert the power of judicial review. To

 conclude that the mere commitment of the apportionment power in article II to the

 General Assembly renders its apportionment decisions unreviewable would require

 us to betray our most fundamental constitutional duty. “It is the state judiciary that

 has the responsibility to protect the state constitutional rights of the citizens; this

 obligation to protect the fundamental rights of individuals is as old as the State.”

 Corum v. Univ. of N.C., 330 N.C. 761, 783 (1992).

¶ 119 The General Assembly has the power to apportion legislative and

 congressional districts under article II and state law, but exercise of that power is

 subject to other “constitutional limitations,” including the Declaration of Rights. The

 question is whether the General Assembly complied with provisions of the

 Declaration of Rights in its exercise of the apportionment power. There is no textually

 demonstrable commitment of that issue to the legislative branch.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

¶ 120 In determining whether plaintiffs’ claims would require the court to make

 “policy choices and value determinations,” Bacon, 353 N.C. at 717, we must determine

 whether, as plaintiffs argue, the Declaration of Rights of the North Carolina

 Constitution prohibits partisan gerrymandering and, if so, whether the application of

 those claims would require such determinations. As we long ago established and have

 since repeatedly affirmed, “[t]his Court is the ultimate interpreter of our State

 Constitution.” Corum, 330 N.C. at 783 (citing Bayard, 1 N.C. (Mart.) 5). So too when

 it comes to reapportionment. Stephenson, 355 N.C. at 370–71, 378–81; Blankenship,

 363 N.C. at 525–26.

 D. Partisan Gerrymandering Violates the Declaration of Rights in the
 North Carolina Constitution and Is Justiciable

¶ 121 Plaintiffs argue that Legislative Defendants’ districting plans violate the free

 elections clause, equal protection clause, free speech clause, and freedom of assembly

 clause of our constitution’s Declaration of Rights. Accordingly, we must examine the

 text and structure of the Declaration of Rights as well as the intent and history of

 these constitutional provisions to determine whether the rights plaintiffs allege are

 protected by the Declaration of Rights and whether this Court is empowered by the

 constitution to guarantee those rights.

¶ 122 Before examining specific provisions in detail, we make some general

 observations about the Declaration of Rights in article I of our constitution. First,

 “[t]he Declaration of Rights was passed by the Constitutional Convention on 17
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 December 1776, the day before the Constitution itself was adopted, manifesting the

 primacy of the Declaration in the minds of the framers.”10 Corum, 330 N.C. at 782.

 The Declaration of Rights preceded the constitution, and hence the rights reserved

 by the people preceded the division of power among the branches therein. “The

 relationship is not that exhibited by the U.S. Constitution with its appended Bill of

 Rights, the latter adding civil rights to a document establishing the basic institutions

 of government. Instead, North Carolina’s declaration of rights . . . is logically, as well

 as chronologically, prior to the constitutional text.” John V. Orth & Paul M. Newby,

 The North Carolina Constitution 5–6 (2d ed. 2013). That logical and chronological

 primacy is preserved in our present constitution, with the Declaration of Rights now

 incorporated in the text of the constitution itself as article I.

¶ 123 Second, early in this Court’s history we “recognized the supremacy of rights

 protected in Article I and indicated that [we] would only apply the rules of decision

 10 The primacy of the Declaration of Rights over the powers allocated in the
 constitutional text in the minds of the framers is fitting for a people so opposed to government
 tyranny coalesced in any source. North Carolinians preceded the Revolution by ten years
 through the Regulator Movement opposing the Royal Governor William Tryon. They
 preceded the Declaration of Independence with the Halifax Resolves. After the Revolution
 they only belatedly approved by convention the federal Constitution because of its failure to
 include a Bill of Rights, an implicit rejection of the notion that structural protections of rights,
 like the separation and division of powers, would suffice. It is worth noting that a leading
 argument for the adoption of a federal Bill of Rights, in the words of Thomas Jefferson, was
 “the legal check which [such a Bill would put] into the hands of the judiciary,” as “a body,
 which if rendered independent, and kept strictly to their own department merits great
 confidence for their learning and integrity.” Laurence H. Tribe, American Constitutional Law
 8 & n.8 (3d ed. 2000) (quoting 14 The Papers of Thomas Jefferson 659 (Julian P. Boyd ed.,
 1958)).
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 derived from the common law and such acts of the legislature that are consistent with

 the Constitution.” Corum, 330 N.C. at 783 (citing Trs. of the Univ. of N.C. v. Foy, 5

 N.C. 57 (1805)). In tying judicial review to the primacy of the Declaration of Rights,

 we recognized that

 [t]he fundamental purpose for [the Declaration’s] adoption
 was to provide citizens with protection from the State’s
 encroachment upon these rights. Encroachment by the
 State is, of course, accomplished by the acts of individuals
 who are clothed with the authority of the State. The very
 purpose of the Declaration of Rights is to ensure that the
 violation of these rights is never permitted by anyone who
 might be invested under the Constitution with the powers
 of the State.

 Id. at 782–83 (citing State v. Manuel, 20 N.C. 144 (1838)); see also id. at 782 (“The

 civil rights guaranteed by the Declaration of Rights in Article I of our Constitution

 are individual and personal rights entitled to protection against state action . . . .”).

¶ 124 Finally, the framers of our Declaration of Rights and constitution guarded

 against not only abuses of executive power but also the tyrannical accumulation of

 power that subverts democracy in the legislative branch. William Hooper, a North

 Carolina delegate to the Continental Congress, urged that the state constitution

 prevent legislators from making “their own political existence perpetual.” Letter from

 William Hooper to the Provincial Congress of North Carolina (Oct. 26, 1776), in 10

 Colonial and State Records of North Carolina 867–68, available at

 https://docsouth.unc.edu/csr/index.php/document/csr10-0407. John Adams, “already
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 a renowned authority on constitutionalism,” Orth & Newby at 5, submitted two

 letters of advice to the Convention, recommending that to prevent the legislature

 from “vot[ing] itself perpetual” the constitution must divide the General Assembly

 into two chambers so each could check the other. Essay by John Adams on “Thoughts

 on Government” (March 1776), in 11 Colonial and State Records of North Carolina

 321, 324, available at https://docsouth.unc.edu/csr/index.php/document/csr11-0189.

 And so the framers did create two chambers, and we have maintained that division

 to this day. See N.C. Const. of 1776, § 1; N.C. Const. art. II, § 1.

¶ 125 Despite these protections, the primacy of the Declaration of Rights suggests

 that our framers did not believe that division of power alone would be sufficient to

 protect their civil and political rights and prevent tyranny. Accordingly, they

 enshrined their rights in the Declaration of Rights. They also created a state judiciary

 invested with the “judicial power.” See N.C. Const. of 1776, § 1; N.C. Const. art. IV,

 § 1. This independent judiciary was another structural protection. In Bayard, we

 concluded that our courts have the power, and indeed the obligation, to review

 legislative enactments for compliance with the North Carolina Constitution and to

 strike down unconstitutional laws. 1 N.C. (Mart.) at 7. The Court reasoned that if we

 abdicated this power and obligation, legislators could make themselves “Legislators

 of the State for life” and insulate themselves from “any further election of the people.”

 Id. Giving effect to the will of the people through popular sovereignty and the rights
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 protected by the Declaration of Rights, including the rights to free and frequent

 elections, were central to our recognition of the necessity of judicial review.

¶ 126 Having reviewed these structural and historical aspects of the Declaration of

 Rights, we now turn to the text to analyze whether plaintiffs’ partisan

 gerrymandering claims have a discernible basis therein. Indeed, the very text of the

 Declaration of Rights calls us back time and again to itself, the source of

 constitutional meaning, by providing that “[a] frequent recurrence to fundamental

 principles is absolutely necessary to preserve the blessings of liberty.” N.C. Const. art

 I, § 35.11 In a leading case from Virginia, construing a cognate provision of the

 Virginia Declaration of Rights, Judge Roane defined “fundamental principles” as

 those great principles growing out of the Constitution, by
 the aid of which, in dubious cases, the Constitution may be
 explained and preserved inviolate; those landmarks, which
 it may be necessary to resort to, on account of the
 impossibility to foresee or provide for cases within the
 spirit, but without the letter of the Constitution.

 Kamper v. Hawkins, 3 Va. (1 Va. Cas.) 20, 40 (1793); see Orth & Newby at 92

 (discussing same). These “landmarks” serve as an important backdrop to aid in

 interpreting the “spirit” of the North Carolina Constitution and the scope of the

 11 By this text, “[a]ll generations are solemnly enjoined to return ad fontes (to the

 sources) and rethink for themselves the implications of the fundamental principles of self-
 government that animated the revolutionary generation.” John V. Orth & Paul M. Newby,
 The North Carolina Constitution 91 (2d ed. 2013).
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 sweeping provisions of its Declaration of Rights.

¶ 127 North Carolina’s Declaration of Rights as it exists today in article I was forged

 not only out of the revolutionary spirit of 1776 but also the reconstruction spirit of

 1868. See John L. Sanders, Our Constitutions: An Historical Perspective,

 https://www.sosnc.gov/documents/guides/legal/North_Carolina_Constitution_Histori

 cal.pdf (“Drafted and put through the convention by a combination of native

 Republicans and a few carpetbaggers, . . . [f]or its time, [the Constitution of 1868] was

 a progressive and democratic instrument of government.”); id. (“The Constitution of

 1868 incorporated the 1776 Declaration of Rights into the Constitution as Article I

 and added several important guarantees.”); id. (“[T]he Constitution of 1971 brought

 forward much of the 1868 language with little or no change.”). Our Declaration of

 Rights begins with the declaration of two fundamental principles, the costly fruit paid

 in the blood of the Civil War and Revolutionary War, respectively: equality of persons

 and the democratic principle of popular sovereignty.12 Article I, sections 1 and 2

 provide:

 Section 1. The equality and rights of persons.
 We hold it to be self-evident that all persons are
 created equal; that they are endowed by their Creator with
 certain inalienable rights; that among these are life,
 liberty, the enjoyment of the fruits of their own labor, and
 the pursuit of happiness.

 12 Article I, section 1 originates from the 1868 constitution, while article I, section 2,

 originates from the 1776 constitution.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 Sec[tion] 2. Sovereignty of the people.
 All political power is vested in and derived from the
 people; all government of right originates from the people,
 is founded upon their will only, and is instituted solely for
 the good of the whole.

 N.C. Const. art. I, §§ 1–2.

¶ 128 Under article I, section 1, equality logically precedes sovereignty, as equality

 is “self-evident.” Article I, section 1 recognizes the self-evident fundamental principle

 of equality; however, that does not mean it is not a source of cognizable rights by its

 own terms as well. See, e.g., Tully v. City of Wilmington, 370 N.C. 527, 533, 536 (2018)

 (holding each person’s “inalienable right” to the “enjoyment of the fruits of their own

 labor” protects the fundamental right to “pursue his chosen profession free from”

 unreasonable government interference). This section deliberately borrowed the

 language of the Declaration of Independence, which was quoted and expanded upon

 in the Gettysburg Address just a few years prior to the 1868 Reconstruction

 Convention. Article I, section 1’s recognition of the first principle that “all persons are

 created equal” is universal.

¶ 129 Article I, section 2 locates the source of all “political power” under the

 Declaration of Rights in “the people.” N.C. Const. art. I, § 2. It specifies that “all

 government of right” can only “originate[ ] from the people.” Id. This “government of

 right” is only established when it is “founded upon [the people’s] will only,” and

 “instituted solely for the good of the whole.” Id. Section 2 of the Declaration of Rights
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

can fruitfully be read together with the first clause of section 3. N.C. Const. art. I, §

3, cl. 1 (“The people of this State have the inherent, sole, and exclusive right of

regulating the internal government and police thereof . . . .”). “These two sections

contain both a general and a specific assertion of democratic theory.” Orth & Newby

at 48 (emphasis added). Section 2’s declaration that “[a]ll political power is vested in

and derived from the people” is an “abstract statement of principle.” Id. Meanwhile,

section 3’s declaration that “the people of this State have the inherent, sole, and

exclusive right of regulating the internal government and police thereof,” is “a specific

local application of the general rule.” Id. These sections “now serve as a fuller

theoretical statement” of the core democratic principle: “the revolutionary faith in

popular sovereignty.” Id.; see Thrift v. Bd. of Comm’rs, 122 N.C. 31, 37 (1898) (“Our

theory of government, proceeding directly from the people, and resting upon their will,

is essentially different — at least, in principle — from that of England . . . .” (emphasis

added)). Under popular sovereignty, the democratic theory of our Declaration of

Rights, the “political power” of the people which is “vested in and derives from

[them],” is channeled through the proper functioning of the democratic processes of

our constitutional system to the people’s representatives in government. N.C. Const.

art. I, § 2. Only when those democratic processes function as provided by our

constitution to channel the will of the people can government be said to be “founded

upon their will only.” Id.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

¶ 130 The principle of equality and the principle of popular sovereignty are the two

 most fundamental principles of our Declaration of Rights. N.C. Const. art. I, §§ 1–2.

 The principle of equality, adopted into our Declaration of Rights from the Declaration

 of Independence and the Gettysburg Address, provides that “all persons are created

 equal.” N.C. Const. art. I, § 1. Meanwhile, under the principle of popular sovereignty,

 the “political power” of the people is channeled through the proper functioning of the

 democratic processes of our constitutional system to the people’s representatives in

 government. N.C. Const. art. I, § 2. While these are two separate fundamental

 principles under our present constitutional system, one cannot exist without the

 other. Equality, being logically as well as chronologically prior, is essential to popular

 sovereignty. See Abraham Lincoln, “On Slavery and Democracy,” I Speeches and

 Writings, 484 (1989) (“As I would not be a slave, so I would not be a master. This

 expresses my idea of democracy. Whatever differs from this, to the extent of the

 difference, is no democracy.”); “Address at Gettysburg, Pennsylvania,” II Speeches

 and Writings at 536 (connecting “the proposition that all men are created equal” to

 “government of the people, by the people, for the people”). Consequently, sections 1

 and 2 of our Declaration of Rights, when read together, declare a commitment to a

 fundamental principle of democratic and political equality. The principle of political

 equality, from the Halifax Resolves and the Declaration of Independence to Lincoln’s

 Gettysburg Address and the Reconstruction Convention to our Declaration of Rights
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 today, can mean only one thing—to be effective, the channeling of “political power”

 from the people to their representatives in government through the democratic

 processes envisioned by our constitutional system must be done on equal terms. If

 through state action the ruling party chokes off the channels of political change on

 an unequal basis, then government ceases to “derive[ ]” its power from the people or

 to be “founded upon their will only,” and the principle of political equality that is

 fundamental to our Declaration of Rights and our democratic constitutional system

 is violated. N.C. Const. art. I, §§ 1, 2; see Bayard, 1 N.C. (Mart.) at 7 (recognizing this

 principle in holding that judicial review is needed to prevent legislators from

 permanently insulating themselves from popular will); see also John Hart Ely,

 Democracy and Distrust 103 (1980) (“In a representative democracy value

 determinations are to be made by our elected representatives, and if in fact most of

 us disapprove we can vote them out of office. Malfunction occurs when the process is

 undeserving of trust, when [ ] the ins are choking of the channels of political change

 to ensure that they will stay in and the outs will stay out.”).

¶ 131 In Dickson v. Rucho, we held a partisan gerrymandering challenge that

 legislative reapportionment plans violated the “Good of the Whole” clause failed

 because that argument “is not based upon a justiciable standard.” 368 N.C. 481, 534

 (2015). Of course, the judgment in Dickson was vacated on federal law grounds, 137

 S. Ct. 2186 (2017). However, taken as a valid proposition of state law, it does not
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 follow that sections 1 and 2 in toto provide no guidance for determining the

 constitutionality and justiciability of partisan gerrymandering or do not aid in

 construing other constitutional provisions. The principle of political equality which

 we have articulated is a fundamental principle of our Declaration of Rights. See N.C.

 Const. art. I, § 35. Such fundamental principles guide us in part through the light

 they throw on other constitutional provisions. Accordingly, interpreting article I,

 section 2, we have held that “[t]his is a government of the people, by the people, and

 for the people, founded upon the will of the people, and in which the will of the people,

 legally expressed, must control” and reasoned that “[i]n construing [other] provisions

 of the constitution, we should keep in mind” this fundamental principle. State ex rel.

 Quinn v. Lattimore, 120 N.C. 426, 428–29 (1897). While plaintiffs do not contend the

 enacted plans constitute partisan gerrymanders in violation of article I, sections 1

 and 2, the fundamental principle of political equality underpinning those sections

 guides our interpretation of other provisions of the Declaration of Rights.

¶ 132 Plaintiffs allege Legislative Defendants’ enacted plans violate the free

 elections clause under section 10, the free speech clause under section 14, the freedom

 of assembly clause under section 12, and the equal protection clause under section 19

 of the Declaration of Rights as partisan gerrymanders. Along with guidance from the

 fundamental principles described above, in construing these provisions in the

 Declaration of Rights, we are mindful that:
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 It is the state judiciary that has the responsibility to
 protect the state constitutional rights of the citizens; this
 obligation to protect the fundamental rights of individuals
 is as old as the State. Our Constitution is more detailed
 and specific than the federal Constitution in the protection
 of the rights of its citizens. We give our Constitution a
 liberal interpretation in favor of its citizens with respect to
 those provisions which were designed to safeguard the
 liberty and security of the citizens in regard to both person
 and property.

 Corum, 330 N.C. at 783 (cleaned up). More broadly, “a Constitution should generally

 be given, not essentially a literal, narrow, or technical interpretation, but one based

 upon broad and liberal principles designed to ascertain the purpose and scope of its

 provisions.” Elliott v. Gardner, 203 N.C. 749, 753 (1932). In interpreting these

 provisions, we remain mindful of our “duty to follow a reasonable, workable, and

 effective interpretation that maintains the people’s express wishes.” Stephenson v.

 Bartlett, 355 N.C. 354, 382 (2002).

 1. Free Elections Clause

¶ 133 Plaintiffs first argue that partisan gerrymandering violates the free elections

 clause in section 10 of our Declaration of Rights. The free elections clause has no

 analogue in the federal Constitution and is, accordingly, a provision that makes the

 state constitution “more detailed and specific than the federal Constitution in the

 protection of the rights of its citizens.” Corum, 330 N.C. at 783. This clause provides,

 in laconic terms, “[a]ll elections shall be free.” N.C. Const. art. I, § 10.

¶ 134 We turn to the history of the free elections clause. See Sneed v. Greensboro City
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 Bd. of Educ., 299 N.C. 609, 613 (1980) (noting in constitutional interpretation we

 consider “the history of the . . . provision and its antecedents”). The free elections

 clause was included in the 1776 Declaration of Rights. It was modeled on a nearly

 identical clause in Virginia’s declaration of rights. See Va. Const. of 1776, Declaration

 of Rights, § 6 (1776); Earle H. Ketcham, The Sources of the North Carolina

 Constitution of 1776, 6 N.C. Hist. Rev. 215, 221 (1929). The Virginia clause was

 derived from a clause in the English Bill of Rights of 1689, a product of the Glorious

 Revolution of 1688. Ketcham, The Sources of the North Carolina Constitution of 1776,

 6 N.C. Hist. Rev. at 221. That provision provided “election of members of parliament

 ought to be free.” Bill of Rights 1689, 1 W. & M. Sess. 2 c. 2 (Eng.). This provision of

 the 1689 English Bill of Rights was adopted in response to the king’s efforts to

 manipulate parliamentary elections by diluting the vote in different areas to attain

 “electoral advantage,” leading to calls for a “free and lawful parliament” by the

 participants of the Glorious Revolution. J.R. Jones, The Revolution of 1688 in

 England 148 (1972); Gary S. De Krey, Restoration and Revolution in Britain: A

 Political History of the Era of Charles II and the Glorious Revolution 241, 247–48,

 250 (2007). Avoiding the manipulation of districts that diluted votes for electoral gain

 was, accordingly, a key principle of the reforms following the Glorious Revolution.

¶ 135 North Carolina’s free elections clause was enacted following the passage of

 similar clauses in other states, including Pennsylvania and Virginia. See John V.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 Orth, North Carolina Constitutional History, 70 N.C. L. Rev. 1759, 1797–98 (1992).

 Pennsylvania’s free elections clause was enacted in response to laws that

 manipulated elections for representatives to Pennsylvania’s colonial assembly.

 League of Women Voters of Pa. v. Pennsylvania, 645 Pa. 1, 178 A.3d 737, 804 (2018).

 Pennsylvania’s version of the free elections clause was intended to end “the dilution

 of the right of the people of [the] Commonwealth to select representatives to govern

 their affairs,” League of Women Voters of Pa., 645 Pa. at 108, 178 A.3d 737 at 808,

 and to codify an “explicit provision[ ] to establish protections of the right of the people

 to fair and equal representation in the governance of their affairs[,]” id. at 104, 178

 A.3d 737 at 806.

¶ 136 Under North Carolina law, our free elections clause was also intended for that

 purpose. This clause was enacted with the preceding clause requiring “frequent

 elections,” which provides that “[f]or redress of grievances and for amending and

 strengthening the laws, elections shall be often held.” N.C. Const. art. I, § 9.

 Construing these provisions in pari materia, it follows that the “elections” which the

 prefatory clause of section 9 calls for must be “free” as well as “frequent.” As a matter

 of fundamental principle, these sections “concern[ ] the application of the principle of

 popular sovereignty, first stated in Section 2.” Orth & Newby at 55. The free elections

 clause, accordingly, provides “free elections” as the most fundamental democratic

 process by which the principle of popular sovereignty is applied, and the government
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 “derive[s]” its power from the people and is “founded upon their will only.” N.C. Const.

 art. I, § 2; see also Quinn, 120 N.C. at 426.

¶ 137 The free elections clause reflects the principle of the Glorious Revolution that

 those in power shall not attain “electoral advantage” through the dilution of votes

 and that representative bodies—in England, parliament; here, the legislature—must

 be “free and lawful.” De Krey, Restoration and Revolution in Britain at 250.

 Legislative Defendants argue and the trial court concluded that the free elections

 clause could not be read to speak on partisan gerrymandering because Patrick Henry,

 one of the drafters of the Virginia free elections clause on which ours was based,

 engaged in the practice of partisan gerrymandering “to the detriment of James

 Madison” at the time of that clause’s drafting.

¶ 138 We are unpersuaded by this evidence. First, the framers of our constitution did

 not establish fixed rules preemptively attempting to address every possible

 contingency. Thus, Legislative Defendants’ attempt to fix the meaning of these

 provisions by sole reference to the practices thought permissible at the time they were

 enacted is not only inconsistent with hundreds of years of constitutional development,

 but it is also inconsistent with the intent of the people as expressed in their choice to

 espouse broad principles rather than narrow rules. Furthermore, the framers of

 North Carolina’s constitution repeatedly articulated their intent to make the North

 Carolina Constitution responsive to the broader principles of the Glorious
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

Revolution.13 The framers of North Carolina’s constitution, such as James Iredell,

believed that the American Revolution represented the fulfillment of the same

principles vindicated by England’s Glorious Revolution. See generally Speech by

James Iredell to the Edenton District Superior Court Grand Jury (May 1778), in 13

Colonial and State Records of North Carolina 434–36, available at

https://docsouth.unc.edu/csr/index.php/document/csr13-0498. And in 1775, prior to

the drafting of the state constitution, North Carolina’s delegates to the Continental

Congress urged North Carolina to fight British attempts to infringe “those glorious

Revolution principles.” Circular letter from William Hooper, Joseph Hewes, and

Richard Caswell to the inhabitants of North Carolina, in 10 Colonial and State

Records of North Carolina 23. Finally, North Carolina’s leaders demanded the

election of delegates to the Provincial Congress “be free and impartial.” Minutes of

the North Carolina Council of Safety (Aug. 22, 1776), in 10 Colonial and State Records

of North Carolina 702. These primary sources indicate that our founders did not hold

the limited view that the only requirement for an election to be a “free” election was

that those qualified had access to the ballot box, although that is also within the

 13 The trial court concluded the free elections clause in our Declaration of Rights “does

not operate as a restraint on the General Assembly’s ability to redistrict for partisan
advantage,” based in part on the history of the free elections clauses in the Virginia
Declaration of Rights and the English Bill of Rights. But based on the history we have
recounted, the perceived unfairness of drawing of borough lines for partisan advantage was
a central concern of the Glorious Revolution, and the framers of the North Carolina
Declaration of Rights and Constitution in 1776 expressed a strong commitment to the
principles of the Glorious Revolution, including an insistence on elections being “impartial.”
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 ambit of the clause; rather, they adhered to the broad principles of the Glorious

 Revolution—that all attempts to manipulate the electoral process, especially through

 vote dilution on a partisan basis, as in the “rotten boroughs” of England, would be

 prohibited. Such a reading is consonant with section 2, which adopts the principle of

 popular sovereignty in order that the government be “founded upon [the people’s] will

 only.” N.C. Const. art. I, § 2.

¶ 139 Moreover, the precise wording of the free elections clause has changed over

 time. It originally read, “[E]lections of Members to serve as Representatives in

 General Assembly ought to be free.” In 1868, in concert with its adoption of the

 equality principle in section 1, the Reconstruction Convention amended the free

 elections clause to read “[a]ll elections ought to be free.” In 1971, the present version

 was adopted, changing “ought to” to the command “shall.” This change was intended

 to “make it clear” that the free elections clause, along with other “rights secured to

 the people by the Declaration of Rights[,] are commands and not mere admonitions

 to proper conduct on the part of government.” N.C. State Bar v. DuMont, 304 N.C.

 627, 639 (1982) (quoting John L. Sanders, “The Constitutional Development of North

 Carolina,” in North Carolina Manual 87, 94 (1979)). Accordingly, though those in

 power during the early history of our state may have viewed the free elections clause

 as a mere “admonition” to adhere to the principle of popular sovereignty through

 elections, a modern view acknowledges this is a constitutional requirement.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

¶ 140 Finally, from the earliest language, the framers evidenced an intent to

 enshrine a broad principle of “free” elections, and this language is a direct application

 of the principle of popular sovereignty in section 2. See N.C. Const. art. 1, § 2. Since

 the Reconstruction Convention of 1868, it must also be textually read in concord

 with—and as giving effect to—the fundamental principle of equality, that “all persons

 are created equal,” announced in section 1. See N.C. Const. art. 1, § 1. Therefore, even

 if “free” originally meant the electoral process would be available for some, at least

 since 1868, it must also mean that voters must not be denied voting power on an

 equal basis in harmony with this fundamental principle. Although our understanding

 of what is required to maintain free elections has evolved over time, there is no doubt

 these fundamental principles establish that elections are not free if voters are denied

 equal voting power in the democratic processes which maintain our constitutional

 system of government. When the legislature denies to certain voters this

 substantially equal voting power, including when the denial is on the basis of voters’

 partisan affiliation, elections are not free and do not serve to effectively ascertain the

 will of the people. This violates the free elections clause as interpreted against the

 backdrop of the fundamental principles in our Declaration of Rights. Accordingly, for

 an election to be free and the will of the people to be ascertained, each voter must

 have substantially equal voting power and the state may not diminish or dilute that

 voting power on a partisan basis.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

¶ 141 Thus, partisan gerrymandering, through which the ruling party in the

 legislature manipulates the composition of the electorate to ensure that members of

 its party retain control, is cognizable under the free elections clause because it can

 prevent elections from reflecting the will of the people impartially and by diminishing

 or diluting voting power on the basis of partisan affiliation. Partisan gerrymandering

 prevents election outcomes from reflecting the will of the people and such a claim is

 cognizable under the free elections clause.

 2. Equal Protection Clause

¶ 142 Plaintiffs also argue that partisan gerrymandering is cognizable under the

 equal protection clause because partisan gerrymandering may violate every

 individual voter’s fundamental right to vote on equal terms and the fundamental

 right to substantially equal voting power. We agree.

¶ 143 The equal protection clause provides that “[n]o person shall be denied the equal

 protection of the laws.” N.C. Const. art. I, § 19. This clause was added to our

 Declaration of Rights with the adoption of the 1971 constitution. Although the

 language of this provision mirrors the federal Equal Protection Clause, “[i]t is beyond

 dispute that this Court ‘ha[s] the authority to construe [the State Constitution]

 differently from the construction by the United States Supreme Court of the Federal

 Constitution, as long as our citizens are thereby accorded no lesser rights than they

 are guaranteed by the parallel federal provision.’ ” Stephenson, 355 N.C. at 381 n.6
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 (second alteration in original) (quoting State v. Carter, 322 N.C. 709, 713 (1988)). Our

 state constitution provides greater protection of voting rights than the federal

 Constitution. Blankenship v. Bartlett, 363 N.C. 518, 522–24 (2009); Stephenson, 355

 N.C. at 376, 380–81, 381 n.6.

¶ 144 The equal protection clause in section 19 of our Declaration of Rights requires

 that if a government classification “impermissibly interferes with the exercise of a

 fundamental right a strict scrutiny must be given the classification.” Northampton

 Cnty. Drainage Dist. No. One v. Bailey, 326 N.C. 742, 746 (1990).

¶ 145 We have held that under our equal protection clause, “the right to vote on equal

 terms is a fundamental right.” Stephenson, 355 N.C. at 378 (quoting Northampton,

 326 N.C. at 747). In Stephenson, we further held that our equal protection clause

 protects “the fundamental right of each North Carolinian to substantially equal

 voting power.” 355 N.C. at 379. Under our state constitution, the fundamental right

 to vote in elections, which is the central democratic process in our constitutional

 system through which the “political power” that inheres in the people under the

 fundamental principles of our Declaration of Rights is channeled to the people’s

 representatives in government, encompasses “the principles of substantially equal

 voting power and substantially equal legislative representation.” Id. at 382.

¶ 146 Accordingly, our state constitution’s equal protection clause in article I, section

 19 provides greater protections in redistricting cases than the federal constitution. In
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

Stephenson, we also held that the use of single-member and multi-member districts

in a redistricting plan violated our state’s equal protection clause. It did so because

voters in multi-member districts had a greater opportunity to influence

representatives, as “those living in [multi-member] districts may call upon a

contingent of responsive Senators and Representatives to press their interests, while

those in a single-member district may rely upon only one Senator or Representative.”

Id. at 379. This “classification of voters” between single-member districts and multi-

member districts created an “impermissible distinction among similarly situated

citizens[,]” implicated “the fundamental right to vote on equal terms,” id. at 378, and

restricted the right to “substantially equal voting power and substantially equal

legislative representation[,]” id. at 382. Accordingly, the redistricting plan triggered

strict scrutiny, not because the government drew a distinction on the basis of a

protected classification, but because the distinction the government drew implicated

a fundamental right. Id. at 378. Under Stephenson, the fundamental right to

substantially equal voting power is more expansive than any analogous fundamental

right under the Equal Protection Clause of the Fourteenth Amendment, since that

provision does not prohibit the use of single-member and multi-member legislative

districts in one map. See Fortson v. Dorsey, 379 U.S. 433, 437 (1965) (holding that the

use of multi-member and single-member districts in the same legislative map did not

violate the Equal Protection Clause where there was “no mathematical disparity”
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 between voters).

¶ 147 Furthermore, the equal protection clause in article I, section 19 applies in

 circumstances where the federal Equal Protection Clause is silent. In Blankenship v.

 Bartlett, we held that our state’s equal protection clause “requires a heightened level

 of scrutiny of judicial election districts,” because it implicates the fundamental “right

 to vote on equal terms in representative elections,” although federal courts have held

 the one-person, one-vote standard of the federal Equal Protection Clause is

 inapplicable to state judicial elections. Blankenship, 363 N.C. at 522–23 (citing

 Chisom v. Roemer, 501 U.S. 380 (1991)).

¶ 148 We hold here that partisan gerrymandering claims are cognizable under the

 equal protection clause of our Declaration of Rights. “[T]he fundamental right to vote

 on equal terms[,]” Stephenson, 355 N.C. at 378, includes the right to “substantially

 equal voting power and substantially equal legislative representation[,]” id. at 382.

 This necessarily encompasses the opportunity to aggregate one’s vote with

 likeminded citizens to elect a governing majority of elected officials who reflect those

 citizens’ views. Designing districts in a way that denies voters substantially equal

 voting power by diminishing or diluting their votes on the basis of party affiliation

 deprives voters in the disfavored party of the opportunity to aggregate their votes to

 elect such a governing majority. Like the distinctions at issue in Stephenson, drawing

 distinctions between voters on the basis of partisanship when allocating voting power
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 diminishes the “representational influence” of voters. Id. at 377. Except, in the case

 of partisan gerrymandering, the effect on the representational influence is more

 severe because those who have been deprived equal voting power lack the same

 opportunity as those from the favored party to elect a governing majority, even when

 they vote in numbers that would garner voters of the favored party a governing

 majority. Accordingly, those voters have far fewer legislators who are “responsive” to

 their concerns and who can together “press their interests.” Id. at 379.

¶ 149 Our reading of the equal protection clause is most consistent with the

 fundamental principles in our Declaration of Rights of equality and popular

 sovereignty—together, political equality. See N.C. Const. art. I, §§ 1, 2. Popular

 sovereignty requires that for a government to be “of right” it must be “founded upon

 [the people’s] will only.” N.C. Const. art. I, § 2. In a statewide election, ascertaining

 the will of the people is straightforward. But in legislative elections, voters only have

 equal “representational influence” if results fairly reflect the will of the people not

 only district by district, but in aggregate, and on equal terms. See Stephenson, 355

 N.C. at 377 (examining the effect of single-member and multi-member districts across

 the state). Otherwise, the “will” on which the government “is founded” is not that of

 the people of this state but that of the ruling party.

¶ 150 We conclude that when on the basis of partisanship the General Assembly

 enacts a districting plan that diminishes or dilutes a voter’s opportunity to aggregate
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 with likeminded voters to elect a governing majority—that is, when a districting plan

 systematically makes it harder for one group of voters to elect a governing majority

 than another group of voters of equal size—the General Assembly unconstitutionally

 infringes upon that voter’s fundamental rights to vote on equal terms and to

 substantially equal voting power. Classifying voters on the basis of partisan

 affiliation so as to dilute their votes in this manner is subject to strict scrutiny

 because it burdens a fundamental right and is presumed unconstitutional unless

 narrowly tailored to a compelling governmental interest. See Northampton, 326 N.C.

 at 746 (“[I]f a classification impermissibly interferes with the exercise of a

 fundamental right a strict scrutiny must be given the classification. Under the strict

 scrutiny test the government must demonstrate that the classification it has imposed

 is necessary to promote a compelling governmental interest.”).

 3. Free Speech Clause and Freedom of Assembly Clause

¶ 151 Finally, plaintiffs argue that partisan gerrymandering is cognizable under the

 free speech clause under section 14 and the freedom of assembly clause under section

 12 of our Declaration of Rights. We agree.

¶ 152 Our free speech clause provides that “[f]reedom of speech and of the press are

 two of the great bulwarks of liberty and therefore shall never be restrained.” N.C.

 Const. art. I, § 14. Our freedom of assembly clause provides, in pertinent part, that

 “[t]he people have a right to assemble together to consult for their common good, to
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 instruct their representatives, and to apply to the General Assembly for redress of

 grievances.” Id. § 12. These provisions textually differ from their federal analogues,

 and we have construed them to provide greater protection than those provisions.

¶ 153 In Corum, this Court construed the free speech clause in our Declaration of

 Rights. 330 N.C. at 781. The plaintiff alleged “retaliation against plaintiff for his

 exercise of certain free speech rights.” Id. at 766. He brought a claim for, inter alia, a

 direct cause of action under article I, section 14 of the state constitution. Id. We

 reasoned that “[t]he words ‘shall never be restrained’ are a direct personal guarantee

 of each citizen’s right of freedom of speech[,]” id. at 781; that this provision “is self-

 executing[,]” id. at 782; and, accordingly, “the common law, which provides a remedy

 for every wrong, will furnish the appropriate action for the adequate redress of a

 violation of that right[,]” id. We observed concerning the free speech clause that

 [t]his great bulwark of liberty is one of the fundamental
 cornerstones of individual liberty and one of the great
 ordinances of our Constitution. Freedom of speech is equal,
 if not paramount, to the individual right of entitlement to
 just compensation for the taking of property by the State.
 Certainly, the right of free speech should be protected at
 least to the extent that individual rights to possession and
 use of property are protected. A direct action against the
 State for its violations of free speech is essential to the
 preservation of free speech.

 Id. (cleaned up). Under the Court’s decision in Corum, government action that

 burdens people because of disfavored speech or association violates the free speech

 clause. Id. at 766. The retaliation in Corum involved the allegation that government
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 actors conditioned the plaintiff’s public employment (in that case, through demotion)

 on limitations upon the plaintiff’s free speech and expression. See id. at 776. In

 essence, by allegedly conditioning a public right or benefit (the plaintiff’s

 employment) on speech, the government accomplished indirectly what it could not

 have accomplished directly, and it penalized plaintiff’s protected free speech rights

 based on his views.

¶ 154 In recognizing a direct cause of action for plaintiff’s retaliation claim under the

 free speech clause, we construed the clause more expansively than the Supreme Court

 of the United States has construed the Free Speech Clause of the First Amendment,

 since that Court has not recognized a comparable direct constitutional claim under

 that provision for retaliation. Even when federal free speech principles are

 persuasive, we reserve the right to extend the reach of our free speech clause beyond

 the scope of the First Amendment. See Libertarian Party v. State, 365 N.C. 41, 47

 (2011).

¶ 155 Free speech and freedom of assembly rights are essential to the preservation

 of our constitutional system. We have held that the “associational rights rooted in the

 free speech and assembly clauses” are “of utmost importance to our democratic

 system.” Libertarian Party, 365 N.C. at 49. In Libertarian Party, we reasoned that

 “citizens form parties to express their political beliefs and to assist others in casting

 votes in alignment with those beliefs.” Id. at 49.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

¶ 156 The role of free speech is also central in our democratic system. As one scholar

 has noted:

 Once one accepts the premise of the Declaration of
 Independence—that governments derive ‘their just powers
 from the consent of the governed’—it follows that the
 governed must, in order to exercise their right of consent,
 have full freedom of expression both in forming individual
 judgments and in forming the common judgment.

 Thomas I. Emerson, The System of Freedom of Expression 7 (1970). Since 1776, the

 people of North Carolina have founded our constitutional system on the premise that

 “[a]ll political power is vested in and derived from the people” and that “government

 of right” must “originate[ ] from the people” and be “founded upon their will only.”

 N.C. Const. art. I, § 2. Since 1868, they have recognized that “all persons are created

 equal.” N.C. Const. art. I, § 1. And since 1971, they have recognized that “[f]reedom

 of speech” is one “of the great bulwarks of liberty” and therefore “shall never be

 restrained.” N.C. Const. art. I, § 14.

¶ 157 Partisan gerrymandering violates the freedoms of speech and association and

 undermines their role in our democratic system. In Corum, we recognized that under

 the free speech clause, state officials may not penalize people for the exercise of their

 protected rights. But partisan gerrymandering does just that. When legislators

 apportion district lines in a way that dilutes the influence of certain voters based on

 their prior political expression—their partisan affiliation and their voting history—it

 imposes a burden on a right or benefit, here the fundamental right to equal voting
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 power on the basis of their views. When the General Assembly systematically

 diminishes or dilutes the power of votes on the basis of party affiliation, it

 intentionally engages in a form of viewpoint discrimination and retaliation that

 triggers strict scrutiny. See State v. Petersilie, 334 N.C. 169, 182 (1993). This practice

 subjects certain voters to disfavored status based on their views, undermines the role

 of free speech and association in formation of the common judgment, and distorts the

 expression of the people’s will and the channeling of the political power derived from

 them to their representatives in government based on viewpoint.

 4. The Declaration of Rights and the Law of Partisan Gerrymandering
 Summarized

¶ 158 In summary, the two most fundamental principles of our Declaration of Rights

 are equality and popular sovereignty. N.C. Const. art. I, §§ 1, 2. Together, they reflect

 the democratic theory of our constitutional system: the principle of political equality.

 The principle of political equality, from the Halifax Resolves and the Declaration of

 Independence to Lincoln’s Gettysburg Address and the Reconstruction Convention to

 our Declaration of Rights today, can mean only one thing—to be effective, the

 channeling of “political power” from the people to their representatives in government

 through the democratic processes envisioned by our constitutional system must be

 done on equal terms. If through state action the ruling party chokes off the channels

 of political change on an unequal basis, then government ceases to “derive[ ]” its

 power from the people or to be “founded upon their will only,” and the principle of
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 political equality that is fundamental to our Declaration of Rights and our

 constitutionally enacted representative system of government is violated.

¶ 159 This principle is reflected in various provisions of our Declaration of Rights.

 The free elections clause under section 10 guarantees the central democratic process

 by which the people’s political power is transferred to their representatives. The equal

 protection clause prohibits government from burdening on the basis of partisan

 affiliation the fundamental right to equal voting power. And the free speech clause

 and the freedom of assembly clause prohibit discriminating against certain voters by

 depriving them of substantially equal voting power, which is a form of impermissible

 viewpoint discrimination and retaliation for engaging in protected political activity.

¶ 160 Partisan gerrymandering of legislative and congressional districts violates the

 free elections clause, the equal protection clause, the free speech clause, and the

 freedom of assembly clause, and the principle of democratic and political equality that

 reflects the spirits and intent of our Declaration of Rights. To comply with the

 constitutional limitations contained in the Declaration of Rights which are applicable

 to redistricting plans, the General Assembly must not diminish or dilute on the basis

 of partisan affiliation any individual’s vote. The fundamental right to vote includes

 the right to enjoy “substantially equal voting power and substantially equal

 legislative representation.” Stephenson, 355 N.C. at 382. The right to equal voting

 power encompasses the opportunity to aggregate one’s vote with likeminded citizens
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 to elect a governing majority of elected officials who reflect those citizens’ views.

 When, on the basis of partisanship, the General Assembly enacts a districting plan

 that diminishes or dilutes a voter’s opportunity to aggregate with likeminded voters

 to elect a governing majority—that is, when a districting plan systematically makes

 it harder for individuals because of their party affiliation to elect a governing majority

 than individuals in a favored party of equal size—the General Assembly deprives on

 the basis of partisan affiliation a voter of his or her right to equal voting power.

¶ 161 This diminution or dilution of a voter’s voting power on the basis of his or her

 views can be measured either by comparing the number of representatives that a

 group of voters of one partisan affiliation can plausibly elect with the number of

 representatives that a group of voters of the same size of another partisan affiliation

 can plausibly elect, or by comparing the relative chances of voters from each party

 electing a supermajority or majority of representatives under various possible

 electoral conditions. Similarly, the diminution or dilution of voting power based of

 partisan affiliation in this way suffices to show a burden on that voter’s speech and

 associational rights. Accordingly, such a plan is subject to strict scrutiny and is

 unconstitutional unless the General Assembly can demonstrate that the plan is

 “narrowly tailored to advance a compelling governmental interest.” Stephenson, 355

 N.C. at 377. Achieving partisan advantage incommensurate with a political party’s

 level of statewide voter support is neither a compelling nor a legitimate governmental
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 interest, as it in no way serves the government’s interest in maintaining the

 democratic processes which function to channel the people’s will into a representative

 government as secured in the above provisions in the Declaration of Rights.

¶ 162 Here, the partisan gerrymandering violation is based on the redistricting plan

 as a whole, not a finding with regard to any individual district. 14 Certainly it is

 possible, as the plaintiffs and the trial court demonstrated, to identify which

 individual districts in the state legislative maps ignore traditional redistricting

 principles to achieve a partisan outcome that otherwise would not occur. It is possible

 to identify the most gerrymandered individual districts. But here the violation is

 statewide because of the evidence that on the whole, the districts have been drawn

 such that voters supporting one political party have their votes systematically

 devalued by having less opportunity to elect representatives to seats, compared to an

 equal number of voters in the favored party. The effect is stark and even more severe

 than what this Court identified in Stephenson as the equal protection clause violation

 arising from the use of both single-member and multi-member districts in a

 redistricting plan. See Stephenson, 355 N.C. at 379–82.

¶ 163 We do not believe it prudent or necessary to, at this time, identify an

 exhaustive set of metrics or precise mathematical thresholds which conclusively

 14 This is not to rule out the possibility that under an equal protection theory or a free

 speech theory there may be a circumstance where a single district is a partisan gerrymander
 but that is not the situation here.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

demonstrate or disprove the existence of an unconstitutional partisan gerrymander.

Cf. Reynolds v. Sims, 377 U.S. 533, 578 (1964) (“What is marginally permissible in

one [case] may be unsatisfactory in another, depending on the particular

circumstances of the case. Developing a body of doctrine on a case-by-case basis

appears to us to provide the most satisfactory means of arriving at detailed

constitutional requirements in the area of . . . apportionment.”). As in Reynolds,

“[l]ower courts can and assuredly will work out more concrete and specific standards

for evaluating state legislative apportionment schemes in the context of actual

litigation.” Id. However, as the trial court’s findings of fact indicate, there are

multiple reliable ways of demonstrating the existence of an unconstitutional partisan

gerrymander. In particular, mean-median difference analysis; efficiency gap analysis;

close-votes, close-seats analysis; and partisan symmetry analysis may be useful in

assessing whether the mapmaker adhered to traditional neutral districting criteria

and whether a meaningful partisan skew necessarily results from North Carolina’s

unique political geography.15 If some combination of these metrics demonstrates

there is a significant likelihood that the districting plan will give the voters of all

political parties substantially equal opportunity to translate votes into seats across

 15 Further, while adherence to neutral districting criteria primarily goes to whether

the map is justified by a compelling governmental interest, the disregarding of neutral
criteria such as compactness, contiguity, and respect for political subdivisions, particularly
when the effect of the map subordinates those criteria to pursuit of partisan advantage, may
also be some evidence a map burdens the fundamental right to equal voting power.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 the plan, then the plan is presumptively constitutional.

¶ 164 To be sure, the evidence in this case and in prior partisan gerrymandering

 cases provides ample guidance as to possible bright-line standards that could be used

 to distinguish presumptively constitutional redistricting plans from partisan

 gerrymanders. There is such a thing as a plan that creates a level playing field for all

 voters. Indeed, historically, there is evidence indicating that most redistricting plans

 actually have provided for partisan fairness instead of partisan advantage. See, e.g.,

 Common Cause v. Rucho, 318 F. Supp. 3d 777, 886–87 (M.D.N.C. 2018), rev’d on other

 grounds 139 S. Ct. 2484 (2019) (finding that North Carolina’s efficiency gap of 19.4%

 was the largest of all states studied and that between 1972 and 2016, the distribution

 of efficiency gaps centered on zero “meaning that, on average, the districting plans in

 [t]his sample did not tend to favor either party”). Those who deny such standards

 exist ignore what the public sees and experiences and what political scientists have

 demonstrated.

¶ 165 Several possible bright-line standards have emerged in the political science

 literature and in the parties’ briefing before this Court. For example, Dr. Duchin

 testified at the trial to having analyzed North Carolina historical election data over

 a period of years, by using a simple overlay method, overlaying the maps onto data

 from all 52 of the statewide elections since 2012 to determine whether “close votes”

 resulted in “close seats,” as one would see in all of the alternative maps to the enacted
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 plans. Under this method, which Dr. Duchin has written about extensively, a plan

 which persistently resulted in the same level of partisan advantage to one party when

 the vote was closer than 52%, could be considered presumptively unconstitutional. As

 Dr. Duchin noted, “I don’t think you get that large and durable [an effect of partisan

 skew] by accident.”

¶ 166 Second, at the trial court below, Dr. Daniel Magleby presented a report in

 rebuttal of the testimony of Dr. Barber, in which he proposed using the measurement

 of the mean-median difference to determine the degree of partisan skew in a

 particular instance. His report described the method as follows:

 One of the simplest measures of symmetry we can apply to
 redistricting scenarios is the median-mean difference (see
 Katz, King and Rosenblatt 2020; MacDonald and Best
 2015; Best et al. 2017) . . . We find [the median-mean
 difference] by taking the mean (average) of the district-
 level vote share and comparing it to the median district-
 level vote-share, the district-level vote share for which
 there are an equal number of districts with higher vote
 shares as there are districts with lower vote shares. When
 the median and mean are equal, the distribution of
 districts is symmetrical and the map will treat the parties
 with symmetry. If the median-mean is not zero, it means
 the map will not treat vote cast for the parties equally.

 Thus, based on Dr. Magelby’s testimony, any mean-median difference that is not zero

 could be treated as presumptively unconstitutional. However, using the actual mean-

 median difference measure, from 1972 to 2016 the average mean-median difference

 in North Carolina’s congressional redistricting plans was 1%. Common Cause, 318 F.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 Supp. 3d at 893. That measure instead could be a threshold standard such that any

 plan with a mean-median difference of 1% or less when analyzed using a

 representative sample of past elections is presumptively constitutional.

¶ 167 With regard to the efficiency gap measure, courts have found “that an

 efficiency gap above 7% in any districting plan’s first election year will continue to

 favor that party for the life of the plan.” Whitford v. Gill, 218 F. Supp. 3d 837, 905

 (W.D. Wis. 2016) rev’d on other grounds 138 S. Ct. 1916 (2018). It is entirely workable

 to consider the seven percent efficiency gap threshold as a presumption of

 constitutionality, such that absent other evidence, any plan falling within that limit

 is presumptively constitutional. The efficiency gap, like other measures of partisan

 symmetry, “is not premised on strict proportional representation, but rather on the

 notion that the magnitude of the winner’s bonus should be approximately the same

 for both parties.” Common Cause, 318 F. Supp. 3d at 889.

¶ 168 Other manageable standards appear in the evidence before the trial court as

 well. Legislative Defendants’ own expert witness proposed using computer

 simulations to draw redistricting plans solely on the basis of traditional redistricting

 criteria, with any adopted redistricting plan with a partisan bias that fell within the

 middle 50% of simulation results being presumptively constitutional. It was also

 suggested that the legislature could be required to draw districts “within 5% of the

 median outcome expected from nonpartisan redistricting criteria, at a statewide
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 level, across a range of electoral circumstances.” The development of such metrics in

 this and future cases is precisely the kind of reasoned elaboration of increasingly

 precise standards the United States Supreme Court utilized in the one-person, one-

 vote context. See, e.g., Brown v. Thomson, 462 U.S. 835, 842–43 (1983) (“Our decisions

 have established, as a general matter, that an apportionment plan with a maximum

 population deviation under 10% falls within this category of minor deviations. A plan

 with larger disparities in population, however, creates a prima facie case of

 discrimination and therefore must be justified by the State.” (citations omitted)).

¶ 169 There may be other standards the parties wish to suggest to the trial court.

 These are primarily questions of what evidence might be relevant to prove a

 redistricting plan’s discriminatory effect under the free elections and equal protection

 clauses and a discriminatory burden to a right or benefit on the basis of protected

 political activity amounting to viewpoint discrimination and retaliation under the

 free speech and freedom of assembly clauses of the state constitution. Because this is

 not a strict proportionality requirement, there is no magic number of Democratic or

 Republican districts that is required, nor is there any constitutional requirement that

 a particular district be competitive or safe. To be clear, the fact that one party

 commands fifty-nine percent of the statewide vote share in a given election does not

 entitle the voters of that party to have representatives of its party comprise fifty-nine

 percent of the North Carolina House, North Carolina Senate, or North Carolina
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 congressional delegation. But those voters are entitled to have substantially the same

 opportunity to electing a supermajority or majority of representatives as the voters

 of the opposing party would be afforded if they comprised fifty-nine percent of the

 statewide vote share in that same election. What matters here, as in the one-person,

 one-vote context, is that each voter’s vote carries roughly the same weight when

 drawing a redistricting plan that translates votes into seats in a legislative body.

¶ 170 Once a plaintiff shows that a map infringes on their fundamental right to equal

 voting power under the free elections clause and equal protection clause or that it

 imposes a burden on that right based on their views such that it is a form of viewpoint

 discrimination and retaliation based on protected political activity under the free

 speech clause and the freedom of assembly clause, the map is subject to strict scrutiny

 and is presumptively unconstitutional and “the government must demonstrate that

 the classification it has imposed is necessary to promote a compelling governmental

 interest.” Northampton, 326 N.C. at 746. As noted above, partisan advantage—that

 is, achieving a political party’s advantage across a map incommensurate with its level

 of statewide voter support—is neither a compelling nor a legitimate governmental

 interest, as it in no way serves the government’s interest in maintaining the

 democratic processes which function to channel the people’s will into a representative
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 government.16 Rather, compelling governmental interests in the redistricting context

 include the traditional neutral districting criteria expressed in article II, sections 3

 and 5 of the North Carolina Constitution. Incumbency protection may ordinarily be

 a permissible governmental interest if it is applied evenhandedly, is not perpetuating

 a prior unconstitutional redistricting plan, and is consistent with the equal voting

 power requirements of the state constitution; however, incumbency protection is not

 a compelling governmental interest that justifies the denial to a voter of the

 fundamental right to substantially equal voting power under the North Carolina

 Constitution. Other widely recognized traditional neutral redistricting criteria, such

 as compactness of districts and respect for other political subdivisions, may also be

 compelling governmental interests. If the General Assembly has created a map that

 infringes on individual voter’s fundamental right to equal voting power and cannot

 show that the map is narrowly tailored to a compelling governmental interest, courts

 must conclude the map is unconstitutional and forbid its use.

¶ 171 The dissent contends that the partisan gerrymandering claims we recognize as

 violating both fundamental principles and particular provisions of our Declaration of

 Rights are not cognizable claims under that document. Our fundamental

 16 Political fairness, or the effort to apportion to each political party a share of seats

 commensurate with its level of statewide support, is a permissible redistricting criterion. See
 Gaffney, 412 U.S. at 736. However, achieving such a goal involves a government’s
 prioritization of, rather than diminution and dilution of, each person’s right to substantially
 equal voting power.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 disagreement stems in one respect from a difference in method. Here, we have

 “recurre[d]” to those “fundamental principles” by which “[a]ll generations are

 solemnly enjoined to return ad fontes (to the sources) and [to] rethink for themselves

 the implications of the fundamental principles of self-government that animated the

 revolutionary generation.” Orth & Newby, at 91. In this light, the dissenters insist

 that the only way to discern the meaning of provisions of the North Carolina

 Constitution is to adhere to their own assessment of historical practice. In so doing,

 they interpret the state constitution in a manner the Framers and the constitution

 they enacted firmly rejected. If constitutional provisions forbid only what they were

 understood to forbid at the time they were enacted, then the free elections clause has

 nothing to say about slavery and the complete disenfranchisement of women and

 minorities. In short, the majority’s view compels the conclusion that there is no

 constitutional bar to denying the right to vote to women and black people.

 Fortunately, the Framers and the people of North Carolina chose to adopt a

 constitution containing provisions which “provide[s] the elasticity which ensures the

 responsive operation of government.” State ex rel. Martin v. Preston, 325 N.C. 438,

 458 (1989).

¶ 172 Second, our disagreement with the dissenting opinion is compelled in part by

 our divergent views of the role of the courts in conducting judicial review for

 constitutionality. The justification for judicial review in North Carolina is motivated
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

by the concern for securing both the fundamental rights contained in our Declaration

of Rights and our constitution, and for ensuring the effective functioning of the

democratic system of government established by the same. In North Carolina, we

presume the legislature has complied with the constitution. Where legislation does

not violate a particular constitutional limitation, and particularly where it does not

violate the rights protected by the Declaration of Rights, the presumption that the

issue will be resolved through the ordinary political process is justified, and

legislation will be upheld if there is a rational basis supporting it. However, in Bayard

v. Singleton and since, we have identified two circumstances justifying judicial review

by this Court. First, we will protect constitutional rights and, although they are by

no means the only enforceable provisions of our constitution, the “civil rights

guaranteed by the Declaration of Rights in Article I of our Constitution,” in

particular. Corum, 330 N.C. at 782. “The very purpose of the Declaration of Rights is

to ensure that the violation of these rights is never permitted by anyone who might

be invested under the Constitution with the powers of the State,” including the

General Assembly. Id. at 783. Accordingly, “[w]e give our Constitution a liberal

interpretation in favor of its citizens with respect to those provisions which were

designed to safeguard the liberty and security of the citizens in regard to both person

and property.” Id. Fundamentally, “[i]t is the state judiciary that has the

responsibility to protect the state constitutional rights of [its people]; this obligation
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 to protect the fundamental rights of individuals is as old as the State.” Id. Indeed, we

 have recognized this duty since Bayard, where we held that legislation violated the

 right to a trial by jury. 1 N.C. (Mart.) at 7. Bayard justified review of all such rights

 on the ground that any erosion of rights endangered other rights. See id. (justifying

 review of “right to a decision of his property by a trial by jury” on the grounds that “if

 the Legislature could take away this right, and require him to stand condemned in

 his property without a trial, it might with as much authority require his life to be

 taken away without a trial by jury, and that he should stand condemned to die,

 without the formality of any trial at all”).

¶ 173 Further this court has recognized an even greater justification for judicial

 review of acts that restrict the democratic processes through which the “political

 power” is channeled to the people’s representatives, and which undermine the very

 democratic system created by our constitution. In Bayard, this Court justified judicial

 review of acts of the coordinate branches not only because without it they might

 violate fundamental rights, but also on the grounds of an even greater harm that

 without judicial review “the members of the General Assembly . . . might with equal

 authority, . . . render themselves the Legislators of the State for life, without any

 further election of the people.” Id. Just as it is the duty of this Court under Bayard to

 guarantee constitutional rights protecting liberty, person, and property, it is the duty

 of this Court under Bayard to protect the democratic processes through which the
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 “political power” of the people is exercised, and that each person’s voice is heard on

 “equal” terms through the vote. N.C. Const. art. I, §§ 2, 1; see, e.g., Stephenson 355

 N.C. at 379 (recognizing “the fundamental right of each North Carolinian to

 substantially equal voting power”); Northampton, 326 N.C. at 747 (holding the “right

 to vote on equal terms is a fundamental right”); People ex rel. Van Bokkelen, 73 N.C.

 at 225 (holding it to be “too plain for argument” that the General Assembly’s

 malapportionment of election districts “is a plain violation of fundamental

 principles”); Ely, Democracy and Distrust at 103 (“Malfunction occurs when the

 process is undeserving of trust, when [ ] the ins are choking off the channels of

 political change to ensure that they will stay in and the outs will stay out.”).

¶ 174 Partisan gerrymandering claims do not require the making of “policy choices

 and value determinations.” Bacon, 353 N.C. at 717. As we have discussed, such claims

 are discernable under the North Carolina Constitution and precedent. Moreover, we

 have described several manageable standards for evaluating the extent to which

 districting plans dilute votes on the basis of partisan affiliation. Accordingly, we hold

 partisan gerrymandering claims are justiciable in North Carolina courts under the

 free elections clause, equal protection clause, free speech clause, and freedom of

 assembly clause of the Declaration of Rights.

 E. Legislative Defendants’ Elections Clause Argument

¶ 175 Legislative Defendants also argue that “the federal constitution bars
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 plaintiffs[’] claims against the congressional plan” under the Elections Clause, U.S.

 Const. art. I, § 4, cl. 1, because the word “Legislature” in that clause forbids state

 courts from reviewing a congressional districting plan violates the state’s own

 constitution. We disagree. This argument, which was not presented at the trial court,

 is inconsistent with nearly a century of precedent of the Supreme Court of the United

 States affirmed as recently as 2015. It is also repugnant to the sovereignty of states,

 the authority of state constitutions, and the independence of state courts, and would

 produce absurd and dangerous consequences.

¶ 176 First, this theory contradicts the holding of Rucho, where the Supreme Court

 of the United States, in an opinion authored by Chief Justice Roberts, said that

 “[p]rovisions in . . . state constitutions can provide standards and guidance for state

 courts to apply” in a case addressing the justiciability of partisan gerrymandering

 claims in congressional plans. 139 S. Ct. at 2507 (emphases added).

¶ 177 Second, a long line of decisions by the Supreme Court of the United States

 confirm the view that state courts may review state laws governing federal elections

 to determine whether they comply with the state constitution. See Smiley v. Holm,

 285 U.S. 355, 368 (1932) (holding the Elections Clause does not “endow the

 Legislature of the state with power to enact laws in any manner other than that in

 which the Constitution of the state has provided” (emphasis added)). The state

 legislature’s enactment of election laws reflects an exercise of the lawmaking power;
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 accordingly, the legislature must comply with all of “the conditions which attach to

 the making of state laws,” id. at 365, including “restriction[s] imposed by state

 Constitutions upon state Legislatures when exercising the lawmaking power,” id. at

 369; see also Ariz. State Leg. v. Ariz. State Indep. Redistricting Comm’n, 576 U.S. 787,

 817–18 (2015) (“Nothing in [the Elections] Clause instructs, nor has this Court ever

 held, that a state legislature may prescribe regulations on the time, place, and

 manner of holding federal elections in defiance of provisions of the State’s

 constitution.”); Growe v. Emison, 507 U.S. 25, 33–34 (1993) (emphasizing “[t]he power

 of the judiciary of a State to require valid reapportionment” of congressional districts

 and rejecting the federal district court’s “mistaken view that federal judges need defer

 only to the Minnesota Legislature and not at all to the State’s courts”).

 F. The 2021 Enacted Plans Violate the Declaration of Rights as Partisan
 Gerrymanders

¶ 178 Now, we must apply these legal principles to the 2021 enacted plans in order

 to determine if the current maps constitute partisan gerrymanders in violation of the

 North Carolina Constitution’s Declaration of Rights. We conclude that they do and

 therefore enjoin the enacted plans from use in any future elections and, in accordance

 with N.C.G.S. § 120-2.4(a), provide the General Assembly the opportunity to submit

 new redistricting plans that satisfy all provisions of the North Carolina Constitution.

¶ 179 As discussed above, the General Assembly triggers strict scrutiny under the

 free elections clause and the equal protection clause of the North Carolina
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 Constitution when, on the basis of partisan affiliation, it deprives a voter of his or her

 fundamental right to substantially equal voting power. This fundamental right

 encompasses the opportunity to aggregate one’s vote with likeminded citizens to elect

 a governing majority of elected officials who reflect those citizens’ views. When on the

 basis of partisanship the General Assembly enacts a districting plan that diminishes

 or dilutes a voter’s opportunity to aggregate with likeminded voters to elect a

 governing majority—that is, when a districting plan systematically makes it harder

 for one group of voters to elect a governing majority than another group of voters of

 equal size—the General Assembly infringes upon that voter’s fundamental right to

 vote. Similarly, this action is subject to strict scrutiny under the free speech clause

 and freedom of assembly clause because it burdens voters on the basis of protected

 political activity.

¶ 180 To trigger strict scrutiny, a party alleging that a redistricting plan violates this

 fundamental right must demonstrate that the plan makes it systematically more

 difficult for a voter to aggregate his or her vote with other likeminded voters, thus

 diminishing or diluting the power of that person’s vote on the basis of his or her views.

 Such a demonstration can be made using a variety of direct and circumstantial

 evidence, including but not limited to: median-mean difference analysis; efficiency

 gap analysis; close-votes-close seats analysis, partisan symmetry analysis; comparing

 the number of representatives that a group of voters of one partisan affiliation can
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 plausibly elect with the number of representatives that a group of voters of the same

 size of another partisan affiliation can plausibly elect; and comparing the relative

 chances of groups of voters of equal size who support each party of electing a

 supermajority or majority of representatives under various possible electoral

 conditions. Evidence that traditional neutral redistricting criteria were subordinated

 to considerations of partisan advantage may be particularly salient in demonstrating

 an infringement of this right.

¶ 181 The right to vote on equal terms is a fundamental right in this state and thus

 when a challenging party demonstrates that a redistricting plan, on the basis of

 partisan affiliation, infringes upon his or her fundamental right to substantially

 equal voting power, strict scrutiny is the appropriate standard for reviewing that act.

 See Stephenson, 355 N.C. at 377 (“Strict scrutiny . . . applies when the classification

 impermissibly interferes with the exercise of a fundamental right . . . .” (cleaned up)).

 Strict scrutiny is “this Court’s highest tier of review.” Id. “Under strict scrutiny, a

 challenged governmental action is unconstitutional if the State cannot establish that

 it is narrowly tailored to advance a compelling governmental interest.” Id. Within the

 redistricting context, compliance with traditional neutral districting principles,

 including those enumerated in article II, sections 3 and 5 of the North Carolina

 Constitution, may constitute a compelling governmental interest. Partisan

 advantage, however, is not a compelling governmental interest.
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

¶ 182 Here, we apply this standard to each of the three 2021 enacted maps: the

 congressional map, the North Carolina House map, and the North Carolina Senate

 map. As noted previously, we have adopted in full the extensive and detailed factual

 findings of the trial court summarized above and have attached the maps themselves

 to this opinion.

 1. Congressional Map

¶ 183 First, we apply this constitutional standard to the 2021 congressional map.

 Based on the trial court’s factual findings, we conclude that the 2021 congressional

 map constitutes partisan gerrymandering that, on the basis of partisan affiliation,

 violates plaintiffs’ fundamental right to substantially equal voting power.

¶ 184 Numerous factual findings compel this conclusion. For instance, based on Dr.

 Mattingly’s ensemble analysis, the trial court found “that the Congressional Map is

 the product of intentional, pro-Republican partisan redistricting. Indeed, the court

 found that

 [a]cross [the] 80,000 simulated nonpartisan plans, not a
 single one had the same or more Democratic voters packed
 into the three most Democratic districts—i.e., the districts
 Democrats would win no matter what—in comparison to
 the enacted plan. And not a single one had the same or
 more Republican voters in the next seven districts—i.e.,
 the competitive districts—in comparison to the enacted
 plan.

¶ 185 Accordingly, the court found that “[t]he Congressional map is ‘an extreme

 outlier’ that is ‘highly non-responsive to the changing opinion of the electorate.’ ” The
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 court found that this high non-responsiveness was a product of “cracking Democrats

 from the more competitive districts and packing them into the most heavily

 Republican and heavily Democratic districts,” which the court described as “the key

 signature of intentional partisan redistricting.”

¶ 186 Based on Dr. Cooper’s analysis, the court observed that “[a]lthough North

 Carolina gained an additional congressional seat as a result of population growth that

 came largely from the Democratic-leaning Triangle (Raleigh-Durham-Chapel Hill)

 and the Charlotte metropolitan areas, the number of anticipated Democratic seats

 under the enacted map actually decreases, with only three anticipated Democratic

 seats, compared with the five seats that Democrats won in the 2020 election.” This

 decrease, the court observed, is enacted “by splitting the Democratic-leaning counties

 of Guilford, Mecklenburg, and Wake among three congressional districts each.” The

 court further noted that “[t]here was no population-based reason” for these splits.

¶ 187 Based on Dr. Pegden’s analysis, the court found “that the enacted

 congressional plan is more favorable to Republicans than 99.9999% of the [billions or

 trillions of] comparison maps his algorithm generated.” Accordingly, the court

 determined that “the enacted congressional map is more carefully crafted to favor

 Republicans than at least 99.9999% of all possible maps of North Carolina satisfying

 the nonpartisan constraints imposed in [Dr. Pegden’s] algorithm.”

¶ 188 Based on Dr. Duchin’s analysis, the trial court found “that the political
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 geography of North Carolina today does not lead only to a district map with partisan

 advantage given to one political party.” Rather, the court determined, “[t]he Enacted

 Plans behave as though they are built to resiliently safeguard electoral advantage for

 Republican candidates.”

¶ 189 Based on Dr. Cooper’s close-votes-close-seats analysis, the trial court found

 that individual congressional districts were drawn to favor certain current or future

 Republican representatives. For instance, the court found that the congressional map

 “places the residences of an incumbent Republican representative and an incumbent

 Democratic representative within a new, overwhelmingly Republican district, NC-11,

 ‘virtually guaranteeing’ that the Democratic incumbent will lose her seat.” Similarly,

 the court observed that “[t]he 2021 Congressional Plan includes one district where no

 incumbent congressional representative resides . . . [which] ‘overwhelmingly favors’

 the Republican candidate based on the district’s partisan lean.”

¶ 190 The trial court found that the congressional map constituted a statistical

 partisan outlier on the regional level, as well. Specifically, the court found that “that

 the enacted congressional plan[s] districts in each region examined exhibit[ed]

 political bias when compared to the computer-simulated districts in the same

 regions.”

¶ 191 More broadly, though, the trial court found that “[t]he congressional district

 map is best understood as a single organism given that the boundaries drawn for a
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 particular congressional district in one part of the state will necessarily affect the

 boundaries drawn for the districts elsewhere in the state.” Accordingly, the court

 found “that the ‘cracking and packing’ of Democratic voters in [larger urban] counties

 has ‘ripple effects throughout the map.’ ”

¶ 192 The trial court considered several different types of statistical analysis in

 confirming that the “extreme partisan outcome” of the congressional map that

 “cannot be explained by North Carolina’s political geography or by adherence to

 Adopted Criteria.” These included: (1) “mean-median difference” analysis; (2)

 “efficiency gap” analysis; (3) “the lopsided margins test”; and (4) “partisan symmetry”

 analysis.

¶ 193 In sum, the trial court found “that the 2021 Congressional Plan is a partisan

 outlier intentionally and carefully designed to maximize Republican advantage in

 North Carolina’s Congressional delegation.” The court found that the enacted

 congressional map “fails to follow and subordinates the Adopted Criteria’s

 requirement[s]” regarding splitting counties and VTDs. Further, the court found

 “that the enacted congressional plan fails to follow, and subordinates, the Adopted

 Criteria’s requirement to draw compact districts. The [c]ourt [found] that the enacted

 congressional districts are less compact than they would be under a map-drawing

 process that adhered to the Adopted Criteria and prioritized the traditional

 districting criteria of compactness.” Ultimately, the court “concluded based upon a
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 careful review of all the evidence that the [congressional map is] a result of

 intentional, pro-Republican partisan redistricting.”

¶ 194 Based on these findings and numerous others, it is abundantly clear and we so

 conclude that the 2021 congressional map substantially diminishes and dilutes on

 the basis of partisan affiliation plaintiffs’ fundamental right to equal voting power,

 as established by the free elections clause and the equal protection clause, and

 constitutes viewpoint discrimination and retaliation burdening the exercise of rights

 guaranteed by the free speech clause and the freedom of assembly clause of the North

 Carolina Constitution. The General Assembly has substantially diminished the

 voting power of voters affiliated with one party on the basis of partisanship—indeed,

 in this case, the General Assembly has done so intentionally. Accordingly, we must

 review the congressional map under strict scrutiny.

¶ 195 Defendants have not shown the 2021 congressional map is narrowly tailored

 to a compelling governmental interest, and therefore the map fails strict scrutiny. As

 noted above, partisan advantage is neither a compelling nor a legitimate

 governmental interest. Rather, given an infringement of plaintiffs’ fundamental right

 to substantially equal voting power, the General Assembly must show that the map

 is narrowly tailored to meet traditional neutral districting criteria, including those

 expressed in article II, sections 3 and 5 of the North Carolina Constitution, those

 expressed in the General Assembly’s own Adopted Criteria, or other articulable
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 neutral principles. Here, the General Assembly has failed to make that showing.

 Indeed, the trial court explicitly found that the congressional maps demonstrate a

 subordination of traditional neutral criteria, including compactness and minimizing

 county and VTD splits, in favor of partisan advantage. We conclude that the General

 Assembly has not demonstrated that the congressional map, despite its extreme

 partisan bias, is nevertheless carefully calibrated toward advancing some compelling

 neutral priority. Accordingly, the congressional map fails strict scrutiny and must be

 rejected.

 2. State House Map

¶ 196 Next, we apply this constitutional standard to the 2021 North Carolina State

 House map. Based on the trial court’s factual findings, we conclude that the 2021

 State House map constitutes partisan gerrymandering that, on the basis of partisan

 affiliation, violates plaintiffs’ fundamental right to substantially equal voting power.

¶ 197 Numerous factual findings compel this conclusion. For instance, based on Dr.

 Mattingly’s ensemble analysis, the trial court found that

 [t]he North Carolina House maps show that they are the
 product of an intentional, pro-Republican partisan
 redistricting over a wide range of potential election
 scenarios. Elections that under typical maps would
 produce a Democratic majority in the North Carolina
 House give Republicans a majority under the enacted
 maps. Likewise, maps that would normally produce a
 Republican majority under nonpartisan maps produce a
 Republican supermajority under the enacted maps. Among
 every possible election that Dr. Mattingly analyzed, the
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 partisan results were more extreme than what would be
 seen from nonpartisan maps.

¶ 198 Indeed, the court found that “the enacted plan shows a systematic bias toward

 the Republican party, favoring Republicans in every single one of the 16 elections [Dr.

 Mattingly] considered.” The court determined that the state House “map is also

 especially anomalous under elections where a non-partisan map would almost always

 give Democrats the majority in the House because the enacted map denied Democrats

 that majority. The probability that this partisan bias arose by chance, without an

 intentional effort by the General Assembly, is ‘astronomically small.’ ” Further, the

 court found that the mapmakers’ selective failure to preserve municipalities in the

 House map, when they did preserve them in the Senate map, was based solely on

 considerations of partisan advantage.

¶ 199 Based on Dr. Pegden’s analysis, the court found that “the enacted House map

 was more favorable to Republicans than 99.99999% of the comparison maps

 generated by his algorithm making small random changes to the district boundaries.”

 Accordingly, the court found “that the enacted map is more carefully crafted for

 Republican partisan advantage than at least 99.9999% of all possible maps of North

 Carolina satisfying [the nonpartisan] constraints.”

¶ 200 Based on Dr. Cooper’s analysis, the trial court found that “Legislative

 Defendants’ exercise of . . . discretion in the . . . House 2021 Plans resulted in . . .

 House district boundaries that enhanced the Republican candidates’ partisan
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 advantage, and this finding is consistent with a finding of partisan intent.”

¶ 201 Based on Dr. Duchin’s close-votes-close-seats analysis, the court found that the

 House map is “designed to systematically prevent Democrats from gaining a tie or a

 majority in the House. In close elections, the Enacted House Plan always gives

 Republicans a substantial House majority. That Republican majority is resilient and

 persists even when voters clearly express a preference for Democratic candidates.”

 “As with the Enacted Congressional Plan . . . , the [c]ourt [found] that the Enacted

 House Plan achieves this resilient pro-Republican bias by the familiar mechanisms

 of packing and cracking Democratic voters . . . .”

¶ 202 Based on Dr. Magleby’s median-mean differential analysis, the trial court

 found “that the level of partisan bias in seats in the House maps went far beyond

 expected based on the neutral political geography of North Carolina.” Specifically, the

 court determined “that the median-mean bias in the enacted maps was far more

 extreme than expected in nonpartisan maps.” In fact, the court found, “[n]o randomly

 generated map had such an extreme median-mean share—meaning that . . . no

 simulated map . . . was as extreme and durable in terms of partisan advantage.”

¶ 203 Finally, based on all of the evidence presented, the trial court found that the

 following North Carolina House district groupings minimized Democratic districts

 and maximized safe Republican districts through the “packing” and “cracking” of

 Democratic voters as the “result of intentional, pro-Republican partisan
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 redistricting”: the Guilford House County Grouping; the Buncombe House County

 Grouping; the Mecklenburg House County Grouping; the Pitt House County

 Grouping; the Durham-Person House County Grouping; the Forsyth-Stokes House

 County Grouping; the Wake House County Grouping; the Cumberland House County

 Grouping; and the Brunswick-New Hanover House County Grouping. Ultimately, the

 court “conclude[d] based upon a careful review of all the evidence that the [House

 map is] a result of intentional, pro-Republican partisan redistricting.”

¶ 204 Based on these findings and numerous others, it is abundantly clear and we so

 conclude that the 2021 North Carolina House map substantially diminishes and

 dilutes on the basis of partisan affiliation plaintiffs’ fundamental right to equal voting

 power, as established by the free elections clause and the equal protection clause, and

 constitutes viewpoint discrimination and retaliation burdening the exercise of rights

 guaranteed by the free speech clause and the freedom of assembly clause of the North

 Carolina Constitution. Accordingly, we review the House map under strict scrutiny.

¶ 205 Defendants have not shown the 2021 House map is narrowly tailored to a

 compelling governmental interest, and therefore the map fails strict scrutiny. As

 noted already, partisan advantage is neither a compelling nor a legitimate

 governmental interest. Rather, the General Assembly must show that the map is

 narrowly tailored to meet traditional neutral districting criteria, including those

 expressed in article II, sections 3 and 5 of the North Carolina Constitution, those
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 expressed in the General Assembly’s own Adopted Criteria, or other articulable

 neutral principles. Here, as with the congressional map above, the General Assembly

 has failed to make that showing. Given the breadth and depth of the evidence that

 partisan advantage predominated over any traditional neutral districting criteria in

 the creation of the House map, the General Assembly has not demonstrated that the

 House map, despite its extreme partisan bias, is nevertheless carefully calibrated

 toward advancing some neutral priority. Indeed, the evidence establishes that the

 General Assembly subordinated these neutral priorities, such as preserving

 municipalities, in favor of partisan advantage. Accordingly, the North Carolina

 House map fails strict scrutiny and must be rejected.

 3. State Senate Map

¶ 206 Third and finally, we apply this constitutional standard to the 2021 North

 Carolina State Senate map. Based on the trial court’s factual findings, we conclude

 that the 2021 State Senate map constitutes partisan gerrymandering that, on the

 basis of partisan affiliation, violates plaintiffs’ fundamental right to substantially

 equal voting power.

¶ 207 As with the two previous maps, numerous factual findings compel our

 conclusion. For instance, based on Dr. Cooper’s analysis, the court found that

 “Legislative Defendants’ exercise of . . . discretion in the Senate . . . Plans resulted in

 . . . district boundaries that enhanced the Republican candidates’ partisan advantage,
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 and this finding is consistent with a finding of partisan intent.”

¶ 208 Based on Dr. Mattingly’s ensemble analysis, the court found “that the State . . .

 Senate plans are extreme outliers that ‘systematically favor the Republican Party to

 an extent which is rarely, if ever, seen in the non-partisan collection of maps.’ ” The

 court found that this intentional partisan redistricting in the Senate “is especially

 effective in preserving Republican supermajorities in instances in which the majority

 or the vast majority of plans in Dr. Mattingly’s ensemble would have broken it.”

 Specifically, the court found that the Senate plan “is an outlier or extreme outlier in

 elections where Democrats win a vote share between 47.5% and 50.5%. This range is

 significant because many North Carolina elections have this vote fraction, and this is

 the range where the non-partisan ensemble shows that Republicans lose the super-

 majority.”

¶ 209 Based on Dr. Pegden’s analysis, the court determined “that the enacted Senate

 map was more favorable to Republicans than 99.9% of comparison maps.”

 Accordingly, the court found “that the enacted Senate map is more carefully crafted

 for Republican partisan advantage than at least 99.9% of all possible maps of North

 Carolina satisfying [the nonpartisan] constraints.”

¶ 210 Based on Dr. Duchin’s close-votes-close-seats analysis, the court found that

 [t]he Enacted Senate Plan effectuates the same sort of
 partisan advantage as the Enacted Congressional Plan.
 The Enacted Senate Plan consistently creates Republican
 majorities and precludes Democrats from winning a
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 majority in the Senate even when Democrats win more
 votes. Even in an essentially tied election or in a close
 Democratic victory, the Enacted Senate Plan gives
 Republicans a Senate majority, and sometimes even a veto-
 proof 30-seat majority. And that result holds even when
 Democrats win by larger margins.

 “As with the Enacted Congressional Plan, the [c]ourt [found] that the Enacted Senate

 Plan achieves its partisan goals by packing Democratic voters into a small number of

 Senate districts and then cracking the remaining Democratic voters by splitting them

 across other districts . . . .”

¶ 211 Finally, based on all of the evidence presented at trial, the trial court found

 that the following North Carolina Senate district groupings minimized Democratic

 districts and maximized safe Republican districts through the “packing” and

 “cracking” of Democratic voters as the “result of intentional, pro-Republican partisan

 redistricting”: the Granville-Wake Senate County Grouping; the Cumberland-Moore

 Senate County Grouping; the Guilford-Rockingham Senate County Grouping; the

 Forsyth-Stokes Senate County Grouping; the Iredell-Mecklenburg Senate County

 Grouping; the Northeastern Senate County Grouping (Bertie County, Camden

 County, Currituck County, Dare County, Gates County, Hertford County,

 Northampton County, Pasquotank County, Perquimans County, Tyrrell County,

 Carteret County, Chowan County, Halifax County, Hyde County, Martin County,

 Pamlico County, Warren County, and Washington County); and the Buncombe-

 Burke-McDowell Senate County Grouping. The trial court did not find any of the
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 Senate district groupings it considered to not be the result of intentional, pro-

 Republican redistricting through packing and cracking. Ultimately, the court

 “concluded based upon a careful review of all the evidence that the [Senate map is] a

 result of intentional, pro-Republican partisan redistricting.

¶ 212 Based on these findings and numerous others, it is abundantly clear and we so

 conclude that the 2021 North Carolina Senate map substantially diminishes and

 dilutes on the basis of partisan affiliation plaintiffs’ fundamental right to equal voting

 power, as established by the free elections clause and the equal protection clause, and

 constitutes viewpoint discrimination and retaliation burdening the exercise of rights

 guaranteed by the free speech clause and the freedom of assembly clause of the North

 Carolina Constitution. Accordingly, we review the Senate map under strict scrutiny.

¶ 213 Conducting that review, we conclude that defendants have not shown the 2021

 Senate map is narrowly tailored to a compelling governmental interest and therefore

 the map fails strict scrutiny. Partisan advantage is not a compelling governmental

 interest. Rather, the General Assembly must show that the Senate map is narrowly

 tailored to meet traditional neutral districting criteria, including those expressed in

 article II, sections 3 and 5 of the North Carolina Constitution, those expressed in the

 General Assembly’s own Adopted Criteria, or other articulable neutral principles.

 Here, as with the congressional and House maps above, the General Assembly has

 failed to make that showing. Given the breadth and depth of the evidence that
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 partisan advantage predominated over any traditional neutral districting criteria in

 the creation of the Senate map, the General Assembly has not demonstrated that the

 Senate map, despite its extreme partisan bias, is nevertheless carefully calibrated

 toward advancing some compelling neutral priority. To the contrary, the evidence

 demonstrates that the Senate map prioritized considerations of partisan advantage

 above traditional neutral districting principles. Accordingly, the North Carolina

 Senate map fails strict scrutiny and must be rejected.

 G. Compliance with Stephenson requirements

¶ 214 Finally, we further hold that under Stephenson, the General Assembly was

 required to conduct a racially polarized voting analysis prior to drawing district lines.

 Notably, the General Assembly’s responsibility to conduct a racially polarized voting

 analysis arises from our state constitution and decisions of this Court, including

 primarily Stephenson, and not from the VRA itself, or for that matter from any federal

 law. In Stephenson, this Court sought to harmonize several sections of our state

 constitution―namely the whole county provision of article II, sections 3(3) and 5(3)

 and the supremacy clause of article I, section 3― in light of the federal requirements

 established by Section 5 and Section 2 of the VRA. 355 N.C. at 359. Of course, since

 the 2013 decision of the Supreme Court of the United States in Shelby County v.

 Holder, 570 U.S. 529 (2013), in which it held that the coverage formula for the

 preclearance requirement under Section 5 of the VRA was no longer justified under
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 the Fourteenth Amendment and held that section was unconstitutional, North

 Carolina has not been subject to that preclearance requirement.

¶ 215 Nevertheless, the Stephenson Court ruling relied exclusively on interpretation

 of the North Carolina Constitution. Indeed, after the Stephenson defendants initially

 removed the case to federal district court, the district court remanded the case,

 stating that “the redistricting process was a matter primarily within the province of

 the states, that plaintiffs have challenged the 2001 legislative redistricting plans

 solely on the basis of state constitutional provisions, that the complaint ‘only raises

 issues of state law,’ and that defendants’ removal of th[e] suit from state court was

 inappropriate.” Stephenson, 355 N.C. at 358. Further, when the Stephenson

 defendants “subsequently filed a notice of appeal from the District Court’s order with

 the United States Court of Appeals for the Fourth Circuit[,] . . . [t]he Fourth Circuit

 denied defendants’ motion to stay the District Court’s order of remand.” Id.

¶ 216 Here, as in Stephenson, plaintiffs’ claims arise under the same provisions of

 the North Carolina Constitution implicated in Stephenson—namely article I, sections

 3 and 5 and article II, sections 3 and 5. Here, as in Stephenson, this Court serves as

 the highest and final authority in interpreting those state constitutional provisions.

 And here, as in Stephenson, we hold that compliance with those provisions, when

 read in harmony, requires the General Assembly to conduct racially polarized voting

 analysis within their decennial redistricting process in order to assess whether any
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 steps must be taken to avoid the dilution of minority voting strength.

 III. Conclusion

¶ 217 Article I, section 2 of the North Carolina Constitution establishes that “[a]ll

 political power is vested in and derived from the people,” that “all government of

 rights originates from the people,” and “is founded upon their will only.” N.C. Const.

 art I, § 2. Furthermore, article I, section 1 of the constitution provides that “all

 persons are created equal.” N.C. Const. art I, § 1. Subsequent constitutional

 provisions within the Declaration of Rights, including the free elections clause, the

 equal protection clause, the free speech clause, and the freedom of assembly clause,

 protect fundamental rights of the people in order to ensure, among other things, that

 their government is indeed “founded upon their will only.” See id.

¶ 218 When North Carolinians claim that acts of their government violate these

 fundamental rights, and particularly when those acts choke off the democratic

 processes that channel political power from the people to their representatives, it is

 the solemn duty of this Court to review those acts to enforce the guarantees of our

 constitution. See Corum, 330 N.C. at 783. Such judicial review ensures that despite

 present day challenges our constitution’s most fundamental principles are preserved.

 Indeed, “[a] frequent recurrence to fundamental principles is absolutely necessary to

 preserve the blessings of liberty.” N.C. Const. art I, § 35.

¶ 219 Today, this Court recurs to those fundamental principles. Specifically, we have
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 considered whether partisan gerrymandering claims present a justiciable question,

 whether constitutional provisions supply administrable standards, and whether,

 having applied these standards, the General Assembly’s 2021 enacted plans

 constitute such a violation of plaintiffs’ constitutional rights.

¶ 220 First, we hold that claims of partisan gerrymandering are justiciable under the

 North Carolina Constitution. Although the primary responsibility for redistricting is

 constitutionally delegated to the General Assembly, this is not a delegation of

 unlimited power; the exercise of this power is subject to restrictions imposed by other

 constitutional provisions, including the Declaration of Rights. Further, as

 demonstrated through our analysis of the constitutional provisions at issue and the

 extensive factual findings of the trial court, claims of partisan gerrymandering can

 be carefully discerned and governed by manageable judicial standards.

¶ 221 Second, we hold that the General Assembly infringes upon voters’ fundamental

 rights when, on the basis of partisan affiliation, it deprives a voter of his or her right

 to substantially equal voting power, as established by the free elections clause and

 the equal protection clause in our Declaration of Rights. We hold it also constitutes

 viewpoint discrimination and retaliation based on protected political activity in

 violation of the free speech clause and the freedom of assembly clause in our

 Declaration of Rights. When a redistricting plan creates such an infringement of

 fundamental rights, strict scrutiny must be applied to determine whether the plan is
 HARPER V. HALL

 2022-NCSC-17

 Opinion of the Court

 nevertheless narrowly tailored to advance a compelling governmental interest.

¶ 222 Here, we hold that the General Assembly’s 2021 enacted plans are partisan

 gerrymanders that on the basis of partisan affiliation substantially infringe upon

 plaintiffs’ fundamental right to equal voting power. Finally, we hold that the enacted

 plans fail strict scrutiny and must therefore be struck down.

¶ 223 We reverse the trial court’s judgment and remand this case to that court to

 oversee the redrawing of the maps by the General Assembly or, if necessary, by the

 court. In accordance with our 4 February 2022 order and our decision today, the

 General Assembly shall now have the opportunity to submit new congressional and

 state legislative districting plans that satisfy all provisions of the North Carolina

 Constitution.17 It is the sincere hope of this Court that these new maps ensure that

 the channeling of “political power” from the people to their representatives in

 government through elections, the central democratic process envisioned by our

 constitutional system, is done on equal terms so that ours is a “government of right”

 that “originates from the people” and speaks with their voice.

 REVERSED AND REMANDED.

 17 In doing so, we hold they must also conduct racially polarized voting analysis to

 comply with the constitutional requirements under Stephenson. As we have reversed the
 judgment of the trial court based on its conclusions about the partisan gerrymandering
 claims, we decline to determine whether NCLCV Plaintiffs could also prevail on their
 minority vote dilution claim or whether plaintiff Common Cause could prevail on its
 intentional racial discrimination claim at this time.
Appendix – Ex. 37 –

 6/&RQJUHVV

 $OOHJKDQ\
 $VKH 1RUWKDPSWRQ *DWHV &XUULWXFN
 6XUU\ 6WRNHV &DVZHOO
 5RFNLQJKDP 3HUVRQ :DUUHQ

 &
 9DQFH

 DP
 +HUWIRUG

 3D
 

 VT

 GH
 *UDQYLOOH
 +DOLID[

 XR

 Q
 :DWDXJD

 WD
 :LONHV

 QN
 <DGNLQ 3HUTXLPDQV
 )RUV\WK
 0LWFKHOO $YHU\
 *XLOIRUG
 $ODPDQFH
 2UDQJH  )UDQNOLQ
  %HUWLH &KRZDQ
 &DOGZHOO 'XUKDP 1DVK
 0DGLVRQ
 <DQFH\ $OH[DQGHU
  'DYLH
 (GJHFRPEH 7\UUHOO

 ,UHGHOO 'DYLGVRQ  0DUWLQ :DVKLQJWRQ
 %XUNH
  &KDWKDP :DNH 'DUH
 %XQFRPEH
 0F'RZHOO
 &DWDZED  5DQGROSK :LOVRQ
 3LWW
 +D\ZRRG 5RZDQ
 6ZDLQ
   /LQFROQ -RKQVWRQ *UHHQH %HDXIRUW
 5XWKHUIRUG /HH
 *UDKDP +\GH
 &DEDUUXV +DUQHWW
 +HQGHUVRQ :D\QH
 -DFNVRQ
 3RON &OHYHODQG *DVWRQ 6WDQO\
 0RQWJRPHU\ 0RRUH 
 &KHURNHH 0DFRQ 7UDQV\OYDQLD  
 /HQRLU &UDYHQ

 &OD\ 0HFNOHQEXUJ 3DPOLFR
 
 5LFKPRQG +RNH &XPEHUODQG -RQHV
 8QLRQ $QVRQ 6DPSVRQ
 'XSOLQ
 &DUWHUHW
 6FRWODQG

 2QVORZ
 5REHVRQ
 %ODGHQ
 3HQGHU

 
 /HJHQG &ROXPEXV 1HZ
 +DQRYHU

 'LVWULFW
 %UXQVZLFN
 &RXQW\

      
 0LOHV
 6/&RQJUHVV 3ULQWHGE\WKH1&*HQHUDO$VVHPEO\1RYHPEHU
 – Ex. 38 –

 6/6HQDWH

 $OOHJKDQ\
 $VKH  1RUWKDPSWRQ *DWHV
 &D
 &XUULWXFN
 6XUU\ 6WRNHV 5RFNLQJKDP &DVZHOO :DUUHQ P
 3HUVRQ 9DQFH 3D GH

 :DWDXJD   *UDQYLOOH +HUWIRUG VT
 XR
 Q
 WD
 +DOLID[ QN
 :LONHV
 )RUV\WK 
 <DGNLQ 3HUTXLPDQV
 0LWFKHOO $YHU\
   2UDQJH  )UDQNOLQ
  %HUWLH &KRZDQ
  *XLOIRUG $ODPDQFH
  'XUKDP 1DVK
 &DOGZHOO
 $OH[DQGHU  
 0DGLVRQ <DQFH\ 'DYLH   (GJHFRPEH 
 ,UHGHOO  :DNH :DVKLQJWRQ
 7\UUHOO
  'DYLGVRQ
  
 0DUWLQ

 %XUNH  5DQGROSK
 &KDWKDP
  'DUH
 %XQFRPEH 0F'RZHOO &DWDZED 5RZDQ
 :LOVRQ 
 6ZDLQ
 +D\ZRRG
    
 3LWW
 %HDXIRUW
 *UDKDP
  /LQFROQ
 &DEDUUXV /HH
 
 -RKQVWRQ
  *UHHQH
 +\GH
 +HQGHUVRQ
 5XWKHUIRUG
   
 -DFNVRQ &OHYHODQG *DVWRQ  :D\QH

 
 3RON  
 0HFNOHQEXUJ
 6WDQO\ 0RQWJRPHU\ 0RRUH +DUQHWW
 
   
&KHURNHH
 0DFRQ
 7UDQV\OYDQLD
   /HQRLU
 &OD\ &UDYHQ 3DPOLFR
   -RQHV
 5LFKPRQG +RNH
 
 8QLRQ $QVRQ 6DPSVRQ 'XSOLQ
 &XPEHUODQG

  &DUWHUHW
 6FRWODQG
  
 2QVORZ
 %ODGHQ
 5REHVRQ
 3HQGHU

 1HZ
 &ROXPEXV
 +DQRYHU
 
 /HJHQG %UXQVZLFN
 
 'LVWULFW

 &RXQW\

 *URXSLQJV

      
 0LOHV
 6RXUFH6/6HQDWH 3ULQWHGE\WKH1&*HQHUDO$VVHPEO\1RYHPEHU
 – Ex. 39 –

 6/+RXVH

 $OOHJKDQ\
 $VKH 1RUWKDPSWRQ *DWHV &XUULWXFN
  &D
  6XUU\ 6WRNHV 5RFNLQJKDP &DVZHOO :DUUHQ P
  3HUVRQ 9DQFH 3D GH
   +HUWIRUG VT Q
    XR
 :DWDXJD *UDQYLOOH WD
 )RUV\WK +DOLID[ QN
 :LONHV *XLOIRUG
 <DGNLQ   3HUTXLPDQV
    'XUKDP 
 0LWFKHOO $YHU\     2UDQJH )UDQNOLQ %HUWLH
   &KRZDQ
  $ODPDQFH 
   
 &DOGZHOO   1DVK 
  $OH[DQGHU 
 0DGLVRQ <DQFH\  'DYLH    (GJHFRPEH
   7\UUHOO
  :DNH :DVKLQJWRQ
  ,UHGHOO 'DYLGVRQ  
     0DUWLQ
  
 %XUNH   
  
 
 0F'RZHOO  &KDWKDP  
  'DUH
 &DWDZED  5RZDQ 5DQGROSK   :LOVRQ
 %XQFRPEH
 +D\ZRRG 
    
 6ZDLQ  3LWW
   -RKQVWRQ *UHHQH %HDXIRUW 
 /LQFROQ 
    /HH  +\GH
 *UDKDP 5XWKHUIRUG 
  &DEDUUXV 
 +HQGHUVRQ    :D\QH
 -DFNVRQ 3RON    +DUQHWW
 &OHYHODQG   0RRUH
  6WDQO\ 0RQWJRPHU\
   *DVWRQ  
&KHURNHH 7UDQV\OYDQLD /HQRLU &UDYHQ
    
 0DFRQ  
 &OD\     3DPOLFR
   
   -RQHV
 0HFNOHQEXUJ 
  5LFKPRQG +RNH
 8QLRQ $QVRQ 6DPSVRQ 'XSOLQ
   &XPEHUODQG
  
   &DUWHUHW
 6FRWODQG
 
 2QVORZ
 5REHVRQ %ODGHQ  
 3HQGHU

 
 
 &ROXPEXV 1HZ
 +DQRYHU
 
 
 /HJHQG %UXQVZLFN
 
 'LVWULFW

 &RXQW\

 *URXSLQJV

      
 0LOHV
 6RXUFH6/+RXVH 3ULQWHGE\WKH1&*HQHUDO$VVHPEO\1RYHPEHU
 Justice MORGAN concurring.

¶ 224 While I fully join my learned colleagues in my agreement with the majority

 opinion in this case, in my view the dispositive strength of the Free Elections Clause

 warrants additional observations in light of the manner in which it has been postured

 and addressed. The substantive construction of the constitutional provision is

 buttressed by the contextual construction of the brief, yet potent, directive.

¶ 225 The entirety of article I, section 10 of the North Carolina Constitution states:

 “All elections shall be free.” N.C. Const. art. I, § 10. The dissenting view of this Court,

 the order of the trial court, and the presentations of Legislative Defendants have

 largely declined the opportunity to address the manner in which the term “free”

 should be interpreted as compared to plaintiffs’ significant reliance on the

 applicability of the Free Elections Clause. In this regard, plaintiffs’ invocation of the

 constitutional provision has either been cast as inapplicable to this case or relegable

 to a diminished role. To the extent that the word “free” in article I, section 10 has

 been construed here by Legislative Defendants, they conflate the right to a free

 election with the right to be free to participate in the election process, stating “there

 is no barrier between any voter and a ballot or a ballot box, no restriction on the

 candidates the voter may select, and no bar on a person’s ability to seek candidacy for

 any office” and also citing the proposition that “[t]he meaning [of North Carolina’s

 Free Elections Clause] is plain: free from interference or intimidation,” quoting John

 V. Orth & Paul Martin Newby, The North Carolina State Constitution 56 (2d ed.
 HARPER V. HALL

 2022-NCSC-17

 Morgan, J., concurring

 2013). And curiously, instead of focusing on how elections must be free, the dissent

 chooses to focus on how the General Assembly should be free to create legislative

 election maps admittedly based on politically partisan considerations.

¶ 226 In my view, a free election is uninhibited and unconstrained in its ability to

 have the prevailing candidate to be chosen in a legislative contest without the stain

 of the outcome’s predetermination. Commensurate with the General Assembly’s

 constitutional authority to draw legislative maps is one’s constitutional right to

 participate in legislative elections which shall be free of actions—such as the General

 Assembly’s creation of the legislative redistricting maps here—which are tantamount

 to the predetermination of elections and, hence, constitute constitutional

 abridgement.

 Justice EARLS joins in this concurring opinion.
 Chief Justice NEWBY dissenting.

¶ 227 How should a constitution be interpreted? Should its meaning be fixed or

 changing? If changing, to whom have the people given the task of changing it? When

 judges change the meaning of a constitution, does this undermine public trust and

 confidence in the judicial process? Traditionally, honoring the constitutional role

 assigned to the legislative branch, this Court has stated that acts of the General

 Assembly are presumed constitutional and deserving of the most deferential standard

 of review: To be unconstitutional, an act of the General Assembly must violate an

 explicit provision of our constitution beyond a reasonable doubt. We have recognized

 that our constitution allows the General Assembly to enact laws unless expressly

 prohibited by its text. This approach of having a fixed meaning and a deferential

 standard of review ensures a judge will perform his or her assigned role and not

 become a policymaker.

¶ 228 With this decision, unguided by the constitutional text, four members of this

 Court become policymakers. They wade into the political waters by mandating their

 approach to redistricting. They change the time-honored meaning of various portions

 of our constitution by inserting their interpretation to reach their desired outcome.

 They justify this activism because their understanding of certain constitutional

 provisions has “evolved over time.” They lament that the people have not placed a

 provision in our constitution for a “citizen referendum” and use the absence of such a

 provision to justify their judicial activism to amend our constitution. The majority
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 says courts must protect constitutional rights. This is true. Courts are not, however,

 to judicially amend the constitution to create those rights. As explicitly stated in our

 constitution, the people alone have the authority to alter our foundational document,

 and the people have the final say.

¶ 229 In its analysis, the majority misstates the history, the case law of this Court,

 and the meaning of various portions of our Declaration of Rights. In its remedy the

 majority replaces established principles with ambiguity, basically saying that judges

 alone know which redistricting plan will be constitutional and accepted by this Court

 based on analysis by political scientists. This approach ensures that the majority now

 has and indefinitely retains the redistricting authority, thereby enforcing its policy

 preferences.

¶ 230 Generally, the majority takes a sweeping brush and enacts its own policy

 preferences of achieving statewide proportionality as determined by political

 scientists and approved by judges. While mentioning traditional, neutral redistricting

 criteria, its primary focus is instead on the final partisanship analysis to achieve

 statewide parity.

¶ 231 The majority requires the General Assembly to finalize corrected maps within

 two weeks of the 4 February 2022 order along with an accompanying political science

 analysis. The majority invites others, who have not been elected by the people, to

 provide alternative maps without that same required analysis, thus inviting private
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 parties to usurp legislative authority to make the laws with respect to redistricting

 without explanation. The majority forces this directive into an artificial timeline

 which could support the majority’s adopting its own maps.

¶ 232 A recent opinion poll found that 76% of North Carolinians believe judges decide

 cases based on partisan considerations. N.C. Comm’n on the Admin. of L. & Just.,

 Final Report 67 (2017). Today’s decision, which dramatically departs from our time-

 honored standard of requiring proof that an explicit provision of the constitution is

 violated beyond a reasonable doubt, will solidify this belief.1

¶ 233 The people speak through the express language of their constitution. They

 have assigned specific tasks to each branch of government. When each branch stays

 within its lane of authority, the will of the people is achieved. When a branch grasps

 a task assigned to another, that incursion violates separation of powers and thwarts

 the will of the people. This decision, with its various policy determinations, judicially

 amends the constitution. Furthermore, it places redistricting squarely in the hands

 of four justices and not the legislature as expressly assigned by the constitution. The

 1 It does not help public confidence that in an unprecedented act, a member of the

 majority used social media to publicize this Court’s initial order when it was released, despite
 the fact that the case was still pending. See Anita Earls (@Anita_Earls), Twitter (Feb. 4, 2022,
 6:28 PM), https://twitter.com/Anita_Earls/status/1489742665356910596 (“Based on the trial
 court’s factual findings, we conclude that the congressional and legislative maps . . . are
 unconstitutional beyond a reasonable doubt.” (alteration in original)).
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 majority’s determinations violate the will of the people, making us a government of

 judges, not of the people. I respectfully dissent.

 I. Standard of Review

¶ 234 The question presented here is whether the enacted plans violate the North

 Carolina Constitution. While the standard of review is significant in all cases, it is

 particularly important in cases challenging the constitutionality of a statute.

 The idea of one branch of government, the judiciary,
 preventing another branch of government, the legislature,
 through which the people act, from exercising its power is
 the most serious of judicial considerations. See Hoke v.
 Henderson, 15 N.C. (4 Dev.) 1, 8 (1833) (“[T]he exercise of
 [judicial review] is the gravest duty of a judge, and is
 always, as it ought to be, the result of the most careful,
 cautious, and anxious deliberation.”), overruled in part on
 other grounds by Mial v. Ellington, 134 N.C. 131, 162, 46
 S.E. 961, 971 (1903); Trs. of Univ. of N.C. v. Foy, 5 N.C. (1
 Mur.) 58, 89 (1805) (Hall, J., dissenting) (“A question of
 more importance than that arising in this case [the
 constitutionality of a legislative act] cannot come before a
 court. . . . [W]ell convinced, indeed, ought one person to be
 of another’s error of judgment . . . when he reflects that
 each has given the same pledges to support the
 Constitution.”). Since its inception, the judicial branch has
 exercised its implied constitutional power of judicial review
 with “great reluctance,” Bayard v. Singleton, 1 N.C.
 (Mart.) 5, 6 (1787), recognizing that when it strikes down
 an act of the General Assembly, the Court is preventing an
 act of the people themselves, see Baker v. Martin, 330 N.C.
 331, 336–37, 410 S.E.2d 887, 890 (1991).

 State ex rel. McCrory v. Berger, 368 N.C. 633, 650, 781 S.E.2d 248, 259 (2016) (Newby,

 J., concurring in part and dissenting in part) (footnote omitted).
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

¶ 235 All political power resides in the people, N.C. Const. art. I, § 2, and the people

 act through the General Assembly, Baker, 330 N.C. at 337, 410 S.E.2d at 891. Unlike

 the United States Constitution, the North Carolina Constitution “is in no matter a

 grant of power.” McIntyre v. Clarkson, 254 N.C. 510, 515, 119 S.E.2d 888, 891 (1961)

 (quoting Lassiter v. Northampton Cnty. Bd. of Elections, 248 N.C. 102, 112, 102

 S.E.2d 853, 861 (1958), aff’d, 360 U.S. 45, 79 S. Ct. 985 (1959)). Rather, “[a]ll power

 which is not limited by the Constitution inheres in the people.” Id. at 515, 119 S.E.2d

 at 891 (quoting Lassiter, 248 N.C. at 112, 102 S.E.2d at 861). Because the General

 Assembly serves as “the agent of the people for enacting laws,” State ex rel. Martin v.

 Preston, 325 N.C. 438, 448, 385 S.E.2d 473, 478 (1989), the General Assembly has

 plenary power, and a restriction on the General Assembly is in fact a restriction on

 the people themselves, Baker, 330 N.C. at 338–39, 410 S.E.2d at 891–92. Therefore,

 this Court presumes that legislation is constitutional, and a constitutional limitation

 upon the General Assembly must be (1) express and (2) proved beyond a reasonable

 doubt. Id. at 334, 410 S.E.2d at 889. When this Court looks for constitutional

 limitations on the General Assembly’s authority, it looks to the plain text of the

 constitution.2

 2 Furthermore, “[i]ssues concerning the proper construction of the Constitution of
 North Carolina ‘are in the main governed by the same general principles which control in
 ascertaining the meaning of all written instruments.’ ” State v. Webb, 358 N.C. 92, 97, 591
 S.E.2d 505, 510 (2004) (quoting State ex rel. Martin v. Preston, 325 N.C. 438, 449, 385 S.E.2d
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

¶ 236 This standard of review is illustrated by the landmark case of Bayard v.

 Singleton, the nation’s first reported case of judicial review. The majority cites Bayard

 in an effort to support its contention that judicial interference is necessary here “to

 prevent legislators from permanently insulating themselves from popular will.” But

 Bayard, rightly understood, was simply about the authority of the Court to declare

 unconstitutional a law which violated an express provision of the constitution. It was

 not about limiting the General Assembly’s authority to make discretionary political

 decisions within its express authority. Bayard involved a pointed assault on a clearly

 expressed and easily discernible individual right in the 1776 constitution, the right

 to a trial by jury “in all controversies at Law respecting Property.” N.C. Const. of

 1776, § XIV. There the court weighed the General Assembly’s ability to enact a

 statute that abolished the right to a jury trial for property disputes—for some citizens

 in some instances—in direct contradiction of the express text of the constitution, the

 fundamental law of the land:

 That by the Constitution every citizen had
 undoubtedly a right to a decision of his property by a trial
 by jury. For that if the Legislature could take away this
 right, and require him to stand condemned in his property
 without a trial, it might with as much authority require his
 life to be taken away without a trial by jury, and that he
 should stand condemned to die, without the formality of
 any trial at all: that if the members of the General

 473, 478 (1989)). “In interpreting our Constitution—as in interpreting a statute—where the
 meaning is clear from the words used, we will not search for a meaning elsewhere.” Id.
 (quoting Preston, 325 N.C. at 449, 385 S.E.2d at 479).
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 Assembly could do this, they might with equal authority,
 not only render themselves the Legislators of the State for
 life, without any further election of the people, from thence
 transmit the dignity and authority of legislation down to
 their heirs male forever.

 Bayard, 1 N.C. at 7. Thus, the holding of Bayard v. Singleton is easily understood: A

 statute cannot abrogate an express provision of the constitution because the

 constitution represents the fundamental law and express will of the people; it is the

 role of the judiciary to perform this judicial review. The Bayard holding, however,

 does not support the proposition that this Court has the authority to involve itself in

 a matter that is both constitutionally committed to the General Assembly and lacking

 in manageable legal standards. Thus, plainly stated and as applied to this case, the

 uncontroverted standard of review asks whether plaintiffs have shown that the

 challenged statutes, presumed constitutional, violate an express provision of the

 constitution beyond a reasonable doubt.

 II. Justiciability

¶ 237 The Supreme Court of the United States has explained that “as essentially a

 function of the separation of powers,” courts must refuse to review issues that are

 better suited for the political branches; these issues are nonjusticiable.

 It is apparent that several formulations which vary
 slightly according to the settings in which the questions
 arise may describe a political question, although each has
 one or more elements which identify it as essentially a
 function of the separation of powers. Prominent on the
 surface of any case held to involve a political question is
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 found a textually demonstrable constitutional commitment
 of the issue to a coordinate political department; or a lack
 of judicially discoverable and manageable standards for
 resolving it; or the impossibility of deciding without an
 initial policy determination of a kind clearly for nonjudicial
 discretion; or the impossibility of a court’s undertaking
 independent resolution without expressing lack of the
 respect due coordinate branches of government; or an
 unusual need for unquestioning adherence to a political
 decision already made; or the potentiality of
 embarrassment from multifarious pronouncements by
 various departments on one question.

 Baker v. Carr, 369 U.S. 186, 217, 82 S. Ct. 691, 710 (1962); see also Bacon v. Lee, 353

 N.C. 696, 716–17, 549 S.E.2d 840, 854 (2001). Thus, respect for separation of powers

 requires a court to refrain from entertaining a claim if any of the following are shown:

 (1) a textually demonstrable commitment of the matter to another political

 department; (2) a lack of judicially discoverable and manageable standards; (3) the

 impossibility of deciding a case without making a policy determination of a kind

 clearly suited for nonjudicial discretion; or (4) the impossibility of a court’s

 undertaking independent resolution of a matter without expressing lack of the

 respect due to a coordinate branch of government. Often the second, third, and fourth

 factors are collectively referred to as lacking a manageable standard.

 A. Manageable Standards

¶ 238 In addressing the manageable standards analysis, the Supreme Court recently

 held that partisan gerrymandering claims present nonjusticiable political questions,

 and it warned of the pitfalls inherent in such claims. See Rucho v. Common Cause,
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 139 S. Ct. 2484, 2506–07 (2019).3 In Rucho “[v]oters and other plaintiffs in North

 Carolina and Maryland challenged their States’ congressional districting maps as

 unconstitutional partisan gerrymanders.” Id. at 2491. “The plaintiffs alleged that the

 gerrymandering violated the First Amendment, the Equal Protection Clause of the

 Fourteenth Amendment, the Elections Clause, and Article I, § 2, of the Constitution.”

 Id. As such, the Supreme Court was tasked with deciding “whether claims of

 excessive partisanship in districting are ‘justiciable’—that is, properly suited for

 resolution by the federal courts.” Id.

¶ 239 In seeking to answer this question, the Court provided the following historical

 background:

 Partisan gerrymandering is nothing new. Nor is
 frustration with it. The practice was known in the Colonies
 prior to Independence, and the Framers were familiar with
 it at the time of the drafting and ratification of the
 Constitution. . . .

 ....

 . . . The Framers were aware of electoral districting
 problems and considered what to do about them. They
 settled on a characteristic approach, assigning the issue to
 the state legislatures, expressly checked and balanced by
 the Federal Congress. As Alexander Hamilton explained,
 “it will . . . not be denied that a discretionary power over

 3 It should be noted that several of the attorneys in Rucho are also litigating this case.

 Similar claims are presented here and similar remedies requested, only this time based on
 our state constitution, not the Federal Constitution. Neither the Federal Constitution nor the
 state constitution have explicit provisions addressing partisan gerrymandering. Likewise,
 some of the plaintiffs’ experts in Rucho are the same experts as used here.
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 elections ought to exist somewhere. It will, I presume, be
 as readily conceded that there were only three ways in
 which this power could have been reasonably modified and
 disposed: that it must either have been lodged wholly in the
 national legislature, or wholly in the State legislatures, or
 primarily in the latter, and ultimately in the former.” The
 Federalist No. 59, p. 362 (C. Rossiter ed. 1961). At no point
 was there a suggestion that the federal courts had a role to
 play. Nor was there any indication that the Framers had
 ever heard of courts doing such a thing.

Id. at 2494–96 (alteration in original). The Court then noted that “[i]n two areas—

[equal voting power defined as] one-person, one-vote and racial gerrymandering—our

cases have held that there is a role for the courts with respect to at least some issues

that could arise from a State’s drawing of congressional districts.” Id. at 2495–96. It

specified, however, that

 [p]artisan gerrymandering claims have proved far
 more difficult to adjudicate. The basic reason is that, while
 it is illegal for a jurisdiction to depart from the one-person,
 one-vote rule, or to engage in racial discrimination in
 districting, “a jurisdiction may engage in constitutional
 political gerrymandering.” Hunt v. Cromartie, 526 U.S.
 541, 551, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (citing
 Bush v. Vera, 517 U.S. 952, 968, 116 S.Ct. 1941, 135
 L.Ed.2d 248 (1996); Shaw v. Hunt, 517 U.S. 899, 905, 116
 S.Ct. 1894, 135 L.Ed.2d 207 (1996) (Shaw II); Miller v.
 Johnson, 515 U.S. 900, 916, 115 S.Ct. 2475, 132 L.Ed.2d
 762 (1995); Shaw [v. Reno], 509 U.S. [630,] 646, 113 S.Ct.
 2816[, 125 L.Ed. 2d 511 (1993)]). See also Gaffney v.
 Cummings, 412 U.S. 735, 753, 93 S.Ct. 2321, 37 L.Ed.2d
 298 (1973) (recognizing that “[p]olitics and political
 considerations are inseparable from districting and
 apportionment”).

Id. at 2497 (last alteration in original). Thus, the Court reasoned that
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 [t]o hold that legislators cannot take partisan
 interests into account when drawing district lines would
 essentially countermand the Framers’ decision to entrust
 districting to political entities. The “central problem” is not
 determining whether a jurisdiction has engaged in
 partisan gerrymandering. It is “determining when political
 gerrymandering has gone too far.” Vieth [v. Jubelirer], 541
 U.S. [267,] 296, 124 S.Ct. 1769 [(2004)] (plurality opinion).
 See League of United Latin American Citizens v. Perry, 548
 U.S. 399, 420, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006)
 (LULAC) (opinion of Kennedy, J.) (difficulty is “providing a
 standard for deciding how much partisan dominance is too
 much”).

Id. The Court then highlighted its “mindful[ness] of Justice Kennedy’s counsel in

Vieth: Any standard for resolving such claims must be grounded in a ‘limited and

precise rationale’ and be ‘clear, manageable, and politically neutral.’ 541 U.S. at 306–

308, 124 S.Ct. 1769 (opinion concurring in judgment).” Id. at 2498. The Court further

clarified that

 [a]n important reason for those careful constraints is that,
 as a Justice with extensive experience in state and local
 politics put it, “[t]he opportunity to control the drawing of
 electoral boundaries through the legislative process of
 apportionment is a critical and traditional part of politics
 in the United States.” [Davis v.] Bandemer, 478 U.S. [109,]
 145, 106 S.Ct. 2797 [(1986)] (opinion of O’Connor, J.). See
 Gaffney, 412 U.S. at 749, 93 S.Ct. 2321 (observing that
 districting implicates “fundamental ‘choices about the
 nature of representation’ ” (quoting Burns v. Richardson,
 384 U.S. 73, 92, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966))). An
 expansive standard requiring “the correction of all election
 district lines drawn for partisan reasons would commit
 federal and state courts to unprecedented intervention in
 the American political process,” Vieth, 541 U.S. at 306, 124
 S.Ct. 1769 (opinion of Kennedy, J.).
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 Id. (first alteration in original). As such, the Supreme Court concluded that “[i]f

 federal courts are to ‘inject [themselves] into the most heated partisan issues’ by

 adjudicating partisan gerrymandering claims, Bandemer, 478 U.S. at 145, 106 S.Ct.

 at 2797 (opinion of O’Connor, J.), they must be armed with a standard that can

 reliably differentiate unconstitutional from ‘constitutional political

 gerrymandering.’ ” Id. at 2499 (second alteration in original) (quoting Cromartie, 526

 U.S. at 551, 119 S. Ct. at 1545).

¶ 240 The Court also explained that partisan gerrymandering claims are effectively

 requests for courts to allocate political power based upon a principle of

 proportionality:

 Partisan gerrymandering claims invariably sound in
 a desire for proportional representation. As Justice
 O’Connor put it, such claims are based on “a conviction that
 the greater the departure from proportionality, the more
 suspect an apportionment plan becomes.” [Bandemer, 478
 U.S. at 159, 106 S.Ct. 2797.] “Our cases, however, clearly
 foreclose any claim that the Constitution requires
 proportional representation or that legislatures in
 reapportioning must draw district lines to come as near as
 possible to allocating seats to the contending parties in
 proportion to what their anticipated statewide vote will
 be.” Id., at 130, 106 S.Ct. 2797 (plurality opinion). See
 Mobile v. Bolden, 446 U.S. 55, 75–76, 100 S.Ct. 1490, 1504,
 64 L.Ed.2d 47 (1980) (plurality opinion) (“The Equal
 Protection Clause of the Fourteenth Amendment does not
 require proportional representation as an imperative of
 political organization.”).

 The Founders certainly did not think proportional
 representation was required. For more than 50 years after
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 ratification of the Constitution, many States elected their
 congressional representatives through at-large or “general
 ticket” elections. Such States typically sent single-party
 delegations to Congress. See E. Engstrom, Partisan
 Gerrymandering and the Construction of American
 Democracy 43–51 (2013). That meant that a party could
 garner nearly half of the vote statewide and wind up
 without any seats in the congressional delegation. The
 Whigs in Alabama suffered that fate in 1840: “their party
 garnered 43 percent of the statewide vote, yet did not
 receive a single seat.” Id., at 48. When Congress required
 single-member districts in the Apportionment Act of 1842,
 it was not out of a general sense of fairness, but instead a
 (mis)calculation by the Whigs that such a change would
 improve their electoral prospects. Id., at 43–44.

 Unable to claim that the Constitution requires
 proportional representation outright, plaintiffs inevitably
 ask the courts to make their own political judgment about
 how much representation particular political parties
 deserve—based on the votes of their supporters—and to
 rearrange the challenged districts to achieve that end.

Id. at 2499. The Court thus determined that “federal courts are not equipped to

apportion political power as a matter of fairness, nor is there any basis for concluding

that they were authorized to do so.” Id. (quoting Vieth, 541 U.S. at 291, 124 S.Ct. 1769

(plurality opinion) (stating that: “ ‘Fairness’ does not seem to us a judicially

manageable standard. . . . Some criterion more solid and more demonstrably met

than that seems to us necessary to enable the state legislatures to discern the limits

of their districting discretion, to meaningfully constrain the discretion of the courts,

and to win public acceptance for the courts’ intrusion into a process that is the very

foundation of democratic decisionmaking.”)).
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

¶ 241 The Court also explained that the Federal Constitution is devoid of any metric

 for measuring political fairness:

 Appellees contend that if we can adjudicate one-
 person, one-vote claims, we can also assess partisan
 gerrymandering claims. But the one-person, one-vote rule
 is relatively easy to administer as a matter of math. The
 same cannot be said of partisan gerrymandering claims,
 because the Constitution supplies no objective measure for
 assessing whether a districting map treats a political party
 fairly. It hardly follows from the principle that each person
 must have an equal say in the election of representatives
 that a person is entitled to have his political party achieve
 representation in some way commensurate to its share of
 statewide support.

 Id. at 2501. The Court then turned to the shortcomings of the political science-based

 tests that the plaintiffs proposed for determining the permissibility of partisan

 gerrymandering:

 The appellees assure us that “the persistence of a
 party’s advantage may be shown through sensitivity
 testing: probing how a plan would perform under other
 plausible electoral conditions.” Experience proves that
 accurately predicting electoral outcomes is not so simple,
 either because the plans are based on flawed assumptions
 about voter preferences and behavior or because
 demographics and priorities change over time. In our two
 leading partisan gerrymandering cases themselves, the
 predictions of durability proved to be dramatically wrong.
 In 1981, Republicans controlled both houses of the Indiana
 Legislature as well as the governorship. Democrats
 challenged the state legislature districting map enacted by
 the Republicans. This Court in Bandemer rejected that
 challenge, and just months later the Democrats increased
 their share of House seats in the 1986 elections. Two years
 later the House was split 50–50 between Democrats and
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 Republicans, and the Democrats took control of the
 chamber in 1990. Democrats also challenged the
 Pennsylvania congressional districting plan at issue in
 Vieth. Two years after that challenge failed, they gained
 four seats in the delegation, going from a 12–7 minority to
 an 11–8 majority. At the next election, they flipped another
 Republican seat.

 Even the most sophisticated districting maps cannot
 reliably account for some of the reasons voters prefer one
 candidate over another, or why their preferences may
 change. Voters elect individual candidates in individual
 districts, and their selections depend on the issues that
 matter to them, the quality of the candidates, the tone of
 the candidates’ campaigns, the performance of an
 incumbent, national events or local issues that drive voter
 turnout, and other considerations. Many voters split their
 tickets. Others never register with a political party, and
 vote for candidates from both major parties at different
 points during their lifetimes. For all of those reasons,
 asking judges to predict how a particular districting map
 will perform in future elections risks basing constitutional
 holdings on unstable ground outside judicial expertise.

 Id. at 2503–04 (citations omitted).

¶ 242 The Supreme Court concluded “that partisan gerrymandering claims present

 political questions beyond the reach of the federal courts. Federal judges have no

 license to reallocate political power between the two major political parties, with no

 plausible grant of authority in the Constitution, and no legal standards to limit and

 direct their decisions.” Id. at 2506–07. The Court’s discussion in Rucho of its previous

 decision in Bandemer, especially its reference to Justice O’Connor’s concurring

 opinion, serves as a cautionary tale for the dangers that loom when a court thrusts
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 itself into the political thicket guided by nothing more than a “nebulous standard.”

 Bandemer, 478 U.S. at 145, 106 S. Ct. at 2817 (O’Connor, J., concurring). The

 Supreme Court did state that some state constitutions might provide the explicit

 guidance necessary to adjudicate partisan gerrymandering claims.

¶ 243 For specific guidance, the Court mentioned a case in which “the Supreme Court

 of Florida struck down that State’s congressional districting plan as a violation of the

 Fair Districts Amendment to the Florida Constitution.” Rucho, 139 S. Ct. at 2507

 (citing League of Women Voters of Florida v. Detzner, 172 So. 3d 363, 416 (Fla. 2015)).

 Notably, in Detzner the state court was directed by the following express

 constitutional provision:

 In establishing congressional district boundaries:

 (a) No apportionment plan or individual district
 shall be drawn with the intent to favor or disfavor a
 political party or an incumbent; and districts shall not be
 drawn with the intent or result of denying or abridging the
 equal opportunity of racial or language minorities to
 participate in the political process or to diminish their
 ability to elect representatives of their choice; and districts
 shall consist of contiguous territory.

 (b) Unless compliance with the standards in this
 subsection conflicts with the standards in subsection (a) or
 with federal law, districts shall be as nearly equal in
 population as is practicable; districts shall be compact; and
 districts shall, where feasible, utilize existing political and
 geographical boundaries.

 (c) The order in which the standards within
 subsections (a) and (b) of this section are set forth shall not
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 be read to establish any priority of one standard over the
 other within that subsection.

 Fla. Const. art. III, § 20 (footnotes omitted). When the Supreme Court referenced the

 use of state constitutions to address claims of partisan gerrymandering, it was

 referring to explicit prohibitions found in state constitutions, not to those created by

 judges as this Court does today. When asked by the dissent why the majority did not

 follow the Florida court’s lead, the majority said, “The answer is that there is no

 ‘Fair Districts Amendment’ to the Federal Constitution.” Rucho, 139 S. Ct. at 2507.

¶ 244 Here the majority opinion confirms the truth of all the warnings given by the

 Supreme Court that there is no manageable standard for adjudicating claims of

 partisan gerrymandering. The will of the people of Florida is fully and clearly

 expressed in their constitution. Like the Federal Constitution, there is no provision

 in our state constitution remotely comparable to this express provision in the Florida

 Constitution. As the Supreme Court said, with an express provision, states are better

 “armed with a standard that can reliably differentiate” between constitutional and

 unconstitutional political gerrymandering. See Rucho, 139 S. Ct. at 2499. Instead, the

 majority inexplicably takes the Court’s statement that the “[p]rovisions in state

 statutes and state constitutions can provide standards and guidance for state courts

 to apply,” id. at 2507, as an unrestricted license to judicially amend our constitution.

 In doing so, the majority wholly ignores the fact that the Court in Rucho identified

 several state constitutional provisions and statutes that are clear, manageable, and
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 express as examples of workable standards for assessing political gerrymandering.

 See id. at 2507–08.

¶ 245 The North Carolina Constitution could have a provision like the Florida

 Constitution. But, to do so properly requires the amendment process authorized in

 the constitution itself, allowing the people to determine the wisdom of this new policy.

 Instead of following the constitutionally required process for properly amending the

 constitution, the majority now does so by judicial fiat, effectively placing in the

 constitution that any redistricting plan cannot “on the basis of partisan affiliation . . .

 deprive[ ] a voter of his or her fundamental right to substantially equal voting power”

 as determined by certain political science tests. Would the people have adopted this

 constitutional amendment? We do not know, and the majority does not care.

¶ 246 The plaintiffs in Rucho presented arguments and evidence similar to what was

 presented here—that the use of certain political science theories could provide a

 manageable standard. The Supreme Court disagreed. See id. at 2503–04. Here the

 majority’s new constitutional standard requires litigants and courts to utilize those

 rejected approaches to predict the electoral outcomes that various proposed plans

 would produce. In doing so, the majority adopts various policies. First, the majority

 makes the initial policy determination that the constitution mandates a statewide

 proportionality standard. Next, it determines that the constitution requires the use

 of political science tests to adhere to this standard and designates which political
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 science tests should be used. But, the majority refuses to identity how the standard

 can be met: “We do not believe it prudent or necessary to, at this time, identify an

 exhaustive set of metrics or precise mathematical thresholds which conclusively

 demonstrate or disprove the existence of an unconstitutional partisan gerrymander.”

 “[B]asing [its] constitutional holdings on unstable ground outside judicial expertise,”

 Rucho, 139 S. Ct. at 2504, the majority’s decision effectively results in the creation of

 a redistricting commission comprised of selected political scientists and judges.

¶ 247 The majority simply fails to recognize that its political science-based approach

 involves policy decisions and that these are the same policy determinations about

 which the Supreme Court warned in Rucho. See id. at 2503–04; id. at 2504 (“For all

 of those reasons, asking judges to predict how a particular districting map will

 perform in future elections risks basing constitutional holdings on unstable ground

 outside judicial expertise.”). Why did the majority choose this approach and these

 specific tests instead of others? The expert witnesses in this case looked to selected

 past statewide elections results for data, and the majority approves such a practice.

 Left unanswered is which past elections’ results are germane to predicting future

 ones. Moreover, what if the experts approved by the majority tend to favor one

 political party over the other as shown by their trial testimony in various cases? Could

 such experts be considered politically neutral?
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

¶ 248 As found by the trial court, “[t]he experts’ analysis does not inform the Court

 of how far the Enacted Maps are from what is permissible partisan advantage.

 Accordingly, these analyses do not inform the Court of how much of an outlier the

 Enacted Maps are from what is actually permissible.” The trial court also found that

 the “statewide races [used by plaintiffs’ experts] have one thing in common, that is,

 the elected positions have very little in common with the legislative and congressional

 races except that they all occur in North Carolina.”

¶ 249 The majority inserts a requirement of “partisan fairness” into our constitution.

 Under the majority’s newly created policy, any redistricting that diminishes or dilutes

 an individual’s vote on the basis of partisanship is unconstitutional. This outcome

 results, as predicted by the Court in Rucho, in a statewide proportionality standard.

 According to the majority, when groups of voters of “equal size” exist within a state,

 elections should result in an equal amount of representatives. Again, this vague

 notion of fairness does not answer how to measure whether groups of voters are of

 equal size or how to predict the results an election would produce.

¶ 250 The majority also bases its reasoning on several false assumptions. First,

 plaintiffs’ experts and now the majority appear to assume that voters will vote along

 party lines in future elections. This assumption is especially troubling considering

 that in 2020 over eight percent of North Carolinians voted for both a Republican

 candidate for president and a Democratic candidate for governor on the same ballot.
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 Though individuals self-select their party affiliation, the views can often differ from

 one individual to another within that affiliation. Second, in equating partisan

 affiliation to an immutable characteristic and then elevating its protection to strict

 scrutiny, the majority also fails to consider that party affiliation can change at any

 point or be absent altogether. How can the General Assembly forecast the appropriate

 protections for the unaffiliated voter, a group growing by rapid number in the state?

 What is the standard for that group’s fair representation? The majority certainly

 provides no answer for these important questions.

¶ 251 Third, the majority’s policy decision erroneously assumes that a voter’s

 interests can never be adequately represented by someone from a different party.

 Representative government is grounded in the concept of geographic representation.

 Though partisanship may influence the representative’s attention to certain political

 issues, the representative is likely to attend to numerous other issues important to

 the shared community interests that affect his or her constituents. The constitution

 cannot guarantee that a representative will have the same political objectives as a

 given constituent because it is an impossible requirement. Representatives are

 individuals with their own beliefs and who pursue their own motivations, often in

 opposition to other members of their own party. As the trial court correctly found,

 plaintiffs’ experts, and now the majority, treat candidates and representatives “as

 inanimate objects in that they do not consider the personality or qualifications of each
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

candidate, any political baggage each candidate may carry, as well as a host of other

considerations that voters use to select a candidate.” Not only does the majority

assume that voters will vote along party lines, but it also likewise transforms the

individual representatives into partisan robots. Such reasoning is divorced from

reality but nonetheless is the expected result when a court involves itself in a “policy

determination of a kind clearly for nonjudicial discretion.” Baker, 369 U.S. at 217, 82

S. Ct. at 710. As in this case, the plaintiffs in Rucho argued that addressing concerns

of partisan gerrymandering was comparable to the process used in the one-person,

one-vote legal analysis. Again, the Supreme Court of the United States disagreed. See

Rucho, 139 S. Ct. at 2501. The one-person, one-vote rule is just “a matter of math.”

Id. But the Constitution does not provide an “objective measure” of how to determine

if a political party is treated “fairly.” Id. Again, rejecting the Supreme Court’s

guidance, the majority holds that one-person, one-vote and partisan gerrymandering

use comparable assessments and even asserts that violations related to partisan

gerrymandering are more egregious than violations of one-person, one-vote. In sum,

there is no judicially discernible manageable standard. As thoroughly discussed in

Rucho, the majority’s approach is replete with policy determinations. Thus, the case

is nonjusticiable.
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 B. Textual Commitment

¶ 252 In addition to the fact that partisan gerrymandering claims are lacking in

 manageable standards, the issue is textually committed to the General Assembly.

 Under our state constitution, the General Assembly possesses plenary power as well

 as responsibilities explicitly recognized in the text. McIntyre, 254 N.C. at 515, 119

 S.E.2d at 891–92. Both the Federal Constitution and the North Carolina Constitution

 textually assign redistricting authority to the legislature. The Federal Constitution

 commits the drawing of congressional districts to the state legislatures subject to

 oversight by the Congress of the United States. “The Times, Places and Manner of

 holding Elections for Senators and Representatives, shall be prescribed in each State

 by the Legislature thereof; but the Congress may at any time by Law make or alter

 such Regulations, except as to the Places of chusing Senators.” U.S. Const. art. I, § 4,

 cl. 1. Our constitution also plainly commits redistricting responsibility to the General

 Assembly. See N.C. Const. art. II, § 3 (“The General Assembly . . . shall revise the

 senate districts and the apportionment of Senators among those districts . . . .”

 (emphasis added)); id. § 5 (“The General Assembly . . . shall revise the representative

 districts and the apportionment of Representatives among those districts . . . .”

 (emphasis added)). The governor has no role in the redistricting process because the
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 constitution explicitly exempts redistricting legislation from the governor’s veto

 power. Id. § 22(5)(b)–(d).

¶ 253 The role of the judiciary through judicial review is to decide challenges

 regarding whether a redistricting plan violates the objective limitations in Article II,

 Sections 3 and 5 of our constitution or a provision of federal law. Under our historic

 standard of review, the Court should not venture beyond the express language of the

 constitution. This Court is simply not constitutionally empowered nor equipped to

 formulate policy or develop standards for matters of a political, rather than legal,

 nature.

¶ 254 Our constitution places only the following four enumerated objective

 limitations on the General Assembly’s redistricting authority:

 (1) Each Senator shall represent, as nearly as may
 be, an equal number of inhabitants, the number of
 inhabitants that each Senator represents being
 determined for this purpose by dividing the population of
 the district that he represents by the number of Senators
 apportioned to that district;

 (2) Each senate district shall at all times consist of
 contiguous territory;

 (3) No county shall be divided in the formation of a
 senate district;

 (4) When established, the senate districts and the
 apportionment of Senators shall remain unaltered until
 the return of another decennial census of population taken
 by order of Congress.
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 Id. § 3; see id. § 5 (setting the same limitations for the state House of Representatives).

 These express limitations neither restrict nor prohibit the General Assembly’s

 presumptively constitutional discretion to engage in partisan gerrymandering. See

 Preston, 325 N.C. at 448–49, 385 S.E.2d at 478. The majority seriously errs by

 suggesting the General Assembly needs an express grant of authority to redistrict for

 partisan advantage. Under our state constitution, the opposite is true; absent an

 express prohibition, the General Assembly can proceed.

¶ 255 In a landmark case this Court considered the explicit limitations in Article II,

 Sections 3 and 5 and concluded that these objective restraints remain valid and can

 be applied consistently with federal law. In Stephenson the plaintiffs challenged the

 2001 state legislative redistricting plans as unconstitutional in violation of the Whole

 County Provisions (WCP) of Article II, Sections 3 and 5. Stephenson v. Bartlett, 355

 N.C. 354, 358, 562 S.E.2d 377, 381 (2002). The defendants argued that “the

 constitutional provisions mandating that counties not be divided are wholly

 unenforceable because of the requirements of the Voting Rights Act [(VRA)].” Id. at

 361, 562 S.E.2d at 383–84. Thus, before addressing whether the 2001 redistricting

 plans violated the Whole County Provisions, this Court first had to address “whether

 the WCP is now entirely unenforceable, as [the] defendants contend, or, alternatively,

 whether the WCP remains enforceable throughout the State to the extent not
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

preempted or otherwise superseded by federal law.” Id. at 369, 562 S.E.2d at 388. In

doing so, we explained that

 an inflexible application of the WCP is no longer attainable
 because of the operation of the provisions of the VRA and
 the federal “one-person, one-vote” standard, as
 incorporated within the State Constitution. This does not
 mean, however, that the WCP is rendered a legal nullity if
 its beneficial purposes can be preserved consistent with
 federal law and reconciled with other state constitutional
 guarantees.

 . . . . The General Assembly may consider partisan
 advantage and incumbency protection in the application of
 its discretionary redistricting decisions, see Gaffney v.
 Cummings, 412 U.S. 735, [93 S. Ct. 2321,] 37 L. Ed. 2d 298
 (1973), but it must do so in conformity with the State
 Constitution. To hold otherwise would abrogate the
 constitutional limitations or “objective constraints” that
 the people of North Carolina have imposed on legislative
 redistricting and reapportionment in the State
 Constitution.

Id. at 371–72, 562 S.E.2d at 389–90. Thus, we referred to the Whole County

Provisions and the other explicit limitations of Article II, Sections 3 and 5 as the

“objective constraints” that the people have imposed upon the General Assembly’s

redistricting authority. We then concluded that “the WCP remains valid and binding

upon the General Assembly during the redistricting and reapportionment process . . .

except to the extent superseded by federal law.” Id. at 372, 562 S.E.2d at 390. Having

decided that the Whole County Provisions remained enforceable to the extent not

preempted or otherwise superseded by federal law, we held that the 2001
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 redistricting plans violated the Whole County Provisions because “the 2001 Senate

 redistricting plan divide[d] 51 of 100 counties into different Senate Districts,” and

 “[t]he 2001 House redistricting plan divide[d] 70 out of 100 counties into different

 House districts.” Id. at 371, 562 S.E.2d at 390.

¶ 256 Having found that the maps violated the still valid Whole County Provisions,

 out of respect for the legislative branch, we then sought to give the General Assembly

 detailed criteria for fashioning remedial maps. The plaintiffs “contend[ed] that

 remedial compliance with the WCP requires the formation of multi-member

 legislative districts in which all legislators would be elected ‘at-large.’ ” Id. at 376,

 562 S.E.2d at 392. As such, we “turn[ed] to address the constitutional propriety of

 such districts, in the public interest, in order to effect a comprehensive remedy to the

 constitutional violation which occurred in the instant case.” Id. at 377, 562 S.E.2d at

 393. In doing so, we noted that “[t]he classification of voters into both single-member

 and multi-member districts . . . necessarily implicates the fundamental right to vote

 on equal terms.” Id. at 378, 562 S.E.2d at 393. We explained that

 voters in single-member legislative districts, surrounded
 by multi-member districts, suffer electoral disadvantage
 because, at a minimum, they are not permitted to vote for
 the same number of legislators and may not enjoy the same
 representational influence or “clout” as voters represented
 by a slate of legislators within a multi-member district.

 Id. at 377, 562 S.E.2d at 393 (emphasis added). Thus, we concluded that the use of

 both single-member and multi-member districts within the same redistricting plan
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 infringes upon “the fundamental right of each North Carolinian to substantially equal

 voting power.” Id. at 379, 562 S.E.2d at 394. In other words, “substantially equal

 voting power” meant that each legislator should represent a similar number of

 constituents. This is an application of the one-person, one-vote concept. Here the

 majority changes the concept of “substantially equal voting power” of one-person, one-

 vote to apply now to “party affiliation.”

¶ 257 We did not discuss the political party of the constituents in Stephenson but

 provided the following remedial directive:

 [T]o ensure full compliance with federal law, legislative
 districts required by the VRA shall be formed prior to
 creation of non-VRA districts. The USDOJ precleared the
 2001 legislative redistricting plans, and the VRA districts
 contained therein, on 11 February 2002.[4] This
 administrative determination signified that, in the opinion
 of the USDOJ, the 2001 legislative redistricting plans had
 no retrogressive effect upon minority voters. In the
 formation of VRA districts within the revised redistricting
 plans on remand, we likewise direct the trial court to
 ensure that VRA districts are formed consistent with
 federal law and in a manner having no retrogressive effect
 upon minority voters. To the maximum extent practicable,
 such VRA districts shall also comply with the legal
 requirements of the WCP, as herein established for all
 redistricting plans and districts throughout the State.

 4 North Carolina is no longer subject to this requirement of Section 5 of the Voting

 Rights Act. N.C. State Conf. of NAACP v. McCrory, 831 F.3d 204, 215–16 (4th Cir. 2016) (“[I]n
 late June 2013, the Supreme Court issued its opinion in Shelby County. In it, the Court
 invalidated the preclearance coverage formula, finding it based on outdated data. Shelby
 [Cnty. v. Holder], [570 U.S. 529, 556–57,] 133 S. Ct. [2612,] 2631 [(2013)]. Consequently, as
 of that date, North Carolina no longer needed to preclear changes in its election laws.”).
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 In forming new legislative districts, any deviation
from the ideal population for a legislative district shall be
at or within plus or minus five percent for purposes of
compliance with federal “one-person, one-vote”
requirements.

 In counties having a 2000 census population
sufficient to support the formation of one non-VRA
legislative district falling at or within plus or minus five
percent deviation from the ideal population consistent with
“one-person, one-vote” requirements, the WCP requires
that the physical boundaries of any such non-VRA
legislative district not cross or traverse the exterior
geographic line of any such county.

 When two or more non-VRA legislative districts may
be created within a single county, which districts fall at or
within plus or minus five percent deviation from the ideal
population consistent with “one-person, one-vote”
requirements, single-member non-VRA districts shall be
formed within said county. Such non-VRA districts shall be
compact and shall not traverse the exterior geographic
boundary of any such county.

 In counties having a non-VRA population pool which
cannot support at least one legislative district at or within
plus or minus five percent of the ideal population for a
legislative district or, alternatively, counties having a non-
VRA population pool which, if divided into districts, would
not comply with the at or within plus or minus five percent
“one-person, one-vote” standard, the requirements of the
WCP are met by combining or grouping the minimum
number of whole, contiguous counties necessary to comply
with the at or within plus or minus five percent “one-
person, one-vote” standard. Within any such contiguous
multi-county grouping, compact districts shall be formed,
consistent with the at or within plus or minus five percent
standard, whose boundary lines do not cross or traverse the
“exterior” line of the multi-county grouping; provided,
however, that the resulting interior county lines created by
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 any such groupings may be crossed or traversed in the
 creation of districts within said multi-county grouping but
 only to the extent necessary to comply with the at or within
 plus or minus five percent “one-person, one-vote” standard.
 The intent underlying the WCP must be enforced to the
 maximum extent possible; thus, only the smallest number
 of counties necessary to comply with the at or within plus
 or minus five percent “one-person, one-vote” standard shall
 be combined, and communities of interest should be
 considered in the formation of compact and contiguous
 electoral districts.

 Because multi-member legislative districts, at least
 when used in conjunction with single-member legislative
 districts in the same redistricting plan, are subject to strict
 scrutiny under the Equal Protection Clause of the State
 Constitution, multi-member districts shall not be used in
 the formation of legislative districts unless it is established
 that such districts are necessary to advance a compelling
 governmental interest.

 Finally, we direct that any new redistricting plans,
 including any proposed on remand in this case, shall depart
 from strict compliance with the legal requirements set
 forth herein only to the extent necessary to comply with
 federal law.

 Id. at 383–84, 562 S.E.2d at 396–97.

¶ 258 The majority attempts to analogize the classification of voters in Stephenson

 that were placed into both single and multi-member districts to the classification of

 voters based upon partisan affiliation. It does so by concluding, without any citation

 or other reference to legal support or any explanation, that the right to vote on equal

 terms “necessarily encompasses the opportunity to aggregate one’s vote with

 likeminded citizens to elect a governing majority of elected officials who reflect those
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 citizens’ views.” The majority thus reasons that “[l]ike the distinctions at issue in

 Stephenson, drawing distinctions between voters on the basis of partisanship when

 allocating voting power diminishes the ‘representational influence’ of voters” because

 “those voters have far fewer legislators who are ‘responsive’ to their concerns and who

 can together ‘press their interests.’ ”

¶ 259 The majority, however, fails to recognize that at least some partisan

 considerations are permitted under Stephenson. Id. at 371, 562 S.E.2d at 390 (“The

 General Assembly may consider partisan advantage and incumbency protection in

 the application of its discretionary redistricting decisions, but it must do so in

 conformity with the State Constitution.” (internal citation omitted)); Rucho, 139

 S. Ct. at 2497 (recognizing that legislators must be permitted to take some “partisan

 interests into account when drawing district lines”). Furthermore, our Stephenson

 decision thus directs that the Whole County Provisions of Article II, Sections 3 and 5

 are still enforceable to the extent that they are compatible with the VRA and one-

 person, one-vote principles. When understanding Stephenson in context, it becomes

 clear that the Court’s statement—that the General Assembly’s practice of partisan

 gerrymandering must still conform with the constitution—refers to the express

 objective limitations present in Article II, Sections 3 and 5. The Court in Stephenson

 did not identify any other restrictions on the General Assembly’s redistricting
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 authority arising from the state constitution; the Court only recognized the express

 limitations, which deal exclusively with geographic and population-based measures.

¶ 260 The majority’s misunderstanding of Stephenson is further expressed through

 its requirement from the 4 February 2022 order that “[t]he General Assembly must

 first assess whether, using current election and population data, racially polarized

 voting is legally sufficient in any area of the state such that Section 2 of the Voting

 Rights Act requires the drawing of a district to avoid diluting the voting strength of

 African-American voters.”5 Contrarily, Stephenson in no way requires the General

 Assembly to conduct an independent analysis under Section 2 of the VRA before

 enacting a redistricting plan. Similarly, federal precedent does not have this

 requirement.6

 5 Interestingly, the language in the majority’s opinion now attempts to contextualize

 this requirement, noting that “the General Assembly’s responsibility to conduct a racially
 polarized voting analysis arises from our state constitution and decisions of this Court,
 including primarily Stephenson, and not from the VRA itself, or for that matter from any
 federal law.” But this attempted contextualization is senseless considering the directive from
 the majority’s order specifically instructed the General Assembly to apply the federal VRA.
 6 “The Equal Protection Clause of the Fourteenth Amendment limits racial
 gerrymanders in legislative districting plans.” Cooper v. Harris, 137 S. Ct. 1455, 1463 (2017).
 Thus, absent a “sufficient justification,” a state is prevented from “separat[ing] its citizens
 into different voting districts on the basis of race.” Bethune-Hill v. Virginia State Bd. of
 Elections, 137 S. Ct. 788, 797 (2017) (alteration in original) (quoting Miller v. Johnson, 515
 U.S. 900, 911, 115 S. Ct. 2475, 2486 (1995)). A plaintiff must first “prove that ‘race was the
 predominant factor motivating the legislature’s decision to place a significant number of
 voters within or without a particular district.’ That entails demonstrating that the legislature
 ‘subordinated’ other factors—compactness, respect for political subdivisions, partisan
 advantage, what have you—to ‘racial considerations.’ ” Cooper, 137 S. Ct. at 1463–64 (citation
 omitted) (quoting Miller, 515 U.S. at 916, 115 S. Ct. at 2488).
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

¶ 261 In Stephenson we explained that “Section 2 of the VRA generally provides that

 states or their political subdivisions may not impose any voting qualification or

 prerequisite that impairs or dilutes, on account of race or color, a citizen’s opportunity

 to participate in the political process and to elect representatives of his or her choice.”

 Stephenson, 355 N.C. at 363, 562 S.E.2d at 385 (first citing 42 U.S.C. §§ 1973a, 1973b

 (1994); and then citing Thornburg v. Gingles, 478 U.S. 30, 43, 106 S. Ct. 2752, 2762

 (1986)). We then stated that “[o]n remand, to ensure full compliance with federal law,

 legislative districts required by the VRA shall be formed prior to creation of non-VRA

 districts.” Id. at 383, 562 S.E.2d at 396–97. We provided this approach to alleviate

 the tension between the Whole County Provisions and the VRA because the

 legislative defendants in Stephenson argued that “the constitutional provisions

 mandating that counties not be divided are wholly unenforceable because of the

 requirements of the Voting Rights Act.” Id. at 361, 562 S.E.2d at 383–84. Thus, the

 Court in Stephenson was not forcing the legislative defendants to conduct a VRA

 analysis. Rather, the Court was merely stating that if Section 2 requires VRA

 districts, those districts must be drawn first so that the remaining non-VRA districts

 can be drawn in compliance with the Whole County Provisions.

¶ 262 Legislative defendants here made the decision not to draw any VRA districts.

 As the trial court correctly noted, “[i]f the [l]egislative [d]efendants are incorrect that

 no VRA Districts are required, [p]laintiff Common Cause has an adequate remedy at
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 law and that is to bring a claim under Section 2 of the VRA.” There is no requirement

 under the North Carolina Constitution or federal law that the General Assembly

 must conduct a racially polarized voting analysis before enacting a redistricting plan.

 Here the trial court found that there was no showing that race was the predominant

 factor in drawing the districts. Similarly, the trial court concluded that the state

 legislative district plans did not violate the Whole County Provisions because the

 plans contained the minimum number of county traversals necessary to comply with

 one-person, one-vote principles and because the traversals were done predominantly

 in pursuit of traditional redistricting principles. Since the trial court formed these

 conclusions based upon findings of fact supported by competent evidence, its

 conclusions should be upheld.

¶ 263 Similar to our holding in Stephenson is People ex rel. Van Bokkelen v. Canaday,

 73 N.C. 198 (1875). There the General Assembly divided the City of Wilmington into

 three wards, with three aldermen elected in each ward. While the first and second

 wards each had about 400 voters, the third ward had 2800. Id. at 225. While the first

 and second wards each consisted of one precinct for registration and voting, the third

 ward had four precincts divided by a “meets and bounds” description which omitted

 a portion of the city. Id. at 223. To be eligible to vote, voters needed to register to vote

 in their assigned precincts. Lastly, the act required a ninety-day residency in the

 ward, whereas the constitution provided for thirty days. Id. at 216, 221. The Court
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 held that these obstacles to voting amounted to “the disfranchisement of the voters.”

 Id. at 223. Furthermore, it observed that the great disparity of voters in the third

 ward as compared to the others meant that a third ward voter’s vote was not equal.

 Id. at 225. The vote in the two wards “counts as much as seven votes in the third

 ward.” Id. This malapportionment was “a plain violation of fundamental principles.”

 Id. The “fundamental principle” is that representation shall be apportioned to the

 popular vote as near as may be. In other words, the Court recognized a basic one-

 person, one-vote principle. This case has no application to partisan gerrymandering.

 Notably, for the more than one hundred years since this case was decided, it has never

 been cited for the proposition for which the majority seeks to use it here.

¶ 264 Since 1776 this Court has exercised restraint absent an express limitation on

 the authority of the General Assembly. Moreover, this Court has long recognized that

 responsibilities reserved for the legislature are not reviewable by this Court because

 they raise political questions. In Howell v. Howell, 151 N.C. 575, 66 S.E. 571 (1909),

 the board of education in Haywood County created a school district and then held a

 vote to enable those in the district to determine whether a special tax should be

 imposed. Id. at 575–76, 66 S.E. at 572. A majority of the qualified voters in the newly

 drawn district voted in favor of the tax. Id. at 576, 66 S.E. at 572. The plaintiffs, who

 were taxpayers within that district, brought an action to annul creation of the special-

 tax school district and to enjoin collection of the tax. Id. at 575, 66 S.E. at 572. The
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 plaintiffs argued that the district was neither compact nor convenient, indicating to

 them that the district had been gerrymandered based on political views to ensure

 that a majority would vote in favor of the tax. Id. at 575–76, 66 S.E. at 572.

¶ 265 This Court, however, recognized that the creation of a special-tax school

 district was a legislative task, which at that time the legislature had delegated to

 local boards of education by a special act. Id. at 581, 66 S.E. at 572; see also Atwell C.

 McIntosh, Special Tax School Districts in North Carolina, 1 N.C. L. Rev. 88, 88–89

 (1922). As such, the Court noted that the board’s creation of the district was “no more

 subject to review than the act of the Legislature itself.” Howell, 151 N.C. at 581, 66

 S.E. at 574. Because “questions of compactness and convenience must be addressed

 to somebody’s judgment and discretion,” and because the duty to create districts at

 that time was “unequivocally delegate[d] . . . to the county board of education,” the

 plaintiffs’ challenge to the district’s creation and composition raised a political

 question. Id. at 578, 66 S.E. at 573. The Court also noted that “[f]or the courts to

 undertake to pass upon such matters would be manifestly unwise.” Id. at 578, 66 S.E.

 at 573. Moreover, the Court stated: “There is no principle better established than that

 the courts will not interfere to control the exercise of discretion on the part of any

 officer to whom has been legally delegated the right and duty to exercise that

 discretion.” Id. at 578, 66 S.E. at 573 (emphasis added).
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

¶ 266 The Court expressed its concern about the politically motivated

 gerrymandering of special-tax districts to produce a favorable result and commented

 that perhaps “the overzealous overstep[ped] the limitations of prudence.” Id. at 582,

 66 S.E. at 574. Nonetheless, the Court recognized that a question about the creation

 of districts, even when a court disagrees with the district’s creation, raises a political

 question “to be fought out on the hustings”—or, through the political process—not

 through the judiciary. Id. at 581, 66 S.E. at 574. In recognition of the constitutionally

 assigned authority to the General Assembly, the Court held it was prohibited from

 interfering.

¶ 267 In sum, a matter is nonjusticiable if the constitution expressly assigns

 responsibility to one branch of government or there is not a manageable standard by

 which to decide it, including whether the matter involves a policy determination. Both

 elements are present here. In addition to the legislature’s plenary power, the

 constitution expressly assigns the General Assembly redistricting authority subject

 only to express limitations. The decision to implement a political fairness

 requirement in the constitution without explicit direction from the text inherently

 requires policy choices and value determinations and does not result in a neutral,

 manageable standard. Here this Court’s intrusion is a violation of separation of

 powers. By striking down the enacted plans as unconstitutional partisan

 gerrymanders, the majority today wholeheartedly ushers this Court into a new
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 chapter of judicial activism, severing ties with over two hundred years of judicial

 restraint in this area. The majority seizes this opportunity to advance its agenda by

 grafting a prohibition of partisan gerrymandering onto several provisions of the

 Declaration of Rights. A review of these provisions, however, demonstrates that none

 specifically address redistricting. They are designed to protect only “individual and

 personal rights” rather than a group’s right to have a party’s preferred candidate

 placed in office. The majority seems to concede that there is no express provision of

 the constitution which addresses partisan gerrymandering. Undeterred, it untethers

 itself from history and case law in this case to apply an evolving understanding to

 these rights.

 III. Declaration of Rights

¶ 268 To properly understand what the drafters meant when they included various

 rights in the Declaration of Rights, and particularly the application, if any, they may

 have in structuring voting districts, the historical context of our apportionment and

 elections process is significant. As recognized by the trial court, North Carolina has

 had some form of elected, representative body since 1665.7 Leading up to the

 7 As early as 1663, the Lords Proprietors could enact laws in consultation with the

 freeman settled in their province. Charter Granted by Charles II, King of England to the
 Lords Proprietors of Carolina (Mar. 24, 1663), in 1 Colonial and State Records of North
 Carolina 23 (William L. Sanders ed., 1886). In 1665 certain “concessions” by the Lords
 Proprietors allowed for the formation of the predecessor to the General Assembly and the
 election of freeman representatives. Concessions and Agreement Between the Lords
 Proprietors of Carolina and William Yeamans, et al. (Jan. 7, 1665), in 1 Colonial and State
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

enactment of the 1776 constitution, in 1774 the delegates of the First Provincial

Congress were elected by geographic location, by county or town. See Henry G.

Connor & Joseph B. Cheshire, Jr., The Constitution of North Carolina Annotated xii–

xiv (1911). The text of the 1776 constitution established the General Assembly as the

Senate and the House of Commons. N.C. Const. of 1776, § I. Senators were elected

annually by county without regard to the population size of that county, id. § II, and

representatives were also elected annually but with two representatives per county

or specified town, id. § III. Only certain towns were included in the representation,

id. but other towns were later added.8 This apportionment was done at the same time

certain Declaration of Rights provisions, namely the popular sovereignty provision,

N.C. Const. of 1776, Declaration of Rights, § I, the free elections clause, id. at § VI,

Records of North Carolina 81 (William L. Sanders ed., 1886). The 1669 Fundamental
Constitutions of Carolina divided those representatives into counties, divided again into
precincts. The Fundamental Constitutions of Carolina (Mar. 1, 1669), in 1 Colonial and State
Records of North Carolina 188 (William L. Sanders ed., 1886). The assembly met every two
years and stood for election every two years. Id. at 199–200. Thus, long before the 1776
constitution, the people in Carolina were electing their representatives in districts.
 Later under the Royal Governor, the bicameral assembly consisted of an upper house
to advise the Royal Governor and a lower house that represented the people and their
interests. See Charles Lee Raper, North Carolina, A Study in English Colonial Government
71–100 (1904) [hereinafter English Colonial Government]. The lower house consisted of
freeman elected by county and certain towns. Id. at 89–91.
 8 The towns represented initially were Edenton, New Bern, Wilmington, Salisbury,

Hillsborough, and Halifax, while others were added over the years. John V. Orth, North
Carolina Constitutional History, 70 N.C. L. Rev. 1759, 1769 (1992) (discussing Article III of
the 1776 constitution and including that Fayetteville, for example, was added to that list in
1789).
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 and the right to assembly and petition, id. at § XVIII, were enacted. Given the

 apportionment provisions, clearly these clauses did not mean “equal voting power,”

 even based on population. Furthermore, partisan gerrymandering was well known to

 the framers, yet none of these provisions were crafted to address it. See Rucho, 139

 S. Ct. at 2496.

¶ 269 Through the years, the population of the state shifted radically from the east

 to the piedmont and west. John V. Orth, North Carolina Constitutional History, 70

 N.C. L. Rev. 1759, 1770–71 (1992). Nonetheless, the eastern region received

 additional representation. Id. at 1770. The General Assembly created smaller

 counties in the east and larger ones in the piedmont and west, tipping the numbers

 of representatives in favor of the east despite population growth trends in other areas.

 Id. at 1770–71. This county-town approach, combined with the power of the General

 Assembly to divide existing counties to create new ones, resulted in superior political

 power in the east despite the shift in population. See id. This malapportionment led

 to civil unrest and a crisis which culminated with the 1835 constitutional convention.

 John V. Orth & Paul Martin Newby, The North Carolina State Constitution 3, 13 (2d

 ed. 2013) [hereinafter State Constitution]. No one argued that the provisions of the

 Declaration of Rights made the legislative apportionment acts unconstitutional.

¶ 270 In 1835 a constitutional convention met to, among other things, adjust the

 representative system to better address differences in population. See id. That
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 convention resulted in amendments that required senatorial districts to be drawn by

 the General Assembly based on the taxes paid by each county, N.C. Const. of 1776,

 amends. of 1835, art. I, § 1, and included the predecessor of the Whole County

 Provisions, see N.C. Const. art. II, § 3(3), that prohibited a county from being divided

 to create the senatorial districts, N.C. Const. of 1776, amends. of 1835, art. I, § 1.

 House seats were allotted based on population, allowing the more populated counties

 to have additional representatives. Id. art. I, § 2. Like today, the General Assembly

 was instructed to reconsider the apportionment of the counties based on population

 according to the census taken by order of Congress. Id. art. I, § 3. Each county was

 required to have at least one House representative. Id. art. I, § 2. Likewise, the

 convention implemented other changes to representation such as lengthening

 legislative terms from one year to two years, id. art. I, §§ 1–2, and allowing the voters

 to elect the governor, id. art. II, § 1.

¶ 271 The constitutional convention of 1868 placed the Declaration of Rights in

 Article I, the forefront of the constitution. See N.C. Const. of 1868, art. I. The

 convention added Article I, Section 1, incorporating the provision from the

 Declaration of Independence that acknowledged our God-given, equal rights. See id.

 art. I, § 1. Significant here, the Senate became apportioned by population. Id. art. II,

 § 5. Along with the express limitation imposed by the Whole County Provisions, the

 1868 amendments required senatorial districts to be contiguous and only be redrawn
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 in connection with the decennial census. Id. The convention lengthened the term of

 the governor to four years, id. art. III, § 1, and constitutionally created a separate

 judicial branch, see id. art. IV, with judges being elected by the voters for eight-year

 terms, id. art. IV, § 26.

¶ 272 For almost one hundred years, apportionment remained unchanged until the

 1960s. During that time, the Speaker of the House received the authority to apportion

 the House districts. N.C. Const. of 1868, amends. of 1961, art. II, § 5. Also, to comply

 with a federal lawsuit and the decision in Baker v. Carr, the constitution was

 amended in 1968 to reflect the one-person, one-vote requirement. State Constitution

 31. This change affected the structure of the House of Representatives in particular.

 Id. Significantly, the number of House members remained at 120, but the

 representatives were no longer apportioned by county; instead, the 120

 representatives were allotted among districts now drawn based on equal population.

 N.C. Const. of 1868, amends. of 1961, art. II, § 5. By the end of the 1960s, the same

 criteria for proper districts—equal population, contiguous territory, the Whole

 County Provisions, and reapportionment in conjunction with the decennial census—

 applied to both Senate and House districts. See N.C. Const. of 1868, amends. of 1967,

 art. II, §§ 4, 6.

¶ 273 The current version of our constitution, ratified by the people at the ballot box

 in 1971 along with five new amendments, came about as a “good government
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 measure,” State Constitution 32–33, or, in other words, an attempt to consolidate the

 1868 constitution and its subsequent amendments along with editorial and

 organizational revisions and amendment proposals. See, e.g., N.C. State Constitution

 Study Comm’n, Report of the North Carolina State Constitution Study Commission

 8–12 (1968).

¶ 274 Based upon our history and the constitutional structure, when the people had

 concerns about ineffective political representation, they addressed those concerns by

 amending the constitution itself, rather than relying on judicial amendment through

 litigation. Each of the provisions relevant to the claims here have existed since 1971,

 with some dating back to the 1776 constitution. They are all housed in Article I of our

 constitution, the Declaration of Rights. None of those clauses have been interpreted

 as a restriction on partisan considerations in redistricting—even after hundreds of

 years of apportionments and decades of redistricting litigation—until today.

¶ 275 The Declaration of Rights is an expressive yet nonexhaustive list of protections

 afforded to individual citizens against government intrusion, along with “the

 ideological premises that underlie the structure of government.” State Constitution

 46. The Declaration of Rights sets out “[b]asic principles, such as popular sovereignty

 and separation of powers,” which are “given specific application in later articles.” Id.

 As such, each provision within the Declaration of Rights must be considered with the

 related, more specific provisions of the constitution that outline the practical
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 workings for governance. That understanding comports with the general principles

 for interpreting all legal documents, treating statutes and constitutional text alike.9

¶ 276 The frequent elections provision provides a classic example of when a general

 principle set forth in the Declaration of Rights is practically developed by other

 constitutional text. Article I, Section 9 states: “For redress of grievances and for

 amending and strengthening the laws, elections shall be often held.” N.C. Const. art.

 I, § 9. This provision appeared in the original Declaration of Rights, see N.C. Const.

 of 1776, Declaration of Rights, § XX, and in 1776 “often” meant annual elections, see,

 e.g., N.C. Const. of 1776, §§ V, VI, XV. The frequency of elections changed in 1835

 through amendments providing for biannual legislative elections. N.C. Const. of

 1776, amends. of 1835, art. I, §§ 1, 2. Even though it changed the frequency of

 elections from one to two years, this constitutional amendment did not violate the

 stated goal to have frequent elections as a timely means of holding accountable an

 unresponsive elected legislature. The concept of frequent elections remained

 embodied in the biannual election cycle.

 9 Compare Piedmont Publ’g Co. v. City of Winston-Salem, 334 N.C. 595, 598, 434
 S.E.2d 176, 177–78 (1993) (“One canon of construction is that when one statute deals with a
 particular subject matter in detail, and another statute deals with the same subject matter
 in general and comprehensive terms, the more specific statute will be construed as
 controlling.”), with Preston, 325 N.C. at 449, 385 S.E.2d at 478 (“Issues concerning the proper
 construction of the Constitution of North Carolina ‘are in the main governed by the same
 general principles which control in ascertaining the meaning of all written instruments.’ ”
 (quoting Perry v. Stancil, 237 N.C. 442, 444, 75 S.E.2d 512, 514 (1953))).
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

¶ 277 Similarly, the 1868 constitution for the first time set the three branches on

 different election cycles. For example, in recognition of its policymaking authority,

 the General Assembly stayed on a biannual election cycle, see N.C. Const. of 1868,

 art. II, §§ 3, 6; however, the executive officers received four-year terms, id. art. III,

 § 1, and the Justices of the Supreme Court received eight-year terms, id. art. IV, § 26.

 Did this change violate the frequent elections provision? The answer is no—the

 principle of “often” elections in the Declaration of Rights is defined by other provisions

 of the constitution.

¶ 278 This Court recently read a provision of the Declaration of Rights in Article I,

 Section 15 together with a more specific and applicable provision in Article IX, Section

 2. Deminski ex rel. C.E.D. v. State Bd. of Educ., 377 N.C. 406, 2021-NCSC-58, ¶ 14.

 Article I, Section 15 acknowledges the “right to the privilege of education” and the

 State’s duty “to guard and maintain that right.” N.C. Const. art. I, § 15. Placed in the

 working articles of the constitution, Article IX, entitled “Education,” see id. art. IX,

 actually “implements the right to education as provided in Article I,” Deminski, ¶ 14.

 This Court explained that “these two provisions work in tandem,” id. in that

 “Article I, Section 15 and Article IX, Section 2 of the North
 Carolina Constitution combine to guarantee every child of
 this state an opportunity to receive a sound basic education
 in our public schools.” Leandro [v. State], 346 N.C. [336],
 347, 488 S.E.2d [249,] 255 [(1997).] . . . .

 Further, Article I, Section 15 places an affirmative
 duty on the government “to guard and maintain that
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 right.” N.C. Const. art. I, § 15. Taken together, Article I,
 Section 15 and Article IX, Section 2 require the government
 to provide an opportunity to learn that is free from
 continual intimidation and harassment which prevent a
 student from learning. In other words, the government
 must provide a safe environment where learning can take
 place.

 Id. ¶¶ 14–15. Thus, to arrive at a proper and harmonious interpretation of the

 constitutional text, the Court read the principles regarding the privilege of education

 enshrined in our Declaration of Rights in conjunction with the specific application

 given to education in a later article. As done in Deminiski, this Court should construe

 the general provisions of the Declaration of Rights in harmony with the more specific

 provisions addressing redistricting.

¶ 279 Moreover, “[t]he civil rights guaranteed by the Declaration of Rights in Article

 I of our Constitution are individual and personal rights entitled to protection against

 state action.” Corum v. Univ. of N.C., 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992)

 (emphasis added); id. at 783, 413 S.E.2d at 290 (“Having no other remedy, our

 common law guarantees plaintiff a direct action under the State Constitution for

 alleged violations of his constitutional freedom of speech rights.” (emphases added)).

¶ 280 Finding no explicit constitutional provision prohibiting partisan

 gerrymandering, the majority creatively attempts to mine the Declaration of Rights

 to find or create some protection for a political group’s right to their preferred form of

 representation and a “fair” share of the “voting power.” The majority seems to say
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

that this entitlement is based on the political party registrants associated with that

group. Under a Corum analysis, however, an individual plaintiff has a direct cause

of action against state officials who, acting in their official capacity, violate his

constitutional rights as protected by the Declaration of Rights. Id. at 783–84, 413

S.E.2d at 290; see Deminski, ¶¶ 16–18 (outlining the Corum framework as the legal

mechanism for bringing a proper claim under the Declaration of Rights).10 Even when

considering a self-identified class of individuals, such as self-selection of political

affiliation, the Court has concluded that the Declaration of Rights protects the

individual’s rights, not the political group’s rights. Libertarian Party of N.C. v. State,

365 N.C. 41, 49, 707 S.E.2d 199, 204–05 (2011) (explaining that casting votes in

alignment with political beliefs implicates “individual associational rights”

(emphasis added)). This principle rings true even when alleging a violation of an

associational right such as those implicated in the free speech and assembly clauses.

Id. at 49, 707 S.E.2d at 204–05 (“In North Carolina, statutes governing ballot access

by political parties implicate individual associational rights rooted in the free speech

and assembly clauses of the state constitution.” (emphasis added) (citing N.C. Const.

art. I, §§ 12, 14)). Nonetheless, in the majority’s view, “political equality” based on a

 10 The holdings in Corum and Deminiski did not expand the role of the Court in
remedying violations of constitutional rights as protected by the Declaration of Rights.
Rather, like in Bayard, those cases involved the Court’s interpretation of express provisions
within the text of the constitution.
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 group’s party affiliation is a fundamental, albeit unwritten, principle of the

 Declaration of Rights akin to an immutable characteristic that deserves the highest

 form of protection under the state constitution.

¶ 281 Contrary to the majority’s assertion, even a cursory review of the applicable

 history and case law supports the basic understanding that the Declaration of Rights

 protects individual rights such as the freedom of an individual to vote his conscience

 in an election which is free from fraud. The individual right to participate in a “free

 election” does not include the right to have one’s preferred candidate elected or a

 political group’s right to proportional representation. Moreover, because “a

 constitution cannot violate itself,” Leandro, 346 N.C. at 352, 488 S.E.2d at 258, this

 Court must construe Article II, Sections 3 and 5 and the provisions that the majority

 relies upon—Article I, Sections 10, 12, 14, and 19—harmoniously. We address each

 provision in turn.

 A. Free Elections Clause

¶ 282 Article I, Section 10 states that “[a]ll elections shall be free.” N.C. Const. art.

 I, § 10. The clause first appears in the 1776 constitution, providing that “[t]he election

 of members, to serve as representatives, ought to be free.” N.C. Const. of 1776,

 Declaration of Rights, § VI.11 The 1868 constitution restated the free elections clause

 11 Under the 1776 constitution, the members of the General Assembly were the only

 elected officials. The General Assembly thus had the exclusive power to: (1) elect the
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 as “[a]ll elections ought to be free.” N.C. Const. of 1868, art. I, § 10. Even though the

 word “ought” in both the 1776 and 1868 constitutions was changed to “shall” in the

 1971 constitution, this change is not a substantive revision to the free elections

 clause. See Report of the North Carolina State Constitution Study Commission 73–75;

 see also Smith v. Campbell, 10 N.C. (3 Hawks) 590, 598 (1825) (declaring that “ought”

 is synonymous with “shall,” noting that “the word ought, in this and other sections of

 the [1776 constitution], should be understood imperatively”). “Free” means having

 political and legal rights of a personal nature or enjoying personal freedom, a “free

 citizen,” or having “free will” or choice, as opposed to compulsion, force, constraint, or

 restraint. See Free, Black’s Law Dictionary (11th ed. 2019). As a verb, “free” means

 to liberate or remove a constraint or burden. Id. Therefore, giving the provision its

 plain meaning, “free” means “free from interference or intimidation.” State

 Constitution 56.12

¶ 283 While the provision protects the voter, it also protects candidates; however,

 there are limits. The terms “elections” and “free,” N.C. Const. art. I, § 10, must be

 Governor, N.C. Const. of 1776, § XV; (2) appoint the Attorney-General, id. § XIII; (3) appoint
 Judges of the Supreme Courts of Law and Equity and Judges of Admiralty, id.; (4) appoint
 the general and field officers of the militia, id. § XIV; (5) elect the council of State, id. § XVI;
 (6) appoint a treasurer or treasurers of the State, id. § XXII; (7) appoint the Secretary of
 State, id. § XXIV; and (8) recommend the appointment of Justices of the Peace to the
 Governor who shall commission them accordingly, id. § XXXIII.
 12 The full text of the Virginia Declaration of Rights, from which the North Carolina

 free elections clause was taken, provides a clearer idea of the intention behind the text.
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 read, for example, in the context of Article VI, entitled “Suffrage and Eligibility to

 Office,” see id. art. VI. Even though “elections shall be free,” they are nonetheless

 restricted in certain ways in Article VI. See, e.g., N.C. Const. art. VI, § 1 (requiring a

 North Carolina voter to be a citizen of the United States and at least 18 years old);

 id. § 2(1)–(2) (placing residency requirements on voters); id. § 2(3) (placing

 restrictions on felons’ voting rights); id. § 3 (allowing for conditions on voter

 registration as prescribed by statute); id. § 5 (requiring that votes by the people be by

 ballot); id. § 7 (requiring public officials to take an oath before assuming office); id.

 § 8 (outlining certain disqualifications from holding public office); id. § 9 (prohibiting

 dual office holding); id. § 10 (allowing an incumbent to continue in office until a

 successor is chosen and qualified).

¶ 284 Based on our constitution’s plain language and history, the framers had a

 specific meaning of the free elections clause. With respect to the history of the clause,

 the trial court found that inclusion of the clause was intended to protect against

 That elections of members to serve as representatives of the
 people, in Assembly ought to be free; and that all men, having
 sufficient evidence of permanent common interest with, and
 attachment to, the community, have the right of suffrage and
 cannot be taxed or deprived of their property for public uses
 without their own consent or that of their representatives so
 elected, nor bound by any law to which they have not, in like
 manner, assented for the public good.
 Va. Const. of 1776, Declaration of Rights, § 6.
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

abuses of executive power, not to protect the people from their representatives who

frequently face election by the people.13 For the same reason, the 1776 constitution

 13 The trial court found in part:

 . . . [T]he words as originally used in the English Bill of
 Rights ([1689]) were crafted in response to abuses and
 interference by the Crown in elections for members of
 parliament which included changing the electorate in different
 areas to achieve electoral advantage. J.R. Jones, The
 Revolution of 1688 in England, 148 (1972). . . . Examining the
 North Carolina Free Elections Clause in a greater context gives
 a complete understanding to its meaning.
 . . . At the time of the Glorious Revolution, King James
 II embarked on a campaign to pack Parliament with members
 sympathetic to him in an attempt to have laws that penalized
 Catholics and criminalized the practice of Catholicism
 repealed. After failing in his attempt to pack parliament, King
 James II was ultimately overthrown and fled England, paving
 the way for King William and Queen Mary to rule together. As
 a condition of King William and Queen Mary’s assumption of
 the throne, they were required to sign the English Declaration
 of Rights which resulted in limiting the powers of the Crown
 and an increase in power to Parliament, most notably in the
 House of Commons.
 . . . The Glorious Revolution and the resulting English
 Bill of Rights were the beginning of a constitutional monarchy.
 While the English Bill of Rights, in part, sought to address the
 Crown’s interference with the affairs of Parliament, there is no
 indication that the English Free Election Clause was directed
 at anyone but the Crown, much less a restriction on the power
 of Parliament. In fact, the opposite seems true. The English
 Bill of Rights reflected a shift in power from the Crown, who
 generally acted to protect its own interest, to the House of
 Commons in Parliament, whose members were elected by the
 people. Because the English Bill of Rights did not abolish the
 monarchy, provisions were necessary to provide protection to
 the elected members of parliament from interference by the
 Crown.
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 . . . By the time the Virginia Declaration of Rights and
the North Carolina Declaration of Rights and Constitution
were passed, the Glorious Revolution had been over for almost
a century. It is safe to say that none of the drafters of the 1776
Constitution were alive during the Glorious Revolution or the
establishment of the English Bill of Rights and their
experiences and concerns did not arise from direct interactions
with the Crown, but instead from direct interactions with the
Royal Governors and their Council who represented the
interests of the Crown. Moreover, the Royal Governors were
representatives of a constitutional monarch, unlike the
monarchs who claimed the throne through divine right before
and up to the signing of the English Bill of Rights.
 . . . Under colonial rule, the North Carolina Royal
Governor had veto power, as no law could be passed without
his consent. While his instructions did not allow him to
determine the manner of electing members to the House of
Burgesses or set the number of members, they did allow him to
dissolve the House of Burgesses. [English Colonial
Government], at 35. The instructions to the Royal Governor
also allowed him to issue charters of incorporation for towns
and counties from which representatives would be elected.
 . . . No doubt there were tensions between the House of
Burgesses and the Governor from 1729 to 1776. In 1746, in an
effort to give equal representation to each county, as the newer
counties were given fewer representatives in the House of
Burgesses, the Royal Governor moved the legislature to
Wilmington where representatives of the larger counties would
not travel, giving the smaller counties effective control of the
lower house. As a result, the legislature passed legislation
giving each county two representatives in the assembly. This
remained in effect until 1754 when the legislation was repealed
by the Crown. [English Colonial Government, at] 90–91.
 ....
 . . . At times, the House of Burgesses refused to seat new
members from counties created by the Governor. The dispute
was not necessarily that the Governor did not have the
authority, but the House believed they had a role in the process
in the creation of counties. [English Colonial Government,] at
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

allowed the General Assembly to elect the Governor. N.C. Const. of 1776, § XV. The

trial court found in part:

 Upon the adoption of the 1776 Constitution, the
 Royal Governor, who represented and protected the
 interest of the Crown, was replaced by a Governor chosen
 by the General Assembly. N.C. Const. of 1776, § XV. . . .

 . . . The circumstances under which the English Free
 Election Clause was written were far different than those
 which caused the same language to be used in the 1776
 Constitution.

 ....

 . . . Any argument that the Free Elections Clause
 placed limits on the authority of the General Assembly to
 apportion seats flies in the face of the overwhelming
 authority given to the General Assembly in the 1776
 Constitution. . . .

 . . . Much like the English Bill of Rights, the 1776
 Constitution shifted power to the elected representatives of
 the people.

As noted by the trial court, under the 1776 constitution, voters did not vote for any

executive branch members, including the governor, nor did voters elect judges. The

General Assembly selected the members of the executive and judicial branches. See

N.C. Const. of 1776, §§ XIII, XV, XXII, XXIV. Despite the existence of the free

 89–90.
As the trial court found, aside from disputes over representation, the lower house fought
the Royal Governor over a myriad of issues, including the right to establish a quorum for
the legislature and, most seriously, over fiscal matters and the appointment of judges.
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 elections clause, under this constitutional structure, the voter did not have the right

 to vote for these offices at all and certainly was not entitled to see his preferred

 candidate in office.

¶ 285 Because of its plain meaning, this Court has issued few opinions interpreting

 the free elections clause though it has been part of our constitution since 1776. The

 first instance was in State ex rel. Swaringen v. Poplin, 211 N.C. 700, 191 S.E. 746

 (1937), in which the plaintiff, a candidate who ostensibly lost an election for the office

 of county commissioner of Wilkes County, brought a quo warranto action, alleging

 that the Wilkes County Board of Elections fraudulently deprived him of the office by

 altering the vote count. Id. at 700–01, 191 S.E. at 746. In response, the defendant

 argued the plaintiff’s complaint failed to state facts sufficient to constitute a cause of

 action. Id. at 701, 191 S.E. at 746. After the trial court rejected the defendant’s

 argument, the defendant appealed, arguing that it was the sole duty of the County

 Board of Elections, rather than the judiciary, “to judicially determine the result of the

 election from the report and tabulation made by the precinct officials.” Id. at 701, 191

 S.E.2d at 747. In affirming the trial court’s decision, we provided the following

 rationale:

 One of the chief purposes of quo warranto or an information
 in the nature of quo warranto is to try the title to an office.
 This is the method prescribed for settling a controversy
 between rival claimants when one is in possession of the
 office under a claim of right and in the exercise of official
 functions or the performance of official duties; and the
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 jurisdiction of the Superior Court in this behalf has never
 been abdicated in favor of the board of county canvassers
 or other officers of an election.

 In the present case fraud is alleged. The courts are
 open to decide this issue in the present action. In Art. I, sec.
 10, of the Constitution of North Carolina, we find it
 written: “All elections ought to be free.” Our government is
 founded on the consent of the governed. A free ballot and a
 fair count must be held inviolable to preserve our
 democracy. In some countries the bullet settles disputes, in
 our country the ballot.

 Id. at 702, 191 S.E. at 747 (internal citations omitted) (quoting N.C. Const. of 1868,

 art. I, § 10). Therefore, we interpreted “free” to mean the right to an honest vote count,

 free from fraud.

¶ 286 The next time we addressed the merits of a free election claim was in Clark v.

 Meyland, 261 N.C. 140, 134 S.E.2d 168 (1964). The plaintiff in Clark challenged a

 statute that required voters wishing to change their party affiliation to first take an

 oath with the following language: “I will support the nominees of the party to which

 I am now changing my affiliation in the next election and the said party nominees

 thereafter until I shall, in good faith, change my party affiliation in the manner

 provided by law.” Id. at 140, 134 S.E.2d at 169. We held that the provision in the

 statute requiring certain provisions of the oath was invalid, explaining that:

 Any elector who offers sufficient proof of his intent, in good
 faith, to change his party affiliation cannot be required to
 bind himself by an oath, the violation of which, if not
 sufficient to brand him as a felon, would certainly be
 sufficient to operate as a deterrent to his exercising a free
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 choice among available candidates at the election––even by
 casting a write-in ballot. His membership in his party and
 his right to participate in its primary may not be denied
 because he refuses to take an oath to vote in a manner
 which violates the constitutional provision that elections
 shall be free. Article I, Sec. 10, Constitution of North
 Carolina.

 When a member of either party desires to change his
 party affiliation, the good faith of the change is a proper
 subject of inquiry and challenge. Without the objectionable
 part of the oath, ample provision is made by which the
 officials may strike from the registration books the names
 of those who are not in good faith members of the party.
 The oath to support future candidates violates the principle
 of freedom of conscience. It denies a free ballot––one that is
 cast according to the dictates of the voter’s judgment. We
 must hold that the Legislature is without power to shackle
 a voter’s conscience by requiring the objectionable part of
 the oath as a price to pay for his right to participate in his
 party’s primary.

 Id. at 142–43, 134 S.E.2d at 170 (emphases added) (citing N.C. Const. of 1868, art. I,

 § 10). Thus, we interpreted “free” to mean freedom to vote one’s conscience.

 Nonetheless, an inquiry into the sincerity of one’s desire to change parties did not

 violate the clause.

¶ 287 The majority judicially amends the free elections clause to read “elections shall

 be free from depriving a voter of substantially equal voting power on the basis of party

 affiliation” with the voting power to be measured by modern political science analysis.

 To believe that the framers of this provision in 1776 or the people who ultimately

 adopted it in subsequent constitutions had even a vague notion that the clause had
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 this unbounded meaning is absurd. The mandated political science methods did not

 even exist. Our hundreds of years of constitutional history confirms that this creative

 idea has no support in our history or case law.

¶ 288 Based upon this Court’s precedent with respect to the free elections clause, a

 voter is deprived of a “free” election if (1) the election is subject to a fraudulent vote

 count, see Poplin, 211 N.C. at 702, 191 S.E. at 747, or (2) a law prevents a voter from

 voting according to one’s judgment, see Clark, 261 N.C. at 142, 134 S.E.2d at 170.

 Therefore, the free elections clause must be read in harmony with other constitutional

 provisions such as Article VI, that limits who can vote and run for office. Free

 elections must be absent of fraud in the vote tabulation. The free elections clause was

 not meant to restrict the General Assembly’s presumptively constitutional ability to

 engage in partisan gerrymandering.

 B. Equal Protection Clause

¶ 289 Next, the majority claims its decision is supported by the equal protection

 clause. Article I, Section 19 provides, in relevant part, that “[n]o person shall be

 denied the equal protection of the laws; nor shall any person be subjected to

 discrimination by the State because of race, color, religion, or national origin.” N.C.

 Const. art. I, § 19. With respect to the history of this clause, the trial court found as

 follows:

 The Equal Protection Clause came into existence as part of
 the ratification of the 1971 Constitution . . . . The addition
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 of the Equal Protection Clause, while a substantive change,
 was not meant to “bring about a fundamental change” to
 the power of the General Assembly. Report of Study
 Comm’n at 10.

This Court reviews claims brought under the equal protection clause as follows:

 Traditionally, courts employ a two-tiered scheme of
 analysis when an equal protection claim is made.

 When a governmental act classifies persons in terms
 of their ability to exercise a fundamental right, or when a
 governmental classification distinguishes between persons
 in terms of any right, upon some “suspect” basis, the upper
 tier of equal protection analysis is employed. Calling for
 “strict scrutiny”, this standard requires the government to
 demonstrate that the classification is necessary to promote
 a compelling governmental interest.

 When an equal protection claim does not involve a
 “suspect class” or a fundamental right, the lower tier of
 equal protection analysis is employed. This mode of
 analysis merely requires that distinctions which are drawn
 by a challenged statute or action bear some rational
 relationship to a conceivable legitimate governmental
 interest.

 For strict scrutiny to be properly applied in
 evaluating an equal protection claim, it is necessary that
 there be a preliminary finding that there is a suspect
 classification or an infringement of a fundamental right. It
 has been held that a class is deemed “suspect” when it is
 saddled with such disabilities, or subjected to such a
 history of purposeful unequal treatment, or relegated to
 such a position of political powerlessness as to command
 particular consideration from the judiciary. The underlying
 rationale of the theory of suspect classification is that
 where legislation or governmental action affects discrete
 and insular minorities, the presumption of
 constitutionality fades because the traditional political
 processes may have broken down.
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 Texfi Indus., Inc. v. City of Fayetteville, 301 N.C. 1, 10–11, 269 S.E.2d 142, 149 (1980)

 (internal citations omitted).

¶ 290 Classification based upon affiliation with one of the two major political parties

 in the United States—especially the Democratic Party in North Carolina14—does not

 trigger heightened scrutiny because neither party has historically been relegated to

 a position of political powerlessness. Allegations of partisan gerrymandering likewise

 do not trigger heightened scrutiny because the practice of partisan gerrymandering

 alone does not constitute “an infringement of a fundamental right.” Id. at 11, 269

 S.E.2d at 149.

¶ 291 This Court has explained that “[t]he right to vote on equal terms is a

 fundamental right.” Northampton Cnty. Drainage Dist. No. One v. Bailey, 326 N.C.

 742, 747, 392 S.E.2d 352, 356 (1990) (emphasis added). The fundamental right to vote

 on equal terms simply means that each vote should have the same weight. This is a

 simple mathematical calculation. Rucho, 139 S. Ct. at 2501. The historic

 understanding of equal voting power is stated in Article II, Sections 3(1) and 5(1),

 requiring that legislators “represent, as nearly as may be, an equal number of

 inhabitants.” Party affiliation is not mentioned. This understanding of equal voting

 14 The trial court found that “[b]etween 1870 and 2010, the Democratic Party at all

 times controlled one or both houses of the General Assembly.” This finding, which is binding
 on appeal, demonstrates that throughout North Carolina’s history, members of the
 Democratic Party certainly have not been relegated to a position of political powerlessness.
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 power meaning one-person, one-vote is supported by our cases such as Stephenson

 and Canaday. To reach its approved application of the equal protection clause, the

 majority begins by radically changing the meaning of the fundamental right to vote.

 It takes this individual right and transforms it into a right to “substantially equal

 voting power on the basis of party affiliation” and then declares a right to statewide

 proportional representation. In its unparalleled distortion of the right to vote, it

 singles out equal representation based on political affiliation, i.e., the two major

 political parties. What about the unaffiliated voters or voters in “non-partisan,” issue-

 focused groups organized for political influence? Of course, nothing about this

 approach is supported by the constitutional text or case law.

¶ 292 Only when a redistricting enactment infringes upon the “right to vote on equal

 terms for representatives” does heightened scrutiny apply. See Stephenson, 355 N.C.

 at 378, 562 S.E.2d at 393 (“The classification of voters into both single-member and

 multi-member districts within [the same redistricting plan] necessarily implicates

 the fundamental right to vote on equal terms, and thus strict scrutiny is the

 applicable standard.”); Blankenship v. Bartlett, 363 N.C. 518, 518, 523–24, 681 S.E.2d

 759, 763–64, 766 (2009) (applying heightened scrutiny where the plaintiffs showed a

 “gross disparity in voting power” because some judicial districts had five times the

 population of others). The “right to vote on equal terms” has been carefully defined in

 our case law.
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

¶ 293 In Stephenson this Court explained that “[t]he classification of voters into both

 single-member and multi-member districts [in the same redistricting plan]

 necessarily implicates the fundamental right to vote on equal terms.” 355 N.C. at 378,

 562 S.E.2d at 393. We reasoned that

 voters in single-member legislative districts, surrounded
 by multi-member districts, suffer electoral disadvantage
 because, at a minimum, they are not permitted to vote for
 the same number of legislators and may not enjoy the same
 representational influence or “clout” as voters represented
 by a slate of legislators within a multi-member district.

 Id. at 377, 562 S.E.2d at 393 (emphasis added).

¶ 294 Likewise, in Blankenship the plaintiffs demonstrated a “gross disparity in

 voting power between similarly situated residents of Wake County” by making the

 following showing:

 In Superior Court District 10A, the voters elect one judge
 for every 32,199 residents, while the voters of the other
 districts in Wake County, 10B, 10C, and 10D, elect one
 judge per every 140,747 residents, 158,812 residents, and
 123,143 residents, respectively. Thus, residents of District
 10A have a voting power roughly five times greater than
 residents of District 10C, four and a half times greater than
 residents of District 10B, and four times greater than
 residents of District 10D.

 363 N.C. at 527, 681 S.E.2d at 766. We explained that the above showing implicated

 the fundamental “right to vote on equal terms in representative elections—a one-

 person, one-vote standard,” and we thus employed a heightened scrutiny analysis. Id.

 at 522, 681 S.E.2d at 762–63.
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

¶ 295 Unlike the classifications in Stephenson and Blankenship, partisan

 gerrymandering has no significant impact upon the right to vote on equal terms under

 the one-person, one-vote standard. In other words, an effort to gerrymander districts

 to favor a political party does not alter voting power so long as voters are permitted

 to (1) vote for the same number of representatives as voters in other districts and (2)

 vote as part of a constituency that is similar in size to that of the other districts.

 Therefore, because partisan gerrymandering does not infringe upon a fundamental

 right, rational basis review applies. As such, read in harmony with Article II, Sections

 3 and 5, Article I, Section 19 only prohibits redistricting plans that fail to “bear some

 rational relationship to a conceivable legitimate governmental interest.” Texfi, 301

 N.C. at 11, 269 S.E.2d at 149.15 Our understanding of the equal protection clause has

 been informed by federal case law interpreting the Federal Equal Protection Clause.

 See Rucho, 139 S Ct. at 2506–07 (finding no manageable standards for assessing

 partisan considerations in redistricting despite claims that the federal Equal

 Protection Clause had been violated). The plan here does not violate the equal

 protection clause.

 15 Here the enacted plans pass rational basis review because they are rationally
 related to the General Assembly’s legitimate purpose of redrawing the legislative districts
 after each decennial census.
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 C. Freedom of Assembly and Freedom of Speech Clauses

¶ 296 The majority also engrafts new meaning into Article I, Sections 12 and 14.

 These sections provide as follows:

 Sec. 12. Right of assembly and petition.
 The people have a right to assemble together to
 consult for their common good, to instruct their
 representatives, and to apply to the General Assembly for
 redress of grievances; but secret political societies are
 dangerous to the liberties of a free people and shall not be
 tolerated.

 ....

 Sec. 14. Freedom of speech and press.
 Freedom of speech and of the press are two of the
 great bulwarks of liberty and therefore shall never be
 restrained, but every person shall be held responsible for
 their abuse.

 N.C. Const. art. I, §§ 12, 14. The trial court made the following findings with respect

 to the history of these clauses:

 Like the Equal Protection Clause, the Free Speech Clause
 was added to the Freedom of the Press Clause as part of
 the 1971 Constitution . . . . The addition of the Free Speech
 Clause, while a substantive change, was not meant to
 “bring about a fundamental change” to the power of the
 General Assembly. Report of Study Comm’n at 10.

 ....

 . . . The Freedom of Assembly Clause first appeared
 in the Declaration of Rights set forth in the 1776
 Constitution and provided that “the people have a right to
 assemble together, to consult for their common good, to
 instruct their Representatives, and to apply to the
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 Legislature, for redress of grievances.” 1776 Const. Decl. of
 Rights XVII. The Freedom of Assembly Clause was
 modified by the 1868 Constitution by deleting the first
 word of the clause “that.” 1868 Const. art. I, § 26.
 Amendments were again made to the Freedom of Assembly
 Clause with the ratification of the 1971 Constitution . . . .
 The change to the Freedom of Assembly Clause was not
 meant as a substantive change, nor was it meant to “bring
 about a fundamental change” to the power of the General
 Assembly. Rept. of Study Comm’n at 10.

¶ 297 The right to free speech is violated when “restrictions are placed on the

 espousal of a particular viewpoint,” State v. Petersilie, 334 N.C. 169, 183, 432 S.E.2d

 832, 840 (1993), or where retaliation motivated by the contents of an individual’s

 speech would deter a person of reasonable firmness from engaging in speech or

 association, Toomer v. Garrett, 155 N.C. App. 462, 477–78, 574 S.E.2d 76, 89 (2002)

 (explaining that the test for a retaliation claim requires a showing “that the plaintiff

 . . . suffer[ed] an injury that would likely chill a person of ordinary firmness from

 continuing to engage” in a “constitutionally protected activity,” including First

 Amendment activities), appeal dismissed and disc. rev. denied, 357 N.C. 66, 579

 S.E.2d 576 (2003); see Evans v. Cowan, 132 N.C. App. 1, 11, 510 S.E.2d 170, 177

 (1999) (determining “there was no forecast of evidence” to support a retaliation

 claim).

¶ 298 Partisan gerrymandering plainly does not place any restriction upon the

 espousal of a particular viewpoint. Rather, redistricting enactments in North

 Carolina are subject to the typical policymaking customs of open debate and
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 compromise. See Berger, 368 N.C. at 653, 781 S.E.2d at 261 (noting that the structure

 of the legislature “ensures healthy review and significant debate of each proposed

 statute, the enactment of which frequently reaches final form through compromise”).

 As such, opponents of a redistricting plan are free to voice their opposition.

¶ 299 Moreover, partisan gerrymandering—and public disdain for the practice—has

 been ubiquitous throughout our state’s history. See Rucho, 139 S. Ct. at 2494

 (“Partisan gerrymandering is nothing new. Nor is frustration with it. The practice

 was known in the Colonies prior to Independence, and the Framers were familiar

 with it at the time of the drafting and ratification of the Constitution.”) As such, it is

 apparent that a person of ordinary firmness would not refrain from expressing a

 political view out of fear that the General Assembly will place his residence in a

 district that will likely elect a member of the opposing party. See Toomer, 155 N.C.

 App. at 477–78, 574 S.E.2d at 89. It is plausible that an individual may be less

 inclined to voice his political opinions if he is unable to find someone who will listen.

 Article I, Sections 12 and 14, however, guarantee the rights to speak and assemble

 without government intervention, rather than the right to be provided a receptive

 audience. See Minn. State Bd. for Cmty. Colls. v. Knight, 465 U.S. 271, 286, 104 S. Ct.

 1058, 1066 (1984) (stating that individuals “have no constitutional right as members

 of the public to a government audience for their policy views”); Johnson v. Wisc.

 Elections Comm’n, 967 N.W.2d 469, 487 (Wis. 2021) (“Associational rights guarantee
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 the freedom to participate in the political process; they do not guarantee a favorable

 outcome.” (emphasis added)).

¶ 300 This Court and the Court of Appeals have interpreted speech and assembly

 rights in alignment with federal case law under the First Amendment. See Petersilie,

 334 N.C. at 184, 432 S.E.2d at 841; Feltman v. City of Wilson, 238 N.C. App. 246,

 252–53, 767 S.E.2d 615, 620 (2014); State v. Shackelford, 264 N.C. App. 542, 552, 825

 S.E.2d 689, 696 (2019). As discussed at length in Rucho, the Supreme Court of the

 United States found no manageable standards for assessing partisan considerations

 in redistricting despite having the similar express protections of speech and assembly

 rights. Rucho, 139 S. Ct. at 2505–07. Therefore, when interpreted in harmony with

 Article II, Sections 3 and 5, it is clear that Article I, Sections 12 and 14 do not limit

 the General Assembly’s presumptively constitutional authority to engage in partisan

 gerrymandering. As with the prior Declaration of Rights clauses, there is nothing in

 the history of the clauses nor the applicable case law that supports the majority’s

 expanded use of them.

 D. Summary

¶ 301 In summary, none of the constitutional provisions cited by plaintiffs prohibit

 the practice of partisan gerrymandering. Each must be read in harmony with the

 more specific provisions that outline the practical workings for governance. Notably,

 Article II, Sections 3 and 5 outline the practical workings of the General Assembly’s
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 redistricting authority. These provisions contain only four express limitations on the

 General Assembly’s otherwise plenary power, none of which address partisan

 gerrymandering. Therefore, because the constitution expressly assigns to the General

 Assembly the authority to redistrict, and this Court is without any satisfactory or

 manageable standards to assess redistricting decisions by the legislative branch, we

 should not and cannot adjudicate partisan gerrymandering claims. The claims here

 present a nonjusticiable political question, and this Court’s intrusion violates

 separation of powers.

¶ 302 Recognizing that there is no explicit constitutional provision supporting its

 position, the majority resorts to an evolving understanding to support its expansive

 approach. The majority cites Article I, Sections 1 and 2 as supporting its statewide

 proportionality argument. See N.C. Const. art. I, § 1 (“We hold it to be self-evident

 that all persons are created equal; that they are endowed by their Creator with

 certain inalienable rights; that among these are life, liberty, the enjoyment of the

 fruits of their own labor, and the pursuit of happiness.”); id. § 2 (“All political power

 is vested in and derived from the people; all government of right originates from the

 people, is founded upon their will only, and is instituted solely for the good of the

 whole.”). Undoubtedly, Article I, Sections 1 and 2, are bedrock constitutional

 principles, recognizing that all are created equal and endowed with God-given rights

 and acknowledging that all political power originates and is derived from the people.
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 Neither provision speaks expressly to limitations on the General Assembly’s

 authority to redistrict. Undeterred, however, the majority reads into our constitution

 a proportionality requirement which appears to be more akin to the European

 parliamentary system, rather than the American system. Furthermore, the “will of

 the people” is expressed in the words of our constitution. The best way to honor the

 “will of the people” is to interpret the constitution as written and as the drafters

 intended. At no point in 1776, 1835, 1868, or 1971 did the drafters or refiners intend

 for the selected provisions of the Declaration of Rights to limit the legislature’s

 authority to redistrict. The limitations the people placed upon the General Assembly

 regarding redistricting are expressly stated in Article II, Sections 3 and 5.

¶ 303 The people expressed their will in the 2020 election, which utilized

 constitutionally compliant maps. Knowing that the 2021 General Assembly would be

 tasked with redistricting, the people elected them. Nonetheless, the majority says it

 is simply “recur[ing] to fundamental principles.” Its analysis and remedies, however,

 are new, not fundamental. Judicially modified constitutional provisions and judicial

 intrusion into areas specifically reserved for the legislative branch are not a

 “recurrence to fundamental principles.” Rather, the decisions of the majority are a

 significant departure threatening “the blessings of liberty.”
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 IV. Remedy

¶ 304 The majority’s remedy mandates its approved political scientists and their

 approaches. Apparently, the majority’s policy decisions guide these selections. The

 majority’s required timeline is arbitrary and seems designed only to ensure this

 Court’s continued direct involvement in this proceeding. Instead of following our

 customary process of allowing the trial court to manage the details of a case on

 remand, the majority mandates a May 2022 primary. No reason is given, nor does

 one exist for not allowing the trial court to manage the remand schedule, including,

 if necessary, further delaying the primary.

¶ 305 The majority defines “partisan advantage” as “achieving a political party’s

 advantage across a map incommensurate with its level of statewide voter support.”

 The majority also defines “political fairness” as “the effort to apportion to each

 political party a share of seats commensurate with its level of statewide support.”

 These definitions demonstrate the majority’s desire to judicially amend our

 constitution to include a requirement of statewide proportional representation. See

 Proportional representation, Black’s Law Dictionary (11th ed. 2014) (“An electoral

 system that allocates legislative seats to each political group in proportion to its

 actual voting strength in the electorate.”) Just as there is no proportionality

 requirement in our constitution, there is none in the Federal Constitution: “Our cases,

 however, clearly foreclose any claim that the Constitution requires proportional
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 representation or that legislatures in reapportioning must draw district lines to come

 as near as possible to allocating seats to the contending parties in proportion to what

 their anticipated statewide vote will be.” Rucho, 139 S. Ct. at 2499 (quoting

 Bandemer, 478 U.S. at 130, 106 S. Ct. at 2809).

¶ 306 The majority asserts that

 [i]f constitutional provisions forbid only what they were
 understood to forbid at the time they were enacted, then
 the free elections clause has nothing to say about slavery
 and the complete disenfranchisement of women and
 minorities. In short, the majority’s [sic] view compels the
 conclusion that there is no constitutional bar to denying
 the right to vote to women and black people.

 This claim is wholly unfounded. Slavery was officially abolished by the Thirteenth

 Amendment to the United States Constitution ratified in 1865. Article I, Section 17,

 of the 1868 state constitution explicitly prohibits slavery. N.C. Const. of 1868, art. I,

 § 17. Similarly, the Nineteenth Amendment to the United States Constitution gave

 women the right to vote. The state constitution was modified accordingly. See N.C.

 Const. art. VI, § 1. As discussed elsewhere, the free election and assembly clauses

 were enacted in 1776 and were never applied to voter qualifications. Free speech and

 equal protection clauses were added to the state constitution in 1971, after equal

 voting qualifications were established. In sum, the issues raised by the majority are

 specifically addressed in the Federal Constitution and the state constitution.
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 V. Conclusion

¶ 307 Historically, to prove an act of the General Assembly is unconstitutional we

 have required a showing that, beyond a reasonable doubt, an express provision of the

 constitution is violated. No express provision of our constitution has been violated

 here. Nonetheless, in the majority’s view, it is the members of this Court, rather than

 the people, who hold the power to alter our constitution. Thus, the majority by judicial

 fiat amends the plain text of Article I, Sections 10, 12, 14, and 19, to empower courts

 to supervise the legislative power of redistricting when met with complaints of

 partisan gerrymandering. Such action constitutes a clear usurpation of the people’s

 authority to amend their constitution. As explicitly stated in our constitution, the

 people alone have the authority to alter this foundational document. N.C. Const. art.

 I, § 3 (“The people of this State have the inherent, sole, and exclusive right of . . .

 altering . . . their Constitution . . . .”); see also id. art. XIII, § 2. Under our

 constitution’s expressed process, the people have the final say. Id. art. XIII, §§ 3–4.

¶ 308 The majority asserts that its holding somehow adheres to “the principle of

 democratic and political equality that reflects the spirits and intent of our Declaration

 of Rights.” It cannot point to any text or case law to support its deciphering of the

 “spirits and intent” of the document because there is nothing in the text of the

 constitution, its history, or our case law that supports the majority’s position. The

 majority simply rules that the North Carolina Constitution now has a statewide
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 proportionality requirement for redistricting. In doing so, the conclusion magically

 transforms the protection of individual rights into the creation of a protected class

 consisting of members of a political party, thereby subjecting a redistricting plan to

 strict scrutiny review. The majority presents various general views about what

 constitutes unconstitutional partisan gerrymandering and provides a variety of

 observations about what the constitution requires. Absent from the opinion is what

 is meant by “substantially equal voting power on the basis of partisan affiliation.”

 Any discretionary decisions constitutionally committed to the General Assembly in

 the redistricting process seem to have been transferred to the Court.

¶ 309 The vagaries within the opinion and the order only reinforce the holding of the

 Supreme Court in Rucho that there is no neutral, manageable standard. The four

 members of this Court alone will approve a redistricting plan which meets their test

 of constitutionality. This case substantiates the observations of the Supreme Court

 of the United States as to the many reasons why partisan gerrymandering claims are

 nonjusticiable. The Court observed that redistricting invariably involves numerous

 policy decisions. It noted that “[p]artisan gerrymandering claims invariably sound in

 a desire for proportional representation,” Rucho, 139 S. Ct. at 2499, and that

 “plaintiffs inevitably ask the courts to make their own political judgment about how

 much representation particular political parties deserve—based on the votes of their

 supporters—and to rearrange the challenged districts to achieve that end,” id. In
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

 other words, plaintiffs ask the courts “to reallocate political power between the two

 major political parties.” Id. at 2507. Despite these well-reasoned warnings, the

 majority of this Court proceeds, and in the process, proves the Supreme Court’s point.

¶ 310 The Supreme Court also warned of the need for courts to provide a clear

 standard so legislatures could “reliably differentiate unconstitutional from

 ‘constitutional political gerrymandering.’ ” Id. at 2499 (quoting Cromartie, 526 U.S.

 at 551, 119 S. Ct. at 1551). It observed that:

 “Fairness” does not seem to us a judicially manageable
 standard. . . . Some criterion more solid and more
 demonstrably met than that seems to us necessary to
 enable the state legislatures to discern the limits of their
 districting discretion, to meaningfully constrain the
 discretion of the courts, and to win public acceptance for
 the courts’ intrusion into a process that is the very
 foundation of democratic decisionmaking.

 Id. at 2499–500 (alteration in original) (quoting Vieth, 541 U.S. at 291, 124 S. Ct. at

 1784 (opinion of Scalia, J.)). The majority ignores all these warnings, fails to

 articulate a manageable standard, and seems content to have the discretion to

 determine when a redistricting plan is constitutional. This approach is radically

 inconsistent with our historic standard of review, which employs a presumption that

 acts of the General Assembly are constitutional, requiring identification of an express

 constitutional provision and a showing of a violation of that provision beyond a

 reasonable doubt.
 HARPER V. HALL

 2022-NCSC-17

 Newby, C.J., dissenting

¶ 311 The Supreme Court cautioned that embroiling courts in cases involving

 partisan gerrymandering claims by applying an “expansive standard” would amount

 to an “unprecedented intervention in the American political process.” Id. at 2498

 (quoting Vieth, 541 U.S. at 306, 124 S. Ct. at 1793 (opinion of Kennedy, J.)). Sadly,

 the majority does just that. I respectfully dissent.

 Justices BERGER and BARRINGER join in this dissenting opinion.